UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION
www.flsb.uscourts.gov

In re:                                                          Case No. 09-36379-PGH
                                                                Chapter 11
Palm Beach Finance Partners, L.P. and
Palm Beach Finance II, L.P.,

       Debtor(s).
_____/

Barry E. Mukamal, as Liquidating Trustee,

       Plaintiff,

                                  Adv. Case. No. 11-02940-PGH

v.

The National Christian Charitable Foundation, Inc.,
d/b/a The National Christian Foundation, Inc.,

       Defendant.
_____/

## PLAINTIFF'S MOTION FOR PARTIAL
## SUMMARY JUDGMENT REGARDING CHOICE OF LAW

Barry E. Mukamal ("***Plaintiff***" or "***Liquidating Trustee***"), in his capacity as Liquidating

Trustee for the Palm Beach Finance Partners Liquidating Trust and the Palm Beach Finance II

Liquidating Trust (collectively, the "***Liquidating Trusts***"), by and through undersigned counsel

and pursuant to Fed. R. Civ. P. 56 and Fed. R. Bank. P. 7056, files his Motion for Partial

Summary Judgment (the "***Motion***"), in accordance with this Court's Agreed *Ex Parte* Order

Granting Plaintiff's Agreed *Ex Parte* Motion to Reset Certain Filing and Disclosure

Requirements for Pretrial and Trial [ECF No. 39] ("***Order Granting Leave***"), and seeks entry of

a partial summary judgment on the application of Georgia, or alternatively, Florida, law to the

claims brought by the Plaintiff in the instant proceedings.   In support of the Motion, the Plaintiff

states as follows:

I.    **Introduction**

This is an action to recover, as constructively fraudulent, transfers made to The National

Christian Charitable Foundation d/b/a The National Christian Foundation, Inc. ("***NCF***" or

"***Defendant***," and, together with Plaintiff, the "***Parties***").  The Parties dispute whether the action

is governed by Minnesota, Georgia or Florida law, but agree that there is no genuine issue of

material fact as to the facts relevant to the Court's determination on the issue.  NCF seeks to

apply Minnesota law, as opposed to the law of its own state, because it seeks to improve its

position in the litigation for a potential better result.  The facts and applicable legal standard,

however, do not support its endeavor to do so.   As will be demonstrated below, the

constructively fraudulent transfers at issue herein were made after the transferee (or its

representatives) (i) initiated contact and sought out, in Georgia, the services of NCF, a Georgia

non-profit, and then (ii) sent funds to NCF in Georgia, which were owned by NCF in Georgia

upon receipt.   No one from NCF ever travelled to Minnesota, or performed any action in

Minnesota, in connection with the transfers (or the set-up of the NCF fund to which they were

made).  Moreover, this proceeding was commenced by a Florida resident, in his capacity as a

fiduciary for two Florida entities and their creditors, in a Florida bankruptcy court.  As such, and

as will be demonstrated in detail below, Plaintiff asserts that the action is properly governed by

Georgia, or alternatively, Florida, law.

II.    **Relevant Procedural History**

On November 29, 2011, the Liquidating Trustee filed suit against Metro Gem, Inc.

("***MGI***") and Frank E. Vennes, Jr. ("***Mr. Vennes***," and together with MGI,, the "***Vennes***

Parties"), Adversary Case No. 11-03041-PGH-A ("*Vennes Action*"), seeking to avoid and recover transfers made by the Palm Beach Funds to the Vennes Parties and to hold the Vennes Parties liable in tort for material misrepresentations made by them to the Palm Beach Funds. [Adv. Case No. 11-03041, ECF No. 1]. The Vennes Action is currently stayed by Orders entered by District Judge Ann D. Montgomery in the United States District Court for the District of Minnesota ("*Minnesota District Court*").[1]

On February 1, 2013, Mr. Vennes entered into a plea agreement with the United States of America as to criminal charges brought against him in the Minnesota District Court in connection with his conduct in relation to the Thomas Petters' fraud.[2] In particular, Mr. Vennes pled guilty to two counts for aiding and abetting securities fraud and money laundering. *Id.* After extensive pre-sentencing briefing by Mr. Vennes and the U.S.A., on October 18, 2013, Mr. Vennes was sentenced to 15 years of imprisonment.[3]

Concurrently with commencing his action against the Vennes Parties, the Liquidating Trustee also commenced suit against NCF, Adv. Case No. 11-2940-PGH ("*Adversary Proceeding*"), seeking to avoid transfers made to or for the benefit of NCF by MGI. [ECF No. 1].

## III.    Material Facts Which are Not in Dispute

Since the filing of the Adversary Proceeding, the parties have been engaged in various discovery efforts, including, but not limited to, the taking by Plaintiff of the depositions of nine (9) current or former employees of the Defendant. As a result of these discovery efforts, the parties agree that the facts relevant to a resolution of the law applicable to the Plaintiff's claims

---

[1] *See, e.g.*, D. Minn., Case No. 08-cv-05348, ECF Nos. 944, 1762, 2187.
[2] *See, e.g.*, D. Minn., Case No. 11-cr-00141, ECF Nos. 166, 167.
[3] *See, e.g.*, D. Minn., Case No. 11-cr-00141, ECF Nos. 290, 291.

have been established.  As such, by agreement between the Parties, the Liquidating Trustee has caused to be filed in this Adversary Proceeding the following deposition transcripts, with exhibits,[4] for each of the following NCF current or former personnel: (i) Terrill A. Parker [ECF No. 56] (the "*Parker Depo*");[5] (ii) Pamela Segars Pugh [ECF No. 50] (the "*Pugh Depo*");[6] (iii) Thomas M. Conway [ECF No. 55] (the "*Conway Depo*");[7] (iv) David Harrold Wills [ECF No. 54] (the "*Wills Depo*");[8] (v) David Johnson [ECF No. 58] (the "*Johnson Depo*");[9] (vi) Timothy Townsend [ECF No. 57] (the "*Townsend Depo*");[10] (vii) Jerry Wallace [ECF No. 51] (the "*Wallace Depo*");[11] (viii) Mary Carroll [ECF No. 52] (the "*Carroll Depo*");[12] and (ix) Ken Bowers [ECF No. 53] (the "*Bowers Depo*").[13]  Finally, the Liquidating Trustee has caused to be filed in this action the Liquidating Trustee's responses to the Defendant's requests for

---

[4] Per agreement between the parties, and to avoid unnecessary duplication or confusion, the exhibits utilized at the depositions were numbered sequentially as used and one complete set of all exhibits has been filed in this action. *See* ECF No. 59. The exhibits consist largely of documents produced by NCF to the Plaintiff and counsel for NCF has stipulated to their authenticity and admissibility for purposes of the Motion.  *See, e.g., Id.*; Pugh Depo at 142:25-144:7. Citations to such exhibits herein shall be made using the following nomenclature: "Dep. Ex. __."

[5] Terry Parker is the co-founder and Chairman of the Board of NCF and his deposition was taken both individually and as NCF's corporate designee pursuant to Rule 30(b)(6) with respect to NCF'S relationship with and any communications with any of the Vennes/Fidelis Parties (as defined below).  *See* Dep. Ex. 64; Parker Depo at 6:22-7:23.

[6] Pamela Pugh is a former employee of NCF deposed pursuant to a Rule 7030 subpoena. *See* Pugh Depo at 8:16-23.

[7] Tom Conway is a former employee of NCF deposed pursuant to a Rule 7030 subpoena. *See* Dep. Ex. 60; Conway Depo at 7:13-24.

[8] David Wills is the President of NCF deposed pursuant to a Rule 7030 subpoena. *See* Wills Depo at 6:12-16.

[9] David Johnson is the CFO of NCF and his deposition was taken both individually and as NCF's corporate designee pursuant to Rule 30(b)(6) with respect to NCF'S banking relationships and bank accounts. *See* Dep. Ex. 80; Johnson Depo at 6:24-7:10.

[10] Tim Townsend is NCF's general counsel and his deposition was taken both individually and as NCF's corporate designee pursuant to Rule 30(b)(6) with respect to the following issues: (i) NCF's organizational and ownership structure; (ii) NCFs communications/interaction with the Internal Revenue Service or other federal, state or local governmental authorities; and (iii) any deliberations/discussions of NCF's Board of Directors (or committee thereof) relating to the Transfers (as defined below).  *See* Dep. Ex. 67; Townsend Depo at 6:14-7:24.

[11] Jerry Wallace is former employee of NCF deposed pursuant to a Rule 7030 subpoena.  *See* Dep. Ex. 25; Wallace Depo at7:16-8:8.

[12] Mary Carroll is an employee of NCF deposed pursuant to a Rule 7030 subpoena.

