UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

In re:                                                    Case No. 09-36379-PGH
                                                          Chapter 11
Palm Beach Finance Partners, L.P. and
Palm Beach Finance II, L.P.,

     Debtor(s).
_____/

Barry E. Mukamal, as Liquidating Trustee,

     Plaintiff,

                                                          Adversary Pro. No. 11-02940-PGH
v.

The National Christian Foundation, Inc.,

     Defendant.
_____/

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM IN SUPPORT

There are no genuine issues of material fact regarding the choice of law determination in this adversary proceeding, and NCF is entitled to judgment as a matter of law that Minnesota law applies under Florida's "significant relationship" test.

Applying Minnesota law, specifically the 2012 charitable contribution amendment to Minnesota's Fraudulent Transfer Act, there are no genuine issues of material fact and NCF is entitled to judgment as a matter of law that the Trustee's claims against NCF are time barred.

## FACTUAL BACKGROUND[1]

### The National Christian Foundation and Its Work

NCF, founded in Atlanta in 1982, is a tax exempt public foundation. As a public foundation, NCF receives contributions from donors and in turn distributes grants to other charities.[2]  In NCF's case, its grant recipients are primarily Christian organizations whose missions NCF has determined are not antithetical to the Christian faith.

NCF typically has distributed in grants to other charities all but 1.5% of the contributions NCF receives from its donors.  This includes 2005 and 2006, when the transactions at issue in this case occurred.

As a practical matter, if the Trustee "recovers" from NCF the $9,010,000 he seeks, NCF will have to pay that "recovery" with funds that NCF would otherwise be distributing as grants for charitable work.

### Donor Advised Funds at NCF

A donor to NCF may establish a Donor Advised Fund ("DAF") at NCF (also known internally as an NCF Giving Fund) and then may recommend grants to appropriate charitable organizations from the DAF/Giving Fund.  NCF normally owns and exercises complete dominion and control of all contributions, and a donor's recommendations for grants from a DAF/Giving Fund are subject to NCF's approval.

A donor establishes a DAF/Giving Fund at NCF by submitting an NCF Giving Fund Application and an initial contribution, which NCF evaluates and either accepts or rejects.  When the DAF/Giving Fund is established, the donor becomes an advisor to that fund and has the

---

[1]      NCF's separately filed Statement of Material Facts in Support of Defendant's Motion for
[2]      NCF is a public foundation (rather than a private foundation) because no single donor contributes more than one-third of NCF's total contributions received over a rolling five-year period.

option to name additional fund advisors.  Contributions to a DAF/Giving Fund normally are invested by NCF pending distributions recommended by the fund advisors and approved by NCF.

When the fund advisor has a recommendation for a grant from a DAF/Giving Fund, the fund advisor submits a grant recommendation to NCF.  NCF then conducts a due diligence review of the recommended grant, including the recipient organization (for example, to verify the organization's tax exempt status and mission), the amount, and the purpose of the grant.  In many cases (including here), the recipient organization has already been approved by NCF, either because the organization has been the recipient of previous grants from NCF or because the recipient organization itself has established a DAF/Giving Fund with NCF.

If a donor's grant recommendation is not approved for some reason, NCF will notify the fund advisor and will give the fund advisor the opportunity to revise the recommendation.

If the grant recommendation is approved, the grant amount is distributed to the approved charity by check or wire transfer from NCF.

**Fidelis Foundation Established a DAF/Giving Fund with NCF**

Fidelis Foundation is a tax exempt public foundation, incorporated in and at all relevant times located in Minnesota.  In March 2005, Fidelis Foundation opened the Fidelis Foundation Giving Fund at NCF with an initial contribution of $400,000.  Thereafter, NCF sent quarterly reports regarding The Fidelis Foundation Fund to Fidelis Foundation in Minnesota.

In April 2005 Fidelis Foundation personnel visited NCF's offices in Atlanta.  The Fidelis Foundation representatives asked that NCF receive the next major gift from Fidelis Foundation's primary donor (Frank Vennes), through a DAF/Giving Fund to be set up by that donor, and then distribute the gift to Fidelis Foundation on the donor's recommendation.  The transaction was

expected to occur by September 30, Fidelis Foundation's fiscal year end, or by the end of the calendar year.

In June 2005 NCF notified Fidelis Foundation that NCF had "approved the Fidelis Foundation as a pre-approved ministry, which means that you can make distributions out of your FF Giving Fund here at NCF back into you[r] Foundation whenever you desire."