[13] Ken Bowers is the COO of NCF and his deposition was taken both individually and as NCF's corporate designee pursuant to Rule 30(b)(6) with respect to the following issues: (i) NCF's operations; (ii) NCF's policies and procedures; (iii) any due diligence done by NCF on any of the Vennes/Fidelis Parties; and (iv) any monies received by NCF from any of the Vennes/Fidelis Parties.  *See* Bowers Depo at 6:9-13.

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3200 SOUTHEAST FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA  33131 • TELEPHONE (305) 358-6363
{Firm Clients/MGEM/MGEM-28/01483766.DOCX.}

admissions [ECF No. 60] ("***Plaintiff's RFA Responses***") and Mr. Vennes' plea agreement from [ECF No. 61] ("***Vennes Plea***").

Through one or more of the aforementioned items, the pleadings filed in this Adversary Proceeding or the Palm Beach Funds' chapter 11 cases, or through items that are otherwise a matter of public record, the following facts material to resolution of this Motion for summary judgment are not in dispute:

1.      In 1995, Mr. Vennes founded MGI, and was at all times its owner and CEO.  *See* Vennes Plea [ECF No. 61], p. 3-4.  Starting in or about 1995 and continuing until in or about September 2008, Mr. Vennes, through MGI, raised money from investors to invest in Petters Company, Inc. ("***PCI***") notes.  *See id.*

2.      The primary business of MGI from 1995 until 2008 was obtaining funds for Thomas J. Petters ("***Petters***") for investment in PCI notes. *See id.*, at p. 4. The transactions underlying the PCI notes, however, were fictitious and PCI's inventory finance operation was nothing but a Ponzi scheme.  *See id.*, at p. 3.

3.      Prior to MGI and his involvement in the Petters' Ponzi scheme, Mr. Vennes was a convicted felon.  He pled guilty, in 1987, to one count of using an interstate communications device in furtherance of a sale of cocaine, one count of a firearms crime, and one count of conspiracy to commit money laundering.  *See* Case Nos. C3-87-23-01, C3-87-37-01, C3-87-38-01, D. Minn.  He was incarcerated at the Federal Correctional Institution (FCI) in Sandstone, Minnesota from 1987 to 1990.  *See* Case No. 11-cr-00141, D. Minn., ECF No. 244, p. 4.

4.      NCF was founded in Atlanta, Georgia in 1982 by three Atlanta professionals: (i) tax attorney Terrill A. Parker ("***Mr. Parker***"), (ii) "leading financial advisor Ron Blue," and (iii) "best-selling author and entrepreneur, Larry Burkett," for the purpose of introducing

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3200 SOUTHEAST FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA  33131 • TELEPHONE (305) 358-6363
{Firm Clients/MGEM/MGEM-28/01483766.DOCX.}

"innovative, tax-wise solutions for transferring wealth to God's Kingdom." *See* Dep. Ex. 26, p. 6; Dep. Ex. 27, p. 7; Parker Depo at 19:13-19.

5.      NCF was incorporated in Georgia. *See* Parker Depo at 156; Townsend Depo at 23:22-23.

6.      NCF is a Georgia non-profit corporation, and has been at all times since its inception in 1982. *See id.*; Parker Depo at 155:23-156:1; Wills Depo at 38:15-21; Conway Depo at 91:10-12; Dep. Ex. 56 at p. 3.

7.      NCF had its headquarters and principal place of business in Georgia at all times since its inception. *See* Parker Depo at 30-31, 156; Wills Depo at 17:19-18:16.

8.      Since its inception, NCF's main operations have occurred in Georgia at its headquarters in Georgia. *See Id.*

9.      NCF's computer systems are housed in Georgia. *See* Parker Depo at 156.

10.     NCF receives funds into and sends funds out of its bank accounts in the state of Georgia. *See* Parker Depo at 156; Johnson Depo at 22-23.

11.     NCF's Board of Directors meets at its headquarters in the state of Georgia. *See* Parker Depo at 156.

12.     NCF is the nation's largest provider of donor-advised funds ("***DAFs***") focused primarily on Christian givers. *See* Dep Ex. 27 at p. 7.   A DAF is a fund set up by an individual or entity with a 501(c)(3) public charity in which the donor is able to make tax-deductible gifts into the DAF, and then recommend grants from the DAF over time. *See* Dep. Ex. 27 at p. 12. Contributions to the DAF are "irrevocable and nonrefundable" when made and, "to the extent allowed by applicable federal and state law, are immediately deductible by the [g]iver as a charitable contribution." *See* Dep. Ex. 56 at p. 3.  Thereafter, the giver retains merely the right to

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3200 SOUTHEAST FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA  33131 • TELEPHONE (305) 358-6363
{Firm Clients/MGEM/MGEM-28/01483766.DOCX.}

recommend, but not control, the grant/distribution of funds from the DAF to other charitable organizations throughout the United States." *See id.* at p. 4; Dep. Ex. 26 at p. 30; Dep. Ex. 27 at p. 31.  NCF has ultimate dominion and control over the funds once they are contributed to the DAF and will only give money from its DAFs (which it calls "giving funds") to charitable organizations that fall within its guidelines.  *See* Dep. Ex. 56 at p. 4; Dep. Ex. 26 at p. 30-31; Dep. Ex. 27 at p. 31-32; Dep. Ex. 3 at p. 2, 4;  Parker Depo at 91:5-21; 109:21-110:4; Townsend Depo at 71:3-72:20.  For example, NCF will not give money to any organization whose mission is deemed by NCF to "be antithetical to the Christian faith," even if the individual or entity establishing the DAF recommends it.  *See* Dep. Ex. 3 at p. 7; Dep. Ex. 56 at p. 4, 16-17; Parker Depo at 94:16-95:7; 159:2-160:18.

13.     In late 2004 or early 2005, Joseph Smith ("***Mr. Smith***"), President of the Fidelis Foundation ("***Fidelis***"), contacted Tom Conway of NCF ("***Mr. Conway***") to inquire as to whether NCF "was able to accept non-liquid gifts from different individuals or even from organizations." Conway Depo at 26:11-28:21. According to Mr. Conway, Mr. Smith was specifically inquiring as to whether NCF could accept "promissory notes in lieu of cash." *Id.* at 26:18-27:7.  Mr. Conway informed Mr. Smith that they could accept "anything that turns into cash someday." *Id.* at 27:3-7.

14.     Following that conversation, on or about March 14, 2005, NCF received a letter at its headquarters in Georgia from Fidelis, signed by Mr. Smith, enclosing (i) an application to open an NCF giving fund and (ii) two checks totaling $400,000 (the "***Smith Letter***").  *See* Dep. Ex. 1; Dep. Ex. 2.  Upon receipt, NCF opened, at its offices in Atlanta, Georgia, a donor-advised fund titled The Fidelis Foundation Fund, Account ID 263203 (the "***Fidelis Fund***").  *See id.*; Parker Depo. at 195:21-196:12, 200:1-14.

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3200 SOUTHEAST FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA  33131 • TELEPHONE (305) 358-6363
{Firm Clients/MGEM/MGEM-28/01483766.DOCX.}

15. The $400,000 in checks received by NCF to open the Fidelis Fund were deposited in an NCF account in Atlanta, Georgia and comingled with other NCF funds from other sources. *See* Dep. Ex. 1; Bowers Depo at 100:25-101:23; Wills Depo at 94:20-95:13; Townsend Depo at 72:2-6; Parker Depo at 156:10-22; 161:19-20; Johnson Depo at 22:8-24:6.

16. The Smith Letter also states as follows: "Craig Howse and I look forward to meeting you and Terry Parker on Monday April 18, 2005." Dep. Ex. 1; Conway Depo at 30:21-31:1.   According to both Mr. Conway and Mr. Parker, that meeting did in fact take place on April 18, 2005 at NCF's offices in Georgia (the "***Georgia Meeting***"). *See* Conway Depo at 30:24-31:3; Parker Depo at 170-71; Dep. Ex. 41.   The attendees at the Georgia Meeting were (i) Mr. Parker, Founder and then-CEO of NCF, (ii) Mr. Conway of NCF, (iii) Mr. Smith, and (iv) Craig Howse, Esq. ("***Mr. Howse***").   *See* Conway Depo at 30-31; Parker Depo at 171:1-12, 191:12-21, Dep. Ex. 41; Dep. Ex. 61.   At the time of the Georgia Meeting (and for all times relevant to the issues presented herein), Mr. Howse was legal counsel to both Fidelis and the Vennes Parties. *See* Parker Depo at 184:20-185:9; Conway Depo at 63:2-5; Dep. Ex. 9 (NCF000022) ("Mr. Vennes, our client. . ."); Dep. Ex. 10 (NCF000029); Dep. Ex. 62.