**Frank Vennes Established a DAF/Giving Fund at NCF and Made Four Contributions to Fidelis Foundation Through NCF ("the Transfers")**

On December 30, 2005, Vennes established a DAF/Giving Fund with NCF – known as The Vennes Charitable Fund – with a $4 million contribution. The $4 million check was drawn on Metro Gem's account at a Minnesota bank. Metro Gem was incorporated in Minnesota and at all relevant times was located in Minnesota.

Less than a week later, on January 6, 2006, NCF wired a $3,985,000 grant (the $4 million contribution by Vennes minus a $15,000 fee to NCF for the expedited grant request) to Fidelis Foundation's bank in Minnesota.

Thereafter, NCF sent quarterly reports and all other written communications regarding The Vennes Charitable Fund to Vennes and his attorney (who was also Fidelis Foundation's attorney) at the addresses they provided in Minnesota. Other written communications from Vennes's attorney regarding The Vennes Charitable Fund were sent to NCF from Minnesota.

On September 27, 2006, NCF received a $610,000 contribution to The Vennes Charitable Fund via wire transfer from Metro Gem's bank account in Minnesota. The next day, NCF wired a $600,000 grant ($610,000 minus a $10,000 fee for the expedited grant request) to Fidelis Foundation's bank account in Minnesota.

On October 2, 2006, NCF received a $400,000 contribution to The Vennes Charitable Fund via wire transfer from Metro Gem's bank account in Minnesota. The next day, NCF wired a grant of $400,000 to Fidelis Foundation's bank account in Minnesota.

On December 19, 2006, NCF received a $4 million contribution to The Vennes Charitable Fund via wire transfer from Metro Gem's bank account in Minnesota. The next day, NCF wired a $4 million grant to Fidelis Foundation's bank account in Minnesota.

In summary:

- Fidelis Foundation and all of its personnel who were involved in the set-up of the Fidelis Foundation Fund at NCF were in Minnesota;

- Vennes, Metro Gem, Vennes's law firm, and all of their personnel who were involved in the set-up of The Vennes Charitable Fund at NCF were in Minnesota;

- All actions taken by personnel of Vennes, Metro Gem, and Vennes's law firm with respect to the processing of the Transfers occurred in Minnesota;

- Each of the four Transfers to NCF was from Metro Gem's bank in Minnesota;

- Each of NCF's four grants to Fidelis Foundation was received into a bank account maintained by Fidelis Foundation in Minnesota; and

- All actions taken by Fidelis Foundation personnel with respect to the processing of NCF's four grants to Fidelis Foundation occurred in Minnesota.

**The Fidelis Foundation Grantees Were Primarily in Minnesota**

After receiving the funds involved in the Transfers via grants from NCF (as directed by Vennes), Fidelis Foundation used the funds to make grants to 20 charities. At least 11 of those charities were in Minnesota; the others were scattered among North Dakota (three charities), Illinois (two charities), and single charities in Georgia, New York, and Washington, D.C. (The

Trustee sued all 20 of Fidelis Foundation's recipients as well. *Mukamal v. CitySites Urban Media, Inc.*, Case 11-03022-PGH Doc. 2 (Amended Complaint) ¶¶ 52-55 and Schedules 1-19.)

**Criminal Prosecutions of Vennes, Harrold, and Prevost in Minnesota**

Vennes was prosecuted in the United States District Court for the District of Minnesota for his role in the Petters Fraud. On February 7, 2013, Vennes pled guilty to one count of aiding and abetting securities fraud and one count of money laundering. The specific money laundering violation admitted by Vennes was an August 2008 check payable to Countrywide Home Loans for a mortgage payment on Vennes's personal residence in Minnesota.

Likewise, the principals of the Palm Beach Funds, David Harrold and Bruce Prevost, were prosecuted and pled guilty to multiple counts of securities fraud in the Minnesota federal court. Throughout the Palm Beach Funds' involvement in the Petters Fraud, all communications between the Palm Beach Funds and Petters or PCI and all transaction documentation went through Vennes – a total of approximately 2,100 investment transactions investing approximately $8 billion in PCI notes.

**Choice of Law Provision in the PBF Transactional Documents**

The 2,100 investment transactions between the Palm Beach Funds and Petters/PCI were documented with Promissory Notes and Security Agreements – all of which contained choice of law provisions designating Minnesota law as their governing law.