17. Mr. Smith and Mr. Howse came to Georgia for the Georgia Meeting to discuss with NCF the problem Fidelis was having meeting its "public support test" under applicable IRS regulations[14] as a result of certain donations Fidelis wished to receive from it's major donor, Mr.

---

[14] Under applicable IRS regulations, 501(c)(3) entities fall into one of two categories: a private foundation or a public charity. Basically, all 501(c)(3)'s are private foundations unless they fall into one of the excepted categories set forth in IRC 509(a)(1)-(4), which includes churches, hospitals, colleges and universities, but also "organizations that receive substantial support from a governmental unit or from the general public." *See* IRC 509(a)(1) and 170(b)(1)(A)(vi). Such organizations are commonly referred to as public charities and the Internal Revenue Code contains detailed standards that must be met and maintained by such entities in order to continue to be treated as public charities. One such test is known as the "public support" test, which measures the percentage of donations the entity receives from the general public, as opposed to a single major donor/source of funding. Essentially, in order to meet the public support test, a charity must receive at least one-third of their funding from the general public (which can include other public charities). The distinction is critical to most charities because a special

Vennes (and his company, MGI), and seeking NCF's assistance in accomplishing a work-around of the applicable IRS regulations by sending the donations to NCF, a public charity, with the recommendation that NCF would then donate the money to Fidelis. *See* Dep. Ex. 41; Dep. Ex. 61; Parker Depo at 177:21-23, 184:20-25, 185:3-9, 191:18-21, 211:16-21; Conway Depo at 38:7-40:13.

18.     According to Mr. Parker, and as demonstrated by the preceding paragraphs (and the documents and testimony cited therein), contact with NCF was initiated by Mr. Howse and Mr. Smith - NCF did not promote its services to any of Mr. Howse, Fidelis, Mr. Vennes, MGI or Mr. Smith (collectively, the "***Vennes/Fidelis Parties***") or otherwise seek out or solicit their use of NCF and its giving funds. *See* Parker Depo at 191:18-21; Conway Depo at 26:13-17. Moreover, the Georgia Meeting is the only face-to-face meeting that ever occurred between NCF and any of the Vennes/Fidelis Parties. *See* Parker Depo at 218:21-24; Conway Depo at 31:17-20.

19.     Following further correspondence and phone conversations between NCF and Messers. Smith and Howse,[15] on or about December 26, 2005, NCF prepared (in Georgia) an internal Gift Acceptance Memorandum regarding a possible promissory note gift from MGI. *See* Dep. Ex. 6 (the "***Gift Acceptance Memo***"); Dep. Ex. 7; Conway Depo at 67:15-68:21; Bowers Depo at 64:2-25; Parker Depo at 244:18-245:17; Pugh Depo at 115. Consistent with the

---

regulatory scheme applies to private foundations but not to public charities. Specifically, the private foundation laws impose a 2 percent tax on investment income, limit self-dealing and business holdings, require annual distributions, prohibit lobbying entirely, and restrict the organization's operations in other ways. In addition, large donors to a private foundation have a lower ceiling on the amount of deductible gifts they can claim each year. As a result, public charity status is preferable to private foundation status. *See* www.irs.gov; G. Lessard, *Public Charity Status Simplified (a little)*, 2008, *available at* http://www.insightcced.org/uploads/publications/legal/public_charity_status_simplified.pdf; Parker Depo at 170-176; Pugh Depo at 124:21-125:12; Bowers Depo at 28:24-32:20.

[15] *See* Dep. Ex. 61; Conway Depo at 57:18-20.

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3200 SOUTHEAST FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA  33131 • TELEPHONE (305) 358-6363
{Firm Clients/MGEM/MGEM-28/01483766.DOCX.}

discussions that took place at the Georgia Meeting (and thereafter) between NCF and the Vennes/Fidelis Parties, the Gift Acceptance Memo:

  a. describes the proposed gift of a "[p]romissory note (Face Value of $2,000,000, 22% rate simple interest per annum, due at maturity) from Metro Gem, Inc. owned by Frank Vennes, Jr. with security interest in merchandise and accounts receivable as named in Exhibit A with ability to call the note due upon default"; and

  b. states that "Frank Vennes is a major donor to the Fidelis Foundation.  Public support test is of concern if the gift goes directly to Fidelis."

*Id.*; Conway Depo at 69:19-70:2.

  20. Sometime between December 26, 2005 and December 30, 2005, and because NCF was not comfortable with a number of issues surrounding the proposed gift of the promissory note, the proposed transfer from MGI changed from an MGI promissory note to cash. *See* Dep. Ex. 8; Parker Depo at 212:15-215:12, 221:13-225:4, 247:3-248:18; Pugh Depo at 153:19-155:21; Conway Depo at 78:2-22.

  21. By letter dated December 30, 2005, NCF received, at its offices in Georgia, a giving fund application (the "***Vennes Fund Application***") and a $4,000,000 MGI check to open a donor-advised fund.  *See* Dep. Ex. 9, 10.  The Vennes Fund Application and check were sent to NCF by Mr. Howse, as counsel to the Vennes Parties.  *See id.*; Wills Depo at 161:20-163:24.  The giving fund application form is an NCF form that originated from NCF's offices in Georgia and was returned completed to NCF's offices in Georgia.  *Id.*; Dep. Ex. 3 at p. 2 (section III.B.); Dep. Ex. 56 at p. 4 ("An NCF Giving Fund may be established by completing an application online at www.nationalchristian.com . . . and delivering it, together with an initial irrevocable

contribution, to NCF. . .”); Wills Depo at 138:25-139:4; Parker Depo at 158:13-159:1.   The

signature block on the Vennes Fund Application contains the following acknowledgment:

> I acknowledge that I have read The National Christian Foundation Program Guidelines
> and agree to the terms and/or conditions described therein.  I understand that in order to
> qualify as a deductible contribution for income tax purposes, The National Christian
> Foundation will fully own all contributed assets, and that. . .my communication
> regarding the Fund is advisory only and that ultimate decisions and control, relative to
> each of these issues, are that of The National Christian Foundation.

Dep. Ex. 10 at NCF000030; Dep. Ex. 11 at NCF000034; Bowers Depo at 140:25-143:13; Wills

Depo at 140:10-143:13.  Consistent with this acknowledgment in the Vennes Fund Application,

NCF’s program guidelines and internal policies and procedures also contain numerous references

to the fact that NCF is the absolute and unconditional owner of all assets in its giving funds.[16]

22.     Upon receipt of the Vennes Fund Application, NCF opened a giving fund titled

The Vennes Charitable Fund, Account ID 320189 (the “***Vennes Fund***”).  *See* Pugh Depo at

170:9-171:1; Dep. Ex. 12; Dep. Ex. 45; Dep. Ex. 82.  The $4,000,000 check to open the Vennes

Fund (the “***First Transfer***”), was drawn on MGI’s account at Eagle Crest Capital Bank, a

division of Home Federal Savings Bank, located in Rochester, Minnesota (“***ECCB***”).  *See* Dep.

Ex. 9 at NCF000024.  NCF deposited the December 30, 2005 Transfer into NCF’s contribution

---

[16] *See* Dep. Ex. 3 at NCF000138 (“All activities of NCF and all participation by Donor(s) in the donor advised fund program of NCF are subject to these Program Guidelines. . .”), NCF000139 (“NCF exercises complete dominion and control of all contributed assets. . . .”), NCF000141 (“NCF is the absolute and unconditional owner of all assets in all NCF Giving Funds. . . .and all contributions to an NCF Giving Fund . . .shall be irrevocable and non-refundable.”), NCF000144 (“Tax laws require that the Donor’s charitable gifts be irrevocable and unconditional in order for a Donor to receive the associated tax benefits of a charitable deduction.”); Dep. Ex. 26 at NCF000433 (“as the absolute owner of contributed funds, NCF bears the ultimate responsibility for their disbursement”), NCF000435 (“Tax laws require that the Donor’s charitable gifts be irrevocable and unconditional in order for a Donor to receive the associated tax benefits of a charitable deduction. . . .Your contribution to NCF is an irrevocable gift; therefore, all assets in a Giving Fund are the property of the Program.”); Dep. Ex. 27 at NCF000329 (same); Dep. Ex. 56 at p. 3 (“Contributions to NCF are irrevocable and nonrefundable . . .”), p. 4 (“An NCF Giving Fund may be established by completing an application online at www.nationalchristian.com . . . and delivering it, together with an initial irrevocable contribution, to NCF. . . .NCF exercises complete dominion and control of all contributed assets. . . .NCF is the absolute and unconditional owner of all assets in all NCF Giving Funds.  All contributions to an NCF Giving Fund shall be irrevocable and non-refundable.”); Parker Depo at 91:5-21; 94:18-95:7; 109:21-110:4, 111:21-112:12, 157:1-5, 167:7-15; Conway Depo at 91:13-19, 95:6-96:2; Townsend Depo at 71:3-72:20; Wills Depo at 41:15-44:20.