**APPROPRIATENESS OF SUMMARY JUDGMENT ON CHOICE OF LAW**

The parties have agreed that the facts relevant to a resolution of the choice of law issue have been established, that a determination now as to which state's fraudulent transfer law applies will aid the parties and the Court in narrowing the issues for trial, and that it is in their collective best interests for the Court to resolve the choice of law issue at this stage of the case.

*See* Agreed *Ex Parte* Motion (I) for Leave of Court to File Cross-Motions for Summary

Judgment on Choice of Law and (II) to Amend Scheduling Order (Doc. 38) ¶¶ 2-3.

## SUMMARY JUDGMENT STANDARD

This Court recently set out the legal standard applied to a motion for summary judgment

in *Pride Family Brands, Inc. v. Carl's Patio, Inc.*, 2014 U.S. Dist. LEXIS 11799 (S.D. Fla. Jan.

30, 2014):

> Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). Once the moving party demonstrates the absence of a genuine issue of material fact, the non-moving party must "come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986) (quoting Fed. R. Civ. P. 56(e)). The Court must view the record and all factual inferences therefrom in the light most favorable to the non-moving party and decide whether "'the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997) (quoting *Anderson*, 477 U.S. at 251-52)).

*Id.* at *9 (granting summary judgment).

In this case, the parties agree that the facts material to the choice of law determination are

undisputed. The Court is therefore in a position to apply Florida's choice of law rules to the

undisputed facts and, having done so, to grant summary judgment to NCF.

## ARGUMENT

I.    **UNDER FLORIDA CHOICE OF LAW RULES, MINNESOTA LAW APPLIES TO THE TRUSTEE'S CLAIMS AGAINST NCF.**

    A.    **This Court Applies the Diversity Jurisdiction Approach to Determine Which Choice of Law Rules to Follow.**

This Court has already determined which of the various choice of law approaches the Court will follow. Between the diversity jurisdiction approach, the uniform federal common law approach, and the hybrid approach, the Court follows the diversity jurisdiction approach to determine which choice of law rules apply. *Mukamal v. Cosmos*, Adv. No. 11-02970-BKC-PGH-A Doc. 59 (July 30, 2013) at 22-23, 26-28.

Under the diversity jurisdiction approach, "[t]he Court will therefore apply the choice of law rules of the state of Florida if and when it engages in a choice of law analysis." *Id.* at 28.

    B.    **The Significant Relationship Test Determines Which State's Substantive Law Applies.**

This Court has also already determined that Florida's choice of law rules apply the "significant relationship test" to any choice of law issues regarding a statute of limitations, per *Bates v. Cook*, 509 So. 2d 1112 (Fla. 1987). *Cosmos*, Doc. 59 (July 30, 2013) at 28, 24.

The Florida Supreme Court adopted the significant relationship test in *Bishop v. Fla. Specialty Paint Co.*, 389 So. 2d 999 (Fla. 1980):

> [W]e now adopt the "significant relationships test" as set forth in the *Restatement (Second) of Conflict of Laws §§ 145-146* (1971):
>
>     *§ 145*. The General Principle
>
>     (1)    The rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in *§ 6*.
>
>     (2)    Contacts to be taken into account in applying the principles of *§ 6* to determine the law applicable to an issue include:

      (a)     the place where the injury occurred,

      (b)     the place where the conduct causing the injury occurred,

      (c)     the domicil, residence, nationality, place of incorporation and place of business of the parties, and

      (d)     the place where the relationship, if any, between the parties is centered.

These contacts are to be evaluated according to their relative importance with respect to the particular issue.

*Bishop*, 389 So. 2d at 1001.

Since *Bishop*, both the federal courts and the Florida courts have had occasion to describe and apply the significant relationship test. *See, e.g., Medlinger v. Bayer Corp. (In re Trasylol Prods. Liab. Litigation)*, 2011 U.S. Dist. LEXIS 38012 at *139 (S.D. Fla. Jan. 18, 2011) ("Under the 'most significant relationship' test, the substantive law of the jurisdiction with the closest nexus to the claims applies"; applying the four *Restatement* contacts to determine that Oklahoma law applied to the products liability suit because the decedent's surgery happened in Oklahoma, the drug in question was administered to the decedent in Oklahoma, and the decedent lived and died in Oklahoma); *Butler University v. Bahssin*, 892 So. 2d 1087, 1091 n.2 (Fla. App. 2004) ("To determine which jurisdiction has the most significant relationship to the lawsuit and parties, a court considers where the injury occurred, where the events causing the injury occurred, the domicile of the parties, and where the parties' relationship is centered. *Restatement (Second) of Conflict of Laws* § 145-46 (1971) (cited in *Bates v. Cook, Inc.*, 509 So. 2d 1112, 1114 (Fla. 1987))."). *See also Cosmos*, Doc. 59 at 25 (describing the relevant "significant relationship" factors as "the relationships of the parties with the particular states, the place of the injury, the place where the conduct causing the injury occurred, and the states' interests and policies in adjudicating these fraudulent transfer claims").