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3200 SOUTHEAST FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA  33131 • TELEPHONE (305) 358-6363
{Firm Clients/MGEM/MGEM-28/01483766.DOCX.}

account at its bank in Georgia (the "*NCF Account*"), comingled with other funds owned by NCF.  *See* Dep. Ex. 13; Dep. Ex. 83; Johnson Depo at 36:10-15; Parker Depo at 161:19-20.

23.    On September 27, 2006, MGI made a second transfer to NCF, when it wired $610,000 from its account at ECCB in Minnesota to NCF's bank account in Georgia (the "*Second Transfer*").  *See* Dep. Ex. 18, at NCF000059; Dep. Ex. 17; Dep. Ex. 19; Dep. Ex. 46; Dep. Ex. 84; Dep. Ex. 87; Johnson Depo at 47:6-17.

24.    On October 2, 2006, MGI made a third transfer to NCF, when it wired $400,000 from its account at ECCB in Minnesota to NCF's bank account in Georgia (the "*Third Transfer*").  *See* Dep. Ex. 20; Dep. Ex. 21 at NCF000080; Dep. Ex. 47; Dep. Ex. 85; Dep. Ex. 87; Johnson Depo at 52:5-9.

25.    On December 19, 2006, MGI made a fourth transfer to NCF, when it wired $4,000,000 from its account at ECCB in Minnesota to NCF's bank account in Georgia (the "*Fourth Transfer*," and collectively with the First Transfer, the Second Transfer and the Third Transfer, the "*Transfers*").  *See* Dep. Ex. 22 at NCF000090; Dep. Ex. 23.

26.    The Vennes Fund and the monies therein were received by NCF in Georgia, and were owned and held by NCF in Georgia.  *See* Bowers Depo at 100:25-102:18; Johnson Depo at 36:9-38:25; Parker Depo at 156.

27.    The Palm Beach Funds' chapter 11 proceedings are pending in this Court, which retains jurisdiction relating thereto.

28.    The offices of the above-captioned chapter 11 debtors (the "*Palm Beach Funds*") were, at all times, located in Florida.  *See* Case No. 09-36379, ECF No. 1, Case No. 09-36396, ECF No. 1.

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3200 SOUTHEAST FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA  33131 • TELEPHONE (305) 358-6363
{Firm Clients/MGEM/MGEM-28/01483766.DOCX.}

29.    The Liquidating Trusts were formed in accordance with a plan of liquidation filed in and confirmed by order of this Florida court and are governed by Florida law.  *See* Case No. 09-36379, ECF No. 246; ECF No. 246-2, p. 70; 97.

30.    The Plaintiff is a Florida resident appointed by this Florida Court to oversee the liquidation of the Palm Beach Funds.  *See id.*

## IV.    Memorandum of Law and Argument[17]

### A. The Conflict Between Minnesota and either Georgia or Florida Law is a False Conflict Because Minnesota Has No Interest in This Dispute

Under any choice of law analysis, the Court must first determine whether the potentially applicable laws actually conflict.  If no conflict exists, the Court need not conduct a choice-of-law analysis.  *See, e.g., Cooper v. Meridian Yachts, Ltd.*,  (11th Cir. 2009) (a false conflict occurs when "the laws of the competing states are substantially similar") (quoting *Fioretti v. Masschusetts Gen. Life Ins. Co.*, 53 F.3d 1228, 1234 (11th Cir. 1995)); *Covington v. Alban Offshore Ltd.*, 650 F.2d 556, 558-59 (5th Cir. 2011) ("[W]e need not decide in this case whether those principles should be drawn from Texas law or federal law, because both bodies of law lead us to the same conclusion."); *Schneider Nat'l Transp. v. Ford Motor Co.*, 280 F.3d 532, 536 (5th Cir. 2002) ("If the laws of the states do not conflict, then no choice-of-law analysis is necessary.").

Here, there is no conflict of law with regard to the application of fraudulent conveyance law as Minnesota, Georgia and Florida are all very similar in that regard.  The only arguable conflict of law exists because Minnesota's Uniform Fraudulent Transfer Act ("*MUFTA*")[18] was amended in 2012 to shorten to 2 years the time period within which a contribution made to a

---

[17] In the interests of brevity, and given the Court's thorough familiarity therewith, the Liquidating Trustee has omitted a recitation of the standard for summary judgment.

[18] Minn. Stat. § 513.41 *et seq.*

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3200 SOUTHEAST FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA  33131 • TELEPHONE (305) 358-6363
{Firm Clients/MGEM/MGEM-28/01483766.DOCX.}

qualified charitable organization can be recovered (the "**MUFTA Amendment**").[19]  Moreover, although Georgia's Uniform Fraudulent Transfer Act ("**GUFTA**")[20] and Florida's Uniform Fraudulent Transfer Act ("**FUFTA**")[21] were amended in 2013 to include a similar limitation, only the MUFTA Amendment purports to have retroactive applicability[22] and would therefore be arguably applicable to this case (which was commenced in 2011, prior to the enactment of any of the amendments). The transfers at issue herein occurred between December of 2005 and December of 2006, which is more than two, but less than four, years prior to the Petition Date (November 30, 2009).  Moreover, while Plaintiff disputes that NCF should be protected, even under MUFTA, by the MUFTA Amendment,[23] Plaintiff does not dispute the fact that NCF is and was, at the time of the transfer, a tax-exempt § 501(c)(3) entity.  As such, there is a potential difference here between application of MUFTA and either GUFTA or FUFTA. However, for the reasons set forth below, this difference is not sufficient to create a conflict for choice of law purposes in the instant case.

---

[19] Minnesota's Governor signed legislation on April 3, 2012, four months after the Adversary Proceeding was commenced, redefining the term "transfer" under the MUFTA. While claims under the statute are generally subject to a six-year statute of limitations, under the new amendment a transfer "does not include a contribution of money ... made to a qualified charitable or religious organization or entity unless the contribution was made *within two years of commencement of an action* under [MUFTA]." Minn. Stat. § 513.41(12) (emphasis added). This amendment expressly states that it applies to any "cause of action existing on, or arising on or after" its effective date, April 4, 2012— that is, the amendment was made retroactively applicable. 2012 Minn. Laws 151.  While not yet at issue, Plaintiff asserts that this amendment is either inapplicable to the Transfers or unenforceable on various grounds and expressly reserves its rights to assert any and all such arguments in the event that the Court finds that Minnesota law applies.

[20] O.C.G.A. § 18-2-70 *et seq.*

[21] Fla. Stat. § 726.101 *et seq.*

[22] As noted above, the MUFTA Amendment contains express language making it retroactively applicable.  The 2013 amendments to GUFTA and FUFTA, on the other hand, contain no such language.  Moreover, the Georgia Supreme Court has held that "[g]enerally statutes prescribe for the future and that is the construction to be given unless a clear contrary intention is shown." *Polito v. Holland*, 258 Ga. 54, 55 (1988).  Likewise, in Florida, it is also clear that, in the absence of an explicit legislative expression to the contrary, a substantive law is to be construed as having prospective effect only.  *See State v. Lavazzoli*, 434 So.2d 321 (Fla. 1983); *Seddon v. Harpster*, 403 So. 2d 409 (Fla. 1981); *Trustees of Tufts College v. Triple R Ranch, Inc.*, 275 So. 2d 521 (Fla. 1973); *Young v. Altenhaus*, 472 So. 2d 1152, 1154 (Fla. 1985) ("This rule mandates that statutes that interfere with vested rights will not be given retroactive effect.").

[23] Fact discovery on these matters is not yet complete, and, as such, they are not yet ripe for the Court's consideration.

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3200 SOUTHEAST FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA 33131 • TELEPHONE (305) 358-6363
{Firm Clients/MGEM/MGEM-28/01483766.DOCX.}

Under the applicable case law, notwithstanding the difference in retroactive application of the MUFTA amendment, the Court must still determine, prior to engaging in a conflict-of-laws analysis, if this difference is a true conflict or a false conflict.  *See Fioretti v. Mass. Gen. Life Ins. Co.,* 53 F.3d 1228, 1234 (11th Cir. 1995);  *Federacion Nacional Autonoma de Futbol de Honduras v. Traffic Sports USA, Inc.,* No. 08–21505–MC, 2008 WL 4056295, at *3 (S.D. Fla. Aug. 29, 2008) (citing *Tune v. Philip Morris Inc.,* 766 So. 2d 350, 352 (Fla. 2d DCA 2000)).  In this case, NCF asserts a "false conflict" because, as a *Georgia* corporation and the only defendant in this action, rather than seek to have its own state law (Georgia) apply, it seeks to have a foreign state's law (Minnesota) apply because it believes that law to be more favorable. As set forth below, this is nothing but a "false conflict," as there is no defendant in this action from Minnesota such that the state of Minnesota would have an actual interest in the dispute.