B.      **Minnesota Has the Most Significant Relationship to the Trustee's Claims Against NCF.**

Analyzing the four contacts identified in *Bishop* and the *Restatement*, as well as other significant contacts, the state with the most significant relationship to the Trustee's claims against NCF is Minnesota.  It is therefore Minnesota's fraudulent transfer law that governs the Trustee's claims.

1.      **The Injury Occurred in Minnesota.**

The injury alleged by the Trustee is the transfer of $9,010,000 (in four transactions in 2005 and 2006) from Vennes/Metro Gem to NCF – money that the Trustee contends should have been paid to (or otherwise kept available by Vennes/Metro Gem to be recovered by) the Palm Beach Funds.

The alleged injury occurred in Minnesota because:

- Vennes/Metro Gem and all their personnel associated with the Transfers, including Vennes's (and Fidelis Foundation's) attorney, were all in Minnesota.

- Immediately prior to the Transfers, the funds were in Vennes/Metro Gem's bank account in Minnesota.

- The Transfers were from Vennes/Metro Gem's bank account in Minnesota.

- Had the Transfers not occurred, the funds would have been in Vennes/Metro Gem's bank account in Minnesota.

- The Transfers were for the benefit of a Minnesota charity, Fidelis Foundation.

- The funds were returned (almost immediately) to Minnesota, to Fidelis Foundation's bank account in Minnesota.

- The funds were in Georgia only for as long as it took NCF to grant the funds to Fidelis Foundation.  On the first occasion, NCF wired the funds to Fidelis Foundation

six days after receiving Vennes's contribution.  On the second, third, and fourth occasions, NCF wired the funds to Fidelis Foundation the very next day after receiving Vennes's contributions.[3]

As far as the United States government was concerned, the injury occurred in Minnesota. When the United States determined to prosecute Vennes (and Petters and the principals of the Palm Beach Funds, Harrold and Prevost), it prosecuted them all in Minnesota – not in Georgia and not in Florida.

Likewise, when the Trustee filed adversary proceeding complaints against hundreds of Vennes/Metro Gem transferees located in many different states seeking to set aside hundreds of allegedly fraudulent transfers, the only state's fraudulent transfer law specifically pled by the Trustee was Minnesota's.  *See* Complaint ¶¶ 33, 42, and Prayer for Relief (a).  To the extent the Trustee now contends that the injury occurred somewhere other than in Minnesota, that contention is inconsistent with his initial pleading.

### 2.  The Conduct Causing the Injury Occurred in Minnesota.

Just as the alleged injury itself occurred in Minnesota, the vast majority of the conduct causing the alleged injury also occurred in Minnesota.

- Vennes and Metro Gem, the transferors, were in Minnesota.

- The intended transferee of the funds – Fidelis Foundation – was in Minnesota.

- All Vennes/Metro Gem personnel associated with the Transfers, including Vennes's (and Fidelis Foundation's) attorney, were in Minnesota.

- All Fidelis Foundation personnel associated with the transfers were in Minnesota.

- Fidelis Foundation established its DAF/Giving Fund at NCF from Minnesota.

---

[3]     As noted earlier, NCF did retain a total of $25,000 in fees for expediting Vennes's requested grants to Fidelis Foundation.

- Vennes established his DAF/Giving Fund at NCF from Minnesota.

- The Transfers were decided on by Vennes/Metro Gem and Fidelis, authorized by Vennes/Metro Gem, and executed by Vennes/Metro Gem all in Minnesota.

- All correspondence to NCF regarding the Transfers – before, during, and after – was from Vennes/Metro Gem and Fidelis Foundation in Minnesota.

- The Transfers were from Vennes/Metro Gem's bank account in Minnesota.

- The funds were returned quickly to Minnesota, to Fidelis Foundation's bank account in Minnesota.

Thus, the vast majority of the conduct causing the alleged injury occurred in Minnesota.

### 3.    Almost All of the Relevant Parties Were Located in Minnesota.

The parties with interests affected by this litigation include the Palm Beach Funds, Vennes, Metro Gem, NCF, Fidelis Foundation, and the recipients of Fidelis Foundation's grants. Only two of those parties were not in Minnesota, and even those parties' involvement included significant relationships with Minnesota.