A "false conflict" between laws exists "if the state with a potentially conflicting law does not have an actual interest in the dispute." *Janvey v. Alguire, et al.,* No. 3:09-cv-00724-N-BL, 2013 WL 2451738, at *3 (N.D. Tex. Jan. 22, 2013), *appeals dismissed* (5th Cir. 13-10194, 13-10195, 13-10102, 13-10100) (Jun 13, 2013), *appeals dismissed* (5th Cir. 13-10212, 13-10204) (Jul 15, 2013) (*citing Duncan v. Cessna Aircraft Co.,* 665 S.W.2d 414, 422 (Tex. 1984) (finding "false conflict" because between Texas and Antigua law fraudulent transfer actions involving net winners in a *Ponzi* scheme where none of the defendants were Antiguan citizens)); *see also Tune,* 766 So. 2d at 352 (citing *Greaves v. State Farm Ins. Co.,* 984 F. Supp. 12, 14 (D.D.C. 1997) (finding a false conflict when the policies of the potentially conflicting state would not be furthered by the application of its laws).  Moreover, a state has an actual interest in the dispute if its relationship to the dispute is within the scope of the policies of the law sought to be applied.

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3200 SOUTHEAST FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA  33131 • TELEPHONE (305) 358-6363
{Firm Clients/MGEM/MGEM-28/01483766.DOCX.}

*Janvey*, at *11 (*citing Sandefer Oil & Gas, Inc. v. AIG Oil Rig of Texas, Inc.*, 846 F.2d 319, 322 (5th Cir. 1988)).

In the context of the instant action, which asserts claims against NCF under theories of constructive fraudulent transfer law, the basic policy at issue is the protection of creditors from fraudulent transfers.  *See In re Mirant Corp.*, 675 F.3d 530, 537 (5th Cir. 2012); *Meiselman v. Hamilton Farm Golf Club LLC*, No. 11–0653 (AET), 2011 WL 3859846, at *7 (D.N.J. Sept. 1, 2011) ("The policy underlying fraudulent transfer law in both New Jersey and Maryland is to protect creditors against a debtor's attempts to place his or her property out of reach."); *Damazo v. Wahby,*  305 A.2d 138, 142 (Md. 1973) ("[T]he underlying objective of the uniform act ... is to enhance and not impair the remedies of the creditor." (citation omitted)); *Feuerbacher v. Moser*, No. 4:11-CV-272, 2012 WL 1070138, at *11 (E.D. Tex. March 29, 2012).  In this context, at least one court has found that a state/jurisdiction does not have an interest in a fraudulent transfer action where no defendant sought their right to apply such law *as a citizen of that state*.  *Janvey,* 2013 WL 2451738 at *4.   In *Janvey*, a case involving clawback actions brought by the receiver appointed in connection with the Stanford *Ponzi* scheme, the Court found that, notwithstanding the fact that the investor/defendants purchased their investments from an Antiguan corporation, Antigua had no interest in applying its own laws in those fraudulent transfer actions because "although Antigua may have some interest in protecting its citizens from the rescission of transfers that are later found fraudulent, no [defendant] asserts his or her right to Antiguan law as an Antiguan citizen." *Id.*  Accordingly, the court in *Janvey* held that Antigua had no interest in the application of its law.  *Id.*

The Court in *Janvey* also found that Antigua had no interest in the dispute because, although the transfers originated from an Antiguan entity, the Antiguan enterprise was nothing

but "a sham, existing solely to perpetuate a worldwide fraud." *Id.* at *11; *see also id.* at *8-9 ("each Stanford Entity either participated in the scheme, derived benefit from the scheme, or lent the appearance of legitimacy to the entirety of Stanford's fraudulent enterprise."). Like the Standford entities in *Janvey*, the publically-available filings and documents, including the Vennes Plea, establish here that the primary business of MGI from 1995 until 2008 was obtaining funds for investment in the Petters *Ponzi* scheme "in order to perpetuate a worldwide fraud." *See Janvey*, at *11; *see also* Vennes Plea, p. 4. Accordingly, although the Transfers originated from MGI in Minnesota, Minnesota has "no interest in applying its own law in such a scenario." *Id.*

Similar holdings have been reached by courts addressing a false conflicts argument in the context of other tort-related causes of action. For example, in *Duncan*, the Texas Supreme Court held that New Mexico had no interest in a product liability/wrongful death dispute where no New Mexican defendant or injured party was involved. 665 S.W.2d at 421-22 ("We can conceive of no legitimate reason why the New Mexico legislature should be concerned with the application of its [uniform contribution among tortfeasors] statute to a Texas settlement to cut off a Texas resident's claim against a Kansas corporation."). Likewise, in *Estate of Miller v. Thrifty Rent-A-Car System, Inc.*, the United States District Court for the Middle District of Florida found that Florida had no interest in having an affirmative defense unique to Florida apply where the only relationship Florida had with the litigation was that several of the Plaintiffs moved to Florida following the incident. 609 F.Supp.2d 1235, 1245 (M.D. Fla. 2009). The court in *Miller* specifically looked to the policy behind the affirmative defense sought to be applied, which was to protect defendants and potentially reduce insurance premiums by limiting excessive tort judgments, and stated that such interests "are implicated when the defendant is a resident of the

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3200 SOUTHEAST FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA 33131 • TELEPHONE (305) 358-6363
{Firm Clients/MGEM/MGEM-28/01483766.DOCX.}

jurisdiction." *Id.* Because the defendant was an Oklahoma corporation in that case, the court found that Florida lacked an interest in applying its affirmative defense. *Id.; see also Walker v. Paradise Grand Hotel, Ltd.*, No. 01–3564–CIV, 2003 WL 21361662 (S.D. Fla. April 24, 2003) (finding that, because defendant was neither a resident nor domiciliary of Maryland, application of Maryland's non-economic damages cap would not further Maryland's policy of protecting domiciliary defendants); *Erny v. Estate of Merola,* 792 A.2d 1208, 1216–21 (N.J. 2002) (concluding that New Jersey's interest in protecting defendants from full joint and several liability was not implicated when the defendant was from New York); *Farrell v. David Davis Enters., Inc.,* No. Civ. A. 95–2986, 1996 WL 21128, at *3 (E.D. Pa. Jan. 19, 1996) (false conflict existed between New Jersey's law limiting joint and several liability and Pennsylvania's law permitting full joint and several liability because New Jersey had no interest in limiting a Pennsylvania defendant's tort liability).

In the instant case, the conflict that exists is one relating to the Minnesota legislature's attempts to retroactively protect qualified charitable organizations in Minnesota from certain fraudulent transfer liability under Minnesota law. Similar to the cases cited above, however, NCF is not and never has been a resident of Minnesota. Moreover, the fact that the outcome of this case may be more favorable for NCF under Minnesota law does not give Minnesota an interest in the instant dispute where one does not otherwise exist. As such, the conflict of laws in this case is a false one and this Court should deny NCF's request to apply Minnesota law.[24]

---

[24] Plaintiff further notes that application of Minnesota law in the instant case could potentially create a result that is *contrary* to the established law and policies of this state. In Florida, it is well-established that an accrued cause of action (and pending litigation) is a vested property right that cannot be abrogated by the legislature. *See, e.g., American Optical Corporation, et al. v. Spiewak, et al.*, 12 So. 2d 220 (Fla. 2009). In contrast, Minnesota law does not treat a cause of action as a vested property right. *See Application of Q Petroleum*, 498 N.W.2d 772 (Minn. App. 1993) (pet. for rev. denied, July 15, 1993) (no vested right in existing law or cause of action until final judgment has been rendered.).