The Palm Beach Funds.  The Palm Beach Funds were located in Florida.  However, the Palm Beach Funds had been participating in the Petters purchase money lending enterprise since 2002, always through Vennes and Metro Gem, operating out of Minnesota.  All of the thousands of transactional documents entered into by the Palm Beach Funds in those years went through Vennes/Metro Gem and designated Minnesota law as their governing law.  *See* Section 5(a) below.  The Palm Beach Funds' activities in and contacts with Minnesota were so extensive that the Palm Beach Funds' principals (Harrold and Prevost) were criminally prosecuted in Minnesota.

Vennes.  Vennes resided in and operated in and from Minnesota.

Metro Gem.  Metro Gem was incorporated and located in Minnesota.

NCF.  NCF was (and is) in Georgia.  However, its sole function was to receive funds from Minnesota and almost immediately to return those funds to Minnesota.  The fact that the funds ever left Minnesota was due merely to the happenstance that NCF is located in Georgia.

Fidelis Foundation.  Fidelis Foundation was incorporated and located in Minnesota.

Fidelis Foundation's Recipients.  The recipients of Fidelis Foundation's grants of the funds from the Transfers primarily were in Minnesota.  None were in Florida and only one was in Georgia, while three were in North Dakota and two were in Illinois.

Thus, almost all of the relevant parties were domiciled, incorporated, and so forth in Minnesota.

### 4.   The Relationships Among the Involved Parties Were Centered in Minnesota.

There were two sets of relationships relevant to this adversary proceeding:  (1) the long-standing relationship between the Palm Beach Funds and Vennes/Metro Gem that is the basis for the Palm Beach Funds' claim to be creditors of Vennes/Metro Gem and (2) the briefer relationship among Vennes/Metro Gem, NCF, and Fidelis Foundation that encompassed the Transfers.  Both sets of relevant relationships were centered in Minnesota.

Palm Beach Funds and Vennes/Metro Gem.  The relationship between the Palm Beach Funds and Vennes/Metro Gem from 2002 through 2008 was centered in Minnesota, where Vennes/Metro Gem were located and from where Vennes/Metro Gem operated.  All communications between the Palm Beach Funds and Petters or PCI and all transaction documentation went through Vennes, including approximately 2,100 investment transactions investing approximately $8 billion in PCI notes.  Evidencing the Minnesota-centeredness of the

relationship, all of the documentation of those 2,100 investment transactions specified that Minnesota law applied to the transactions.

 <u>Vennes/Metro Gem, NCF, and Fidelis Foundation.</u>   The relationship among Vennes/Metro Gem, NCF, and Fidelis Foundation was likewise centered in Minnesota. Vennes/Metro Gem and Fidelis Foundation (and its recipient charities) were all located in Minnesota.   The funds Vennes/Metro Gem contributed to NCF for the benefit of Fidelis Foundation originated in Minnesota and were returned to Minnesota (to Fidelis Foundation) almost immediately as grants from NCF.   Fidelis Foundation in turn granted the funds to its recipient charities primarily in Minnesota.

 As with the other *Restatement* contacts, the relationships among the involved parties were all centered in Minnesota.

### 5.   Other Significant Contacts Were Also with Minnesota.

 The four contacts explicitly identified in *Restatement (Second) of Conflict of Laws* § 145 are not exclusive.  *See* § 145(2) ("Contacts to be taken into account in applying the principles of *§ 6* to determine the law applicable to an issue <u>include</u> . . . .") (emphasis added).   In this case, there are three additional significant contacts with Minnesota.

#### a.   The Governing Law in the PBF Transactional Documents Was Minnesota Law.

 The 2,100 investment transactions involving the Palm Beach Funds were documented with Promissory Notes and Security Agreements.   Each of those transactional documents contained a choice of law provision designating Minnesota law as the governing law.   In other words, in every one of the 2,100 investments brokered by the Debtors in this case, the Debtors and their investors agreed in advance that any disputes regarding those transactions would be governed by Minnesota law.   It is therefore entirely appropriate that the Debtors' fraudulent

transfer claims against NCF (and other transferees of Vennes/Metro Gem) likewise be decided by Minnesota law.