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3200 SOUTHEAST FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA 33131 • TELEPHONE (305) 358-6363
{Firm Clients/MGEM/MGEM-28/01483766.DOCX.}

**B. Even if Minnesota Has an Interest in the Dispute, the Weight of Factors to be Considered By the Court Support An Application of Georgia Law**

When conducting a choice of law analysis, courts are divided on the issue of whether bankruptcy courts should apply federal choice of law rules or the choice of law rules of the forum state. *Dzikowski v. Friedlander (In re Friedlander Capital Mgmt. Corp.)*, 411 B.R. 434, 441 (Bankr. S.D. Fla. 2009); *Kaiser Grp. Holdings, Inc. v. Squire Sanders & Dempsey LLP (In re Kaiser Grp. Intern. Inc.)*, Adversary No. 09–52317–MFW, 2010 WL 3271198, at *3 (Bankr. D. Del. Aug. 17, 2010); *see also, Jafari v. Wynn Las Vegas, LLC (In re Jafari)*, 569 F.3d 644, 649 (7th Cir. 2009) ("[T]he Supreme Court has not addressed whether federal choice-of-law rules or the choice-of-law rules of the forum state apply in bankruptcy, and the courts of appeals that have reached the question have been divided."). In other adversary proceedings in the Palm Beach Funds' chapter 11 proceedings, this Court has previously held that it will follow the diversity jurisdiction approach and apply the "law applicable to diversity cases to hold that the forum state's choice of law rules are imposed on bankruptcy adjudications where the underlying rights and obligations are defined by state law.'" *See, e.g.,* ECF No. 59, *Mukamal v. Cosmos (In re Palm Beach Finance Partners, L.P.),* Adv. Case No. 11-02990-PGH (Bankr. S.D. Fla. July 30, 2013), p. 23 (*quoting In re Friedlander Capital Mgmt. Corp*., 411 B.R. at 441-42 (*citations omitted)).   As such, the choice of law rules of the State of Florida will govern the choice of law analysis in the instant proceedings.

Although Florida courts have not yet specifically addressed the question, other courts have consistently held that, for choice of law purposes, a fraudulent transfer action is one that sounds in tort and should therefore be analyzed as such. *See MC Asset Recovery LLC v. Commerzbank A.G. (In re Mirant),* 675 F.3d 530, 536 (5th Cir. 2012); *In re Cyrus II P'ship*, 413

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3200 SOUTHEAST FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA  33131 • TELEPHONE (305) 358-6363
{Firm Clients/MGEM/MGEM-28/01483766.DOCX.}

B.R. 609, 617-18 (Bankr. S.D. Tex. 2008) *citing Terry v. June*, 420 F.Supp.2d 493, 502-03 (W.D. Va. 2006); *SEC v. The Infinity Group Co*., 27 F.Supp.2d 559, 564 (E.D. Pa. 1998). Florida has adopted the "significant relationships" test found in the Restatement (Second) of Conflict of Laws §§ 145, et. seq. (1971), for determining which state's law is to be applied in tort actions filed in a Florida court.  *State Farm Mutual Automobile Insurance Company v. Olsen*, 406 So. 2d 1109 (Fla. 1981); *Bishop v. Florida Specialty Paint Co.*, 389 So. 2d 999 (Fla. 1980).[25]

Section 145 of the Restatement (Second) sets out the rule for tort cases:

> (1) The rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in § 6.

> (2) Contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:

>> (a) the place where the injury occurred,

>> (b) the place where the conduct causing the injury occurred,

>> (c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and

>> (d) the place where the relationship, if any, between the parties is centered.

Section 6 of the Restatement (Second) lists the following factors as important choice of law considerations in all areas of law:

> (a) the needs of the interstate and international systems,

> (b) the relevant policies of the forum,

> (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,

> (d) the protection of justified expectations,

---

[25] The Florida Supreme Court has likewise held that that the "significant relationship" test should be applied to choice of law issues regarding a statute of limitations.  *Merkle v. Robinson*, 737 So. 2d 540, 542-43 (1999) (treating statute of limitation choice of law questions the same as "substantive" choice of law questions, which . . . Florida decides pursuant to the "significant relationship" test).

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3200 SOUTHEAST FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA  33131 • TELEPHONE (305) 358-6363
{Firm Clients/MGEM/MGEM-28/01483766.DOCX.}

(e) the basic policies underlying the particular field of law,

(f) certainty, predictability and uniformity of result, and

(g) ease in the determination and application of the law to be applied.

Restatement (Second) of Conflict of Laws § 6 (1971).  The Restatement advises that "[t]hese contacts are to be evaluated according to their relative importance with respect to the particular issue." *Grupo Televisa, S.A. v. Telemundo Communications Group, Inc.,* 485 F.3d 1233, 1240 (11th Cir. 2007) (citing Restatement (Second) of Conflict of Laws § 145).   Indeed, it is "not the number of contacts, but the qualitative nature of those particular contacts that determines which state has the most significant relationship to the occurrence and the parties."  *ASARCO LLC v. Americas Min. Corp.*, 382 B.R. 49, 64 (S.D. Tex. 2007).   In addition, the Restatement factors should be considered in light of which state's law has the most significant relationship "*to the particular substantive issue to be resolved." Hughes Wood Prods., Inc. v. Wagner,* 18 S.W.3d 202, 205 (Tex. 2000) (emphasis in original); *see also Bishop,* 389 So. 2d at 1001.  If two or more states are interested, then the court must determine which state has a dominant interest and apply the law of that state. *Bishop,* 389 So. 2d at 1001.

### 1. Place of Injury/Place Where the Conduct Causing the Injury Occurred (§ 145(2)(a) and (b))

In the context of fraudulent transfer actions, courts have found the relevance of the § 145(2) contacts, and particularly items (a) and (b), to be limited or minimized, because the injury is intangible and the facts generally make it difficult, if not impossible, to identify with certainty what conduct actually "caused" the injury or where exactly the injury occurred.  *See, e.g., Mirant*, 675 F.3d at 537 ("Here, it is not necessary to definitively identify or locate the relevant conduct because constructive fraudulent transfer laws are more concerned with helping

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3200 SOUTHEAST FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA  33131 • TELEPHONE (305) 358-6363
{Firm Clients/MGEM/MGEM-28/01483766.DOCX.}

injured parties than deterring conduct."); *ASARCO*, 382 B.R. at 62-63 (stating that these two factors would not weigh heavily in the court's decision in a fraudulent transfer case because they were "elusive" and "hard to discern"); *cf. Topp, Inc. v. Uniden American Corp.*, 483 F.Supp.2d 1187 (S.D. Fla. 2007) (stating that the place of injury is "less significant in the case of fraudulent representations") (*citing Trumpet Vine Inv. v. Union Capital*, 92 F.3d 1110 (11th Cir. 1996)); *Cohen v. Implant Innovations, Inc.*, 259 F.R.D. 617, 635 (S.D. Fla. 2007) (stating that the place of injury was not significant in an unfair trade practices case and therefore would not be given significant weight)).

Indeed, the commentary to the Restatement actually suggests that when the injury is intangible, as it is here, the importance of these factors is severely diminished. *Cf.* Restatement (Second) of Conflict of Laws § 145 cmt. e (1971) ("Situations do arise, however, where the place of injury will not play an important role in the selection of the state of the applicable law. . . .such as in the case of fraud and misrepresentation, there may be little reason in logic or persuasiveness to say that one state rather than another is the place of injury, or when . . .injury has occurred in two or more states."). According to the Restatement commentary, when "the place of injury cannot be ascertained or is fortuitous and, with respect to the particular issue, bears little relation to the occurrence and the parties, *the place where the defendant's conduct occurred will usually be given particular weight in determining the state of the applicable law*." *Id.* (emphasis added).

Here, the defendant's conduct clearly occurred in Georgia – the Vennes/Fidelis Parties came to Georgia, seeking to use NCF's services for their own purposes, the monies were transferred into NCF's bank account in Georgia, and the NCF-owned and controlled donor-advised fund into which they were placed was setup and administered in Georgia by NCF

personnel located at NCF's headquarters in Georgia.  Indeed, NCF does not and cannot contest the fact that all actions it took in connection with the Vennes Fund or the Transfers occurred in Georgia.

Accordingly, Plaintiff submits that, under the guidance provided by the Restatement itself, although their impact on the analysis are limited, given the intangible nature of the injury, these two factors under § 145(2) weigh in favor of Georgia law.

### 2.  Domicile/Residence of the Parties (§ 145(2)(c))

This factor also weighs in favor of Georgia, or alternatively Florida, law.  NCF is a Georgia non-profit corporation that has its headquarters and principal place of business in Georgia.  Plaintiff (the Liquidating Trustee) is a Florida resident that has been appointed by a Florida court to oversee the liquidation of two entities (the Palm Beach Funds) that had their offices and operations at all times in the state of Florida.  Moreover, although not actually parties to the instant proceedings, the investors/creditors whose interests the Plaintiff represents are located all over the United States, as well as internationally.  *See* ECF No. 49, *In re Palm Beach Finance Partners, L.P.*, Case No. 09-36379; ECF No. 21, *In re Palm Beach Finance II, L.P.*, Case No. 09-36396.  Finally, as noted above, ***no resident of Minnesota is a party to this action.*** As such, this factor weighs in favor of either Georgia or Florida law.  *See, e.g. Meiselman*, No. 11–0653 (AET), 2011 WL 3859846, at *7 ("The putative creditors – here, the Plaintiffs – are predominantly New Jersey residents, so New Jersey has a strong interest in protecting these creditors in light of its fraudulent transfer policy.").