> **b.    The Trustee Pleaded Minnesota Law in the Adversary Complaint in This Case (and in the Hundreds of Other Adversary Complaints).**

As of the 2011 filing of the adversary proceedings, the Trustee evidenced by his pleading his intent and expectation to pursue all of his fraudulent transfer claims under Minnesota law. He explicitly pled his claims against NCF and the other adversary proceeding defendants "[p]ursuant to M.S.A. §§ 513.44 and 513.48," "pursuant to M.S.A. § 513.41," "[p]ursuant to M.S.A. §§ 513.45 and 513.48," and (again) "pursuant to M.S.A. § 513.41."  Complaint Count 1 (heading), ¶ 33, Count 2 (heading), and ¶ 42.[4]

> **c.    The Uniform Fraudulent Transfer Act Has Been Amended to Include a Choice of Law Provision Under Which the Debtor/Transferor's Location (in This Case, Minnesota) Determines the Governing Law.**

The Uniform Fraudulent Transfer Act that is the basis for the fraudulent transfer statutes in Minnesota, Florida, and Georgia is the product of the National Conference of Commissioners on Uniform State Laws, also known as the Uniform Law Commission ("ULC").  On July 16, 2014, the ULC adopted several amendments to the UFTA (including re-naming the Act as the Uniform Voidable Transactions Act).

Significantly, one of the recent amendments adds a choice of law provision to the Uniform Act.  Under that choice of law provision, the law governing the voidability of a

---

[4]    It is true that the Trustee also pled, as a backup, the catch-all "or other applicable law." However, "other applicable law" is mentioned only in the headings of the Counts of the Complaint.  The only law cited in the body of the Counts is Minnesota law.  Complaint (Doc. 1) ¶¶ 33, 42 ("pursuant to M.S.A. § 513.41").  In addition, to this day the Trustee has never amended the Complaint to specify any applicable law other than Minnesota law.

transaction is <u>the law of the state where the debtor/transferor is located when the transfer is</u> <u>made</u>.

The new choice of law section states:

**SECTION 10. GOVERNING LAW.**

> (a)    In this section, the following rules determine a debtor's location:
>
> (1) A debtor who is an individual is located at the individual's principal residence.
>
> (2) A debtor that is an organization and has only one place of business is located at its place of business.
>
> (3) A debtor that is an organization and has more than one place of business is located at its chief executive office.
>
> (b)    **<u>A claim in the nature of a claim under this [Act] is governed by the local law of the jurisdiction in which the debtor is located when the transfer is made or the obligation is incurred</u>**.

Doc. 68-2 (UVTA Amendment) at 12-13 (emphasis added).[5]

The Official Comment to the choice of law amendment explains the rationale for the choice of the debtor/transferor's jurisdiction:

**<u>Official Comment</u>**

> 1.    Section 10, added in 2014, is a simple and predictable choice of law rule for claims of the nature governed by the Act. . . . "Local" law means the substantive law of the referenced jurisdiction, and not its choice of law rules. . . .
>
> Basing choice of law on the location of the debtor is analogous to the rule set forth in U.C.C. § 9-301 (2014), which provides that the priority of a security interest in intangible property is generally governed by the local law of the jurisdiction in which the debtor is located. The analogy is apt, because the substantive rules of this Act are a species of priority rule, in that they determine the circumstances in which a debtor's creditors, rather than the debtor's transferee, have superior rights in property transferred by the debtor.

---

[5]   The amended Uniform Voidable Transfers Act is publicly available at http://www.uniformlaws.org/shared/docs/Fraudulent%20Transfer/2014AM_AUVTA_Draft_As%20approved.pdf.  As the amended Uniform Act notes on its cover page, the "text is subject to revision by the Committee on Style" of the ULC.  By definition, however, any revisions will be purely stylistic, not substantive.

16

Doc. 68-1 (UVTA Draft) at 46.[6]

The amendment to the Uniform Act is not binding, of course, because it has not (yet) been adopted in Minnesota, but it is instructive.  The UCL – a century-old organization[7] of lawyers appointed by the states to study and review the law of the states to determine which areas of law should be uniform – has determined that the debtor/transferor's location at the time of the transfer is the most significant "contact" for choice of law purposes in fraudulent transfer cases.  This determination follows on the ULC's previous determination that the Uniform Commercial Code should specify the law of the debtor's location as the law governing perfection of a security interest in collateral (U.C.C. § 9-301) – a choice of law solution adopted by Minnesota and Georgia and Florida.  *See* Minn. Stat. § 336.9-301(1) ("Except as otherwise provided in this section, while a debtor is located in a jurisdiction, the local law of that jurisdiction governs perfection, the effect of perfection or nonperfection, and the priority of a security interest in collateral"); O.C.G.A. § 11-9-301(1) (same); Fla. Stat. § 679.3011(1) (same).