### 3.  Place Where the Relationship is Centered (§ 145(2)(d))

The evidence establishes and it is undisputed that one or more of the Vennes/Fidelis Parties initiated the relationship with NCF.  They specifically sought out the services of NCF, as

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3200 SOUTHEAST FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA  33131 • TELEPHONE (305) 358-6363
{Firm Clients/MGEM/MGEM-28/01483766.DOCX.}

a public charity that could take non-cash or cash contributions into a donor-advised fund so that the Vennes Parties could continue to indirectly contribute to Fidelis (in the form of a promissory note) as a work-around of Fidelis' "public support test." NCF did not seek out contributions from the Vennes/Fidelis Parties or otherwise promote its services. NCF did not solicit the Vennes/Fidelis Parties' moneys or otherwise reach out to the Vennes/Fidelis Parties as an initial matter. *Id.* Rather, the Vennes/Fidelis Parties made a conscious and purposeful choice to "bring their business" to the state of Georgia, by travelling to Georgia and seeking out NCF in order to open donor-advised funds and use them for their own purposes.

In addition, all monies were transferred into NCF's bank account in Georgia and the donor-advised fund into which they were deposited was owned by NCF, a Georgia non-profit, and processed and controlled by NCF personnel located in Georgia.

Simply stated, the Vennes/Fidelis Parties came to Georgia to ask NCF, in Georgia, to do certain things in Georgia to assist the Vennes/Fidelis Parties in achieving their goals. Accordingly, the relationship underlying the Transfers is centered in Georgia and this factor weighs heavily in favor of the application of Georgia law. *See Gulf Group Holdings, Inc. v. Coast Asset Management Corp.*, 516 F.Supp.2d 1253, 1270 (S.D. Fla. 2007) (finding the relationship centered in Florida in an injury to professional reputation case where the agreement between the parties involved actions and activities taking place in Florida).

### 4. Relative Interests of the States Under § 6

The Eleventh Circuit has instructed that the Court "cannot simply add up the factors delineated in section 145(2) and then apply the law of the sovereign with the greatest numerical total. . . .Rather, [the court] must, as mandated by section 145(1), turn to the factors delineated in section 6 to determine which sovereign has the most significant contact." *Judge v. Am. Motors*

*Corp.,* 908 F.2d 1565, 1569 (11th Cir. 1990).   Moreover, "the importance of the various section

6 factors varies depending on the nature of the issue that underlies the conflict of laws."   *Cortes*

*v. American Airlines, Inc.*, 177 F.3d 1272, 1299 (11th Cir. 1999).

### a.   Policy Considerations (Factors (b), (c) and (e))

Under § 6 of the Restatement, the second, third and fifth factors address the

interrelationship of the policies of the various interested states, as well as the policy underlying

the particular field of law.  As noted in the commentary to the Restatement, these considerations

are

> of particular importance in situations where the policies of the interested states are largely
> the same but where there are nevertheless minor differences between their relevant local
> law rules.  In such instances, there is good reason for the court to apply the local law of
> that state which will best achieve the basic policy, or policies, underlying the particular
> field of law involved.

Restatement (Second) of Conflict of Laws § 6 cmt. h (1971).  This rationale was followed by the

United States Court of Appeals for the Fifth Circuit in *Mirant*, a case highly analogous to the

instant case involving a fraudulent transfer action brought by the debtor to avoid a guaranty (and

seek return of the funds paid pursuant to such guaranty).  675 F.3d 530.  In that case, both New

York and Georgia had otherwise significant contacts to the dispute, but New York fraudulent

transfer law treated the guaranty as a potentially recoverable transfer while Georgia law

(applicable at the time) did not.[26]  As such, a decision by the court to apply Georgia law would

remove the transaction from the definition of a recoverable transfer and effectively eliminate the

plaintiff's cause of action.  After characterizing the differences between the two fraudulent

transfer laws as "minor," when the "entire corpus" of the laws are considered, the Fifth Circuit

followed the above-quoted guidance in the commentary to the Restatement, finding that, in such

---

[26] The Georgia statute applicable at the time of the transaction in *Mirant* was later repealed when Georgia adopted
their version of the uniform fraudulent transfer act in 2002.

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3200 SOUTHEAST FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA  33131 • TELEPHONE (305) 358-6363
{Firm Clients/MGEM/MGEM-28/01483766.DOCX.}

a case, the court should "apply the local law of that state which will best achieve the basic policy, or policies, underlying the particular field of law involved." *Id.* at 537.  Given that the plaintiff's cause of action in *Mirant* would be eliminated by application of Georgia law, the Fifth Circuit held that "[i]n this instance, the choice is clear. . . .The basic creditor protection policy underlying fraudulent transfer law will be better served by the application of New York law in this case." *Id.* at 537-38.   The Fifth Circuit further noted that, while application of Georgia's exemption would clearly benefit the defendants, ***none of them were citizens of Georgia.*** *Id.* at 538.  In such a case, "[t]he fact that . . . Georgia's citizens would not benefit from the application of Georgia law diminishes Georgia's interest." *Id.; cf. Meiselman*, No. 11–0653 (AET), 2011 WL 3859846, at *7 ("The putative creditors – here, the Plaintiffs – are predominantly New Jersey residents, so New Jersey has a strong interest in protecting these creditors in light of its fraudulent transfer policy.").

Application of these same principles and rationales are appropriate here.  In the instant case, the basic policy is the same no matter whether MUFTA, GUFTA or FUFTA is applied – the protection of creditors from fraudulent transfers. *Mirant*, 675 F.3d at 537-38; *Meiselman*, No. 11–0653 (AET), 2011 WL 3859846, at *7; *Damazo,* 305 A.2d at 142;  *Feuerbacher*, No. 4:11–CV-272, 2012 WL 1070138, at *11.   However, by virtue of the Minnesota Amendment, application of MUFTA in the instant case could potentially provide an exemption, which, if applicable, would eliminate the Plaintiff's ability to recover the Transfers.  A similar exemption is not, however, applicable under either GUFTA or FUFTA.  As such, just like the fraudulent transfer exemption for guaranty at issue in *Mirant*, "[t]he basic creditor protection policy underlying fraudulent transfer law will be better served" by application of Georgia law in the instant case.  Moreover, given the fact that the Defendant is not a citizen of Minnesota,

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3200 SOUTHEAST FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA  33131 • TELEPHONE (305) 358-6363
{Firm Clients/MGEM/MGEM-28/01483766.DOCX.}

Minnesota's interest in application of its version of the uniform fraudulent transfer act is greatly diminished. Indeed, it is not apparent that any citizen of Minnesota will gain from application of Minnesota's statute in the instant case.

Although courts in the Eleventh Circuit have not yet considered these issues in the fraudulent transfer context, the Eleventh Circuit has reached an analogous result when considering other torts. In *Judge v. Am. Motors Corp.,* the Eleventh Circuit found that Mexico had no interest in applying its prohibition on claims for wrongful death in a dispute relating to two Florida tourists that were killed due to an alleged defect in their rental car while vacationing in Mexico. 908 F.2d 1565, 1567-73 (11th Cir. 1990). The Eleventh Circuit distinguished between "conduct-regulation" rules that prescribe substantive standards for people to observe, such as a "rule of the road," and "loss-distribution" rules that prescribe how liability is to be apportioned in a legal action, such as a limitation on damages. *Id.* at 1572 n. 9. The court explained that a sovereign's interest in applying a "loss-distribution" rule turns not on the site of the incident but on the people involved in the incident. *Id.* The Eleventh Circuit went on to find that, where neither the plaintiff nor the defendant are residents of the jurisdiction in which the accident occurred, the jurisdiction lacks an interest in seeing that the plaintiff is properly compensated or that the defendant is protected from excessive tort judgments. *Id.* at 1572–73; *see also Walker,* No. 01–3564-CIV, 2003 WL 21361662, at *5 (S.D. Fla. 2003) (finding that applying Maryland's non-economic damages cap would not further Maryland's policy where defendant was neither a domiciliary nor a resident of Maryland); *Cortes*, 177 F.3d at 1303 ("Although Colombia possesses an interest in applying its compensatory damages scheme to the claims of Colombian domiciliaries on behalf of a Colombian decedent, the absence of a

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3200 SOUTHEAST FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA  33131 • TELEPHONE (305) 358-6363
{Firm Clients/MGEM/MGEM-28/01483766.DOCX.}

Colombian defendant who would benefit from Colombia's more restrictive damages scheme renders these interests less compelling.").

Indeed, the Eleventh Circuit has expressly stated that "a limit on recovery should not be applied when there is no domiciliary defendant because it advances no policy behind the limitation." *Foster v. United States*, 768 F.2d 1278, 1283 (11th Cir. 1985).   As noted above, the instant case involves neither a plaintiff nor a defendant that are residents of Minnesota.  As such, these factors weigh heavily in favor of the application of Georgia, or alternatively, Florida, law.