Thus, at least three additional significant contacts militate in favor of the application of Minnesota law in this case:  the choice of law provisions in the thousands of underlying investment transaction documents executed and relied on by the Palm Beach Funds; the Trustee's own selection of the most likely applicable law at the outset of this case; and the recent amendment to the Uniform Fraudulent Transfer Act previously adopted by Minnesota, Georgia, and Florida.

---

[6]    The draft UVTA, including the Official Comments, is publicly available at http://www.uniformlaws.org/shared/docs/Fraudulent%20Transfer/2014AM_auvta_draft.pdf.

[7]    The ULC was founded in 1892.  *See* "About ULC" at http://www.uniformlaws.org.

II.     **UNDER MINNESOTA FRAUDULENT TRANSFER LAW, THE TRUSTEE'S CLAIMS ARE BARRED BY THE CHARITABLE CONTRIBUTION AMENDMENT.**

The Minnesota Fraudulent Transfers Act was amended in 2012, as described shortly thereafter by the United States District Court for the District of Minnesota:

> Apparently concerned that nonprofits, charities, religious organizations and the like would be unable to repay donations long after they had been received and spent, Minnesota's Governor signed legislation on April 3, 2012, redefining the term "transfer" under the MFTA. While claims under the statute were previously subject to a six-year statute of limitations, under the new definition a transfer "does not include a contribution of money . . . made to a qualified charitable or religious organization or entity unless the contribution was made *within two years of commencement of an action* under [the MFTA]."  Minn. Stat. § 513.41(12) (emphasis added).  This amendment applies to any "cause of action existing on, or arising on or after" its effective date, April 4, 2012 -- that is, the amendment was retroactively applicable.  2012 Minn. Laws 151.

*Kelley v. College of St. Benedict*, 2012 U.S. Dist. LEXIS 153802 at *5 (D. Minn. Oct. 26, 2012).

Just before the charitable contribution amendment took effect, the Trustee of the Petters bankruptcy proceeding in Minnesota had brought the adversary proceeding against St. Benedict College to set aside both a $2 million donation and a $1 million pledge from Petters.  *Id.* at *6. The college then moved to dismiss, "arguing that the MFTA claims were untimely, based upon the statutory amendment above."  *Id.*  Significantly, <u>Trustee Kelley did not oppose the motion to dismiss but instead capitulated</u>, amending his complaint to drop his fraudulent transfer claims as to the $2 million donation.  *Id.*[8]

This Court is familiar with the charitable contribution amendment to the MFTA:

> Although not explicitly labeled a statute of limitations, Minn. Stat. § 513.41(12) unmistakably limits the amount of time a plaintiff has to institute a fraudulent transfer action.  Pursuant to § 513.41(12), transfers to charitable entities are only actionable if they occurred within two years prior to the

---

[8]     For a time, Trustee Kelley continued to assert fraudulent transfer claims as to the $1 million pledge, but the college's agreement that it would not attempt to enforce the pledge mooted the remaining fraudulent transfer claims.  *Id.* at *20.

commencement of the action.  Accordingly, a plaintiff must institute a cause of action seeking to recover a fraudulent transfer to a charitable entity within two years of the transfer – otherwise, he loses his cause of action.  Section 513.41(12)'s two-year look-back period thus functions just like a conventional statute of limitations.  Furthermore, because the two-year look-back period effectively limits the amount of time the plaintiff has to bring a cause of action, it furthers the same basic policies served by conventional statutes of limitations: repose, elimination of stale claims, and certainty about a plaintiff's opportunity for recovery and a defendant's potential liabilities.  Because the § 513.41(12)'s two-year look-back period functions precisely like a statute of limitations and furthers the same policies as conventional statutes of limitations, the Court finds that the look-back period qualifies as "applicable nonbankrutpcy law . . . [which] fixes a period within which the debtor may commence an action" within the meaning of 11 U.S.C. § 108(a).

*CitySites Urban Media, Inc.*, Doc. 165 at 13 (March 21, 2013).

Defendant NCF is a "qualified charitable or religious organization or entity" under the charitable contribution amendment because it is an organization or entity described in 26 U.S.C. § 170(c)(2).  It is a foundation organized and operated exclusively for religious and/or charitable purposes, no part of the net earnings of which inures to the benefit of any private shareholder or individual, which is not disqualified for tax-exemption under Code Section 501(c)(3) by reason of attempting to influence legislation, and which does not participate or intervene in political campaigns.  Townsend Aff. ¶ 5.