### b.  Uniformity (Factors (a) and (f))

The remaining factors in § 6 also support application of Georgia or Florida law in this case.  When considering the needs of the interstate system, the Restatement commentary notes that "[c]hoice-of-law rules, among other things, should seek to further harmonious relations between states and to facilitate commercial intercourse between them." Restatement (Second) of Conflict of Laws § 6 cmt. d (1971).  Those needs are best met by application of the law which more closely reflects the approach taken by the majority of states and jurisdictions. *Mirant*, 650 F.3d at 538.   While a few states have adopted additional protections or exemptions for charitable donations, the majority of states have not done so and neither Georgia nor Florida did so in a manner applicable to this cause of action.[27]   As with the exemption for guarantees addressed by the Fifth Circuit in *Mirant*, the Minnesota Amendment at issue here, "exempts transactions that most states identify as fraudulent transfers." *Id.* at 537.  As such, this factor also weighs in favor of the application of Georgia or Florida law here. *Id.* at 538 ("Here, the needs of the interstate

---

[27] Notably, the Uniform Law Committee has considered and rejected a proposal to include protections or exemptions for charitable donations in the amendments to the Uniform Fraudulent Transfer Act that it is proposing this year. *See* Edwin E. Smith and Professor Kenneth Kettering, *Uniform Fraudulent Transfer Act Amendments 2014: A View from the Uniform Law Commission*, January 27, 2014, http://media.straffordpub.com/products/uniform-fraudulent-transfer-act-amendments-2014-a-view-from-the-uniform-law-commission-2014-01-27/presentation.pdf, p. 17.

system are best met by the application of New York's law which reflects the approach taken by an overwhelming majority of the states."); *see also Taylor v. Community Bankers Securities, LLC*, No. H-12–02088, 2013 WL 3166336, at \*6 (stating that this factor supported the application of a UFTA state's law over one that had not yet adopted the uniform act). Indeed, application of Georgia or Florida law here will "promote the Restatement's goal of uniformity of result." *Id.*

### c.    Ease in Determination/Application of the Law to be Applied (Factor (g)).

Courts have found this factor to weigh in favor of the forum state, as the one most familiar to the court considering the issue. *See, e.g., Cohen*, 259 F.R.D. at 638 (*citing Pycsa Panama S.A. v. Tensar Earth Technologies, Inc.*, 2008 WL 1775409, at \*28 (S.D. Fla. Apr. 16, 2008)); *Feuerbacher*, No. 4:11–CV–272, 2012 WL 1070138, at \*12. Moreover, courts have stated that this factor could have greater importance in the case where the law of the non-forum interested state "is not easily ascertainable." *Cohen*, 259 F.R.D. at 638. Here, the MUFTA Amendment is relatively new and there is no case law yet in Minnesota providing any guidance as to its applicability. Moreover, the legislative history is sparse and lends little to no guidance, other than to demonstrate that Minnesota charities successfully lobbied their Minnesota legislative representatives to provide them with some protection from the PCI Trustee's attempts to assert MUFTA's potentially unlimited reachback (under Minn. Stat. § 541.05, Subd. 1(6)).[28]

---

[28] *See* ECF No. 62, House of Representatives Congressional Meeting Minutes (Judiciary Policy and Finance Committee, April 27, 2011), p. 2 ("This Bill arose out of the Petters case. It was brought to me by Big Brothers and Big Sisters of the Greater Twin Cities and Passages Support by the Minnesota Council of Non-Profits. The Bankruptcy trustee in the case is seeking to clawback money that Petters gave to charities. . . .he is seeking to back to the year 2000 by using Minnesota Fraudulent Transfers Act. This Act has no Statute of limitations. . . .without this change, the Trustee will be able to go back forever. . ."), p.3 ("Unless this is changed, it will change the face of the non-profit world in the State of Minnesota. . ."), p. 4 ("The Minnesota Council of Non-Profits encourages you to pass this Bill as a remedy to a rare but significant financial predicament for Minnesota's non-profit organizations."). *See also* ECF No. 62, House of Representatives Congressional Meeting Minutes (Commerce & Regulatory Reform

As such, this factor weighs in favor of the application of Florida law (or perhaps Georgia, as the state with a UFTA statute more similar to Florida's).

### d.   Protection of Justified Expectations (Factor (d)),

This factor is generally applicable when one party has justifiably molded its conduct to conform with the requirements of a particular law.  *See, e.g., Francis v. Starwood Hotels & Resorts Worldwide, Inc.*, No. 10-CV-02105-REB-KLM, 2011 WL 3351320 (D. Colo., Aug. 3, 2011) ("[B]ecause defendant is incorporated under the law of Maryland, application of Maryland law will protect defendant's reasonable, justified expectation that its corporate conduct would be governed and regulated by the laws of that state.").   Moreover, the relevant inquiry is the "expectations of the parties at the time of the conduct which underlies the cause of action."  *See Harding v. Proko Industries, Inc.*, 765 F. Supp. 1053 (D. Kan. 1991) ("it is simply absurd to argue that the defendants, in manufacturing and distributing asbestos products, were guided in their conduct by a decision of the Kansas Supreme Court still some 20 years in the future.").  No argument can be made here that NCF, a Georgia non-profit, engaged in the transactions at issue in reliance on the Minnesota Amendment which did not even exist at the time of the Transfers. In fact, it is far more plausible that NCF believed that Georgia law governed its actions and the transactions at issue – *i.e.* the set-up and administration of a donor-advised fund with NCF. Accordingly, to the extent that this factor is relevant, it also weighs in favor of Georgia law.

## CONCLUSION

The stark reality in this case is that there is no "true conflict" of law.  NCF seeks to apply Minnesota law as opposed to the law of its own state, because it seeks to improve its position for a potentially better result.  The conflict of law here is a "false conflict" because there is no

---

Committee, April 28, 2011), p. 5 ("We see this as an appropriate remedy to an infrequent but very real problem for non-profit organizations in Minnesota.").

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3200 SOUTHEAST FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA  33131 • TELEPHONE (305) 358-6363
{Firm Clients/MGEM/MGEM-28/01483766.DOCX.}

defendant in this action from Minnesota such that the state of Minnesota would have an actual interest in the dispute.  Additionally, to the extent applicable given the false nature of the conflict, taking into account all of the various factors under § 145 of the Restatement, and doing so in light of the particular substantive issue to be resolved, both the qualitative and the quantitative contacts weigh in favor of the application of Georgia, or alternatively Florida, law in the instant Adversary Proceeding.  As outlined in detail above, nearly every factor weighs in favor of the application of Georgia, or in some case Florida, law.  As such, the Plaintiff respectfully requests that the Court grant the Motion and find that the Adversary Proceeding is governed by Georgia, or alternatively Florida, law.

## <u>CERTIFICATE OF SERVICE</u>

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was served on August 5, 2014, via the Court's Notice of Electronic Filing upon the Registered Users listed on the attached <u>Exhibit 1</u> and via Regular U.S. Mail on David J. Myers., Esq., FSB FisherBroyles, LLP, Northpark Town Center, Suite 1700, 1200 Abernathy Road, Building 600, Atlanta, GA 30328 [myers@fsblebal.com].

s/ Peter D. Russin
Peter D. Russin, Esquire
Florida Bar No. 765902
prussin@melandrussin.com
Jessica L. Wasserstrom, Esquire
Florida Bar No. 985820
jwasserstrom@melandrussin.com
MELAND RUSSIN & BUDWICK, P.A.
3200 Southeast Financial Center
200 South Biscayne Boulevard
Miami, Florida  33131
Telephone: (305) 358-6363
Telecopy: (305) 358-1221

*Attorneys for the Plaintiff*

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3200 SOUTHEAST FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA  33131 • TELEPHONE (305) 358-6363
{Firm Clients/MGEM/MGEM-28/01483766.DOCX.}

<u>**SERVICE LIST**</u>

<u>**Electronic Mail Notice List**</u>

The following is the list of parties who are currently on the list to receive e-mail notice/service for this case and who therefore will be served via the Court's Notice of Electronic Filing:

- Michael S Budwick    mbudwick@melandrussin.com, ltannenbaum@melandrussin.com;mrbnefs@yahoo.com
- Francis L. Carter    flc@katzbarron.com, lcf@katzbarron.com
- David J Myers    myers@fsblegal.com
- Bradley S Shraiberg    bshraiberg@sfl-pa.com, dwoodall@sfl-pa.com;vchapkin@sfl-pa.com;lrosetto@sfl-pa.com;scusack@sfl-pa.com;blee@sfl-pa.com
- Jessica L Wasserstrom    jwasserstrom@melandrussin.com, ltannenbaum@melandrussin.com;mrbnefs@yahoo.com

**Exhibit 1**