The transfers alleged in the Complaint in this case all occurred more than two years before either this adversary proceeding was commenced or the underlying bankruptcy case was commenced.  The Complaint in this Adversary Proceeding was filed on November 23, 2011 (Doc. 1).  The Petition in the underlying bankruptcy case was filed on November 30, 2009.  *See* Case No. 09-36379-PGH Doc. 1.  At the earliest, the transfers involving NCF would have to have occurred after November 30, 2007 to be potentially actionable under the charitable contribution amendment to the MFTA.  As reflected in Schedule 1 to the Complaint, however,

all of the transfers involving NCF occurred a year or more earlier, in late 2005 and 2006. *See* Complaint (Doc. 1) ¶ 31 and Schedule 1.

Accordingly, the Trustee's claims against NCF under the Minnesota Fraudulent Transfer Act (Counts I and II) are barred by the charitable contribution amendment to that statute. Those claims should therefore be dismissed with prejudice.[9]

## III.   UNDER MINNESOTA LAW, THE TRUSTEE'S UNJUST ENRICHMENT CLAIM SHOULD ALSO BE DISMISSED.

The Trustee's unjust enrichment claim (Count III) against NCF should be dismissed for at least two reasons.

First, under Minnesota law, unjust enrichment is an equitable claim that cannot stand where "there is an adequate legal remedy or where statutory standards for recovery are set by the legislature." *College of St. Benedict*, 2012 U.S. Dist. LEXIS 153802 at *20. As the District of Minnesota held in dismissing the Petters Trustee's unjust enrichment claim against a charitable transferee,

> The MFTA provided Kelley with an adequate legal remedy here. "In order for a legal remedy to be adequate it must be practical and efficient." Kelley nowhere argues that is untrue of the MFTA, despite bearing the burden of doing so. Moreover, it makes no difference that Kelley did not timely avail himself of the statute. Indeed, to conclude otherwise would permit Kelley to make an end-run around the recent amendments to the MFTA, which appear to have been designed to preclude precisely the types of claims brought in this case.

*Id.* at *21-23 (citations omitted). The same result follows here.

Second, under Minnesota law, the failure of the fraudulent transfer claims necessarily results in the failure of the unjust enrichment claim.

---

[9]   *See also* Florida's "borrowing statute," Fla. Stat. § 95.10 (1997) ("When the cause of action arose in another state or territory of the United States, or in a foreign country, and its laws forbid the maintenance of the action because of lapse of time, no action shall be maintained in this state.")

"An action for unjust enrichment may be based on failure of consideration, fraud, mistake, and situations where it would be morally wrong for one party to enrich himself at the expense of another."  However, a claim of unjust enrichment does "not lie simply because one party benefits from the efforts or obligations of others, but instead lies where one party was unjustly enriched in the sense that the term 'unjustly' could mean illegally or unlawfully."

*Hesselgrave v. Harrison*, 435 N.W.2d 861, 863-64 (Minn. Ct. App. 1989) (citations omitted).

Because the Trustee cannot establish that the transfers to NCF are illegal or unlawful under the MFTA, the Trustee fails to state a claim for unjust enrichment under Minnesota law. Count III of the Complaint should therefore be dismissed with prejudice.

## CONCLUSION

For the foregoing reasons, defendant NCF's motion for summary judgment should be granted and the Trustee's Complaint should be dismissed with prejudice.

Dated August 5, 2014.

Respectfully submitted,

**FISHERBROYLES, LLP**

By: _/s/ David J. Myers_____
David J. Myers
GA Bar No.:  533072 (admitted *pro hac vice*)

1200 Abernathy Road
Building 600, Suite 1700
Atlanta, Georgia 30328
404-825-3907 (o)
770-551-8105 (f)
dmyers@fisherbroyles.com

**SHRAIBERG, FERRARA & LANDAU, P.A.**

Bradley S. Shraiberg, Esq.
Florida Bar No. 121622

2385 NW Executive Center Drive, Suite 300
Boca Raton, Florida 33431
Telephone: 561-443-0800
Facsimile: 561-998-0047

bshraiberg@sfl-pa.com

Attorneys for National Christian Charitable
Foundation, Inc.

## <u>CERTIFICATE OF SERVICE</u>

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was furnished via Notice of Electronic Filing to those parties registered to receive electronic filings on this the 5th day of August, 2014.

By: */s/ David J. Myers*
David J. Myers