UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

In re:                                              Case No. 09-36379-PGH
                                                    Chapter 11
Palm Beach Finance Partners, L.P. and
Palm Beach Finance II, L.P.,

       Debtor(s).

_____/

Barry E. Mukamal, as Liquidating Trustee,

       Plaintiff,

                                                    Adversary Pro. No. 11-02940-PGH

v.

The National Christian Foundation, Inc.,

       Defendant.

_____/

## STATEMENT OF MATERIAL FACTS IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Defendant, National Christian Charitable Foundation, Inc. ("NCF"), hereby sets forth the material facts as to which NCF contends that there does not exist a genuine issue to be tried.

### The National Christian Foundation and Its Work

1.      NCF is a tax exempt or non-profit organization under § 501(c)(3) of the Internal Revenue Code, is a publicly supported organization under § 509(a)(1) of the Internal Revenue Code, and is an organization or entity described in 26 U.S.C. § 170(c)(2) – it is a foundation organized and operated exclusively for religious and/or charitable purposes, no part of the net earnings of which inures to the benefit of any private shareholder or individual, which is not disqualified for tax-exemption under Code Section 501(c)(3) by reason of attempting to

1

influence legislation, and which does not participate or intervene in political campaigns. Townsend Aff. ¶ 5.

2.        NCF is a particular type of non-profit organization known as a "public foundation," meaning that NCF receives contributions from donors (no single one of which contributes more than one-third of NCF's total contributions received) and in turn distributes grants to other tax exempt organizations – in NCF's case, primarily Christian organizations, whose missions NCF has determined are not antithetical to the Christian faith.  Townsend Aff. ¶ 6.

3.        NCF typically in each year, beginning with at least the year 2005, has expended for operating expenses other than grants 1.5% or less of its beginning liquid-asset balance derived from contributions, and has distributed the remainder of contributions it receives from donors in grants to other charities.  Townsend Aff. ¶ 7.

4.        Founded and incorporated in Georgia in 1982, NCF has at all times been a Georgia non-profit corporation with its principal place of business in Georgia.  Townsend Aff. ¶ 8.

5.        Any "recovery" by the Trustee in this case will necessarily be paid with funds that NCF would otherwise be distributing as grants for charitable purposes.  Townsend Aff. ¶ 9.

### Donor Advised Funds at NCF

6.        A donor to NCF – an individual, a for-profit entity, a non-profit entity, a donor advised fund, a trust, an estate, etc. – may establish a donor advised fund ("DAF") at NCF (also known internally as an NCF Giving Fund).  Townsend Aff. ¶ 10.

7.        Having established a DAF/Giving Fund at NCF, the donor may recommend grants to appropriate charitable organizations from the DAF/Giving Fund.  Townsend Aff. ¶ 11.

8.     NCF normally owns and exercises complete dominion and control of all contributions, and a donor's recommendations for grants from a DAF/Giving Fund are subject to NCF's approval.  Townsend Aff. ¶ 12.

9.     A donor establishes a DAF/Giving Fund at NCF by submitting an NCF Giving Fund Application and an initial contribution, which NCF evaluates and either accepts or rejects. Townsend Aff. ¶ 13.

10.     When the DAF/Giving Fund is established, the donor becomes an advisor to that fund and has the option to name additional fund advisors.  Townsend Aff. ¶ 14.

11.     Contributions to a DAF/Giving Fund normally are invested by NCF pending distributions recommended by the fund advisors and approved by NCF.  Townsend Aff. ¶ 15.

12.      When the fund advisor has a recommendation for a grant from a DAF/Giving Fund, the fund advisor submits a grant recommendation to NCF.  NCF then conducts a due diligence review of the recommended grant, including the recipient organization (e.g., to verify the organization's tax exempt status and mission), the amount, and the purpose of the grant. Townsend Aff. ¶ 16.

13.     In many cases, the recipient organization has already been approved by NCF, either because the organization has been the recipient of previous grants from NCF or because the recipient organization itself has established a DAF/Giving Fund with NCF.  Townsend Aff. ¶ 17.

14.     If a donor's grant recommendation is not approved for some reason, NCF will notify the fund advisor and will give the fund advisor the opportunity to revise the recommendation.  Townsend Aff. ¶ 18.

15.     If the grant recommendation is approved, the grant amount is distributed to the approved charity by check or wire transfer from NCF.  Townsend Aff. ¶ 19.

## Fidelis Foundation Established a DAF/Giving Fund with NCF

16.     Fidelis Foundation, a tax exempt charity, was incorporated in Minnesota and at all relevant times was doing business in Minnesota.  Plaintiff's Response to Defendant's First Set of Requests for Admissions to Plaintiff (Doc. 60) ¶¶ 81-89.

17.     On March 14, 2005, Joseph Smith, as President of Fidelis Foundation, submitted to NCF a completed Giving Fund Application and two checks totaling $400,000.  Depo. Exhibit 1 (Doc. 59-1 at 1-5).

18.     NCF opened a Giving Fund for Fidelis Foundation known as The Fidelis Foundation Fund, with Account ID 263203.  Depo. Exhibit 2 (Doc. 59-1 at 6-19).

19.     Thereafter, NCF sent quarterly reports regarding The Fidelis Foundation Fund to Fidelis Foundation at its Fernbrook Lane address in Plymouth, Minnesota.  *Id.*

20.     On April 18, 2005, Terry Parker and Tom Conway of NCF met with Joseph Smith and Craig Howse of Fidelis Foundation at NCF's offices in Atlanta, Georgia.  Depo. Exhibit 41 (Doc. 59-5 at 25).

21.     The Fidelis Foundation representatives asked that NCF receive the next major gift from Fidelis Foundation's primary donor (Vennes), through a DAF/Giving Fund to be set up by that donor, and then distribute the gift to Fidelis Foundation on the donor's recommendation. The transaction was expected to occur by September 30, Fidelis Foundation's fiscal year end, or by the end of the calendar year.  *Id*.

22.     On June 29, 2005, Tom Conway of NCF sent a letter to Joseph Smith of Fidelis Foundation.  Among other things, Mr. Conway informed Mr. Smith that NCF had "approved the

4

Fidelis Foundation as a pre-approved ministry, which means that you can make distributions out of your FF Giving Fund here at NCF back into you[r] Foundation whenever you desire." Depo. Exhibit 61 (Doc. 59-7 at 47).

### Frank Vennes Established a DAF/Giving Fund at NCF and Made Four Contributions to Fidelis Foundation Through NCF ("the Transfers")

23.     On December 30, 2005, Vennes established a DAF/Giving Fund with NCF when Vennes's attorney, G. Craig Howse, submitted to NCF a completed Giving Fund Application and a check for $4 million.  Depo. Exhibits 9-10 (Doc. 59-1 at 74-80).

24.     The $4 million check was drawn on Metro Gem's account at Eagle Crest Capital Bank, a division of Home Federal Savings Bank, in Rochester, Minnesota.  Depo. Exhibit 10 (Doc. 59-1 at 76).

25.     Metro Gem was incorporated in Minnesota and at all relevant times was located in Minnesota.  Plaintiff's Response to Defendant's First Set of Requests for Admissions to Plaintiff (Doc. 60) ¶¶ 72-80.

26.     NCF opened a Giving Fund for Vennes known as The Vennes Charitable Fund, Account ID 320189.  Depo. Exhibit 13 (Doc. 59-2 at 2).

27.     On January 6, 2006, NCF wired a $3,985,000 grant ($4 million minus a $15,000 fee to NCF for the expedited grant request) to Fidelis Foundation's bank in Minnesota.  *Id.*; Depo. Exhibit 14 (Doc. 59-2 at 3).

28.     Fidelis Foundation had previously provided NCF with Wiring Instructions for its account at Private Bank Minnesota, 222 South 9th Street, Suite 3800, Minneapolis, Minnesota 55402.  Townsend Aff. ¶ 20 and Exhibit A.

29.     Thereafter, NCF sent quarterly reports regarding The Vennes Charitable Fund to Vennes at P.O. Box 97 in Excelsior, Minnesota.  Depo. Exhibits 13 (Doc. 59-2 at 2), 17 (Doc. 59-2 at 7), 20 (Doc. 59-2 at 17), 82 (Doc. 59-9 at 24).

30.     Mr. Howse and his law firm sent other written communications to NCF from Minnesota regarding The Vennes Charitable Fund via email and facsimile.  Depo. Exhibits 19 (Doc. 59-2 at 15-16), 36 (Doc. 59-5 at 17), 63 (Doc. 59-7 at 50-52).

31.     NCF sent other written communications regarding The Vennes Charitable Fund to Vennes and Howse in Minnesota, via email and mail.  Depo. Exhibits 19 (Doc. 59-2 at 15-16), 36 (Doc. 59-5 at 17), 45-48 (Doc. 59-5 at 52-55), 51 (Doc. 59-5 at 60-61), 87 (Doc. 59-9 at 30).

32.     On September 27, 2006, NCF received a $610,000 contribution to The Vennes Charitable Fund via wire transfer from Metro Gem's account at Home Federal Savings Bank in Minnesota.  Depo. Exhibits 17-18 (Doc. 59-2 at 7-8, 10).

33.     On September 28, 2006, NCF wired a $600,000 grant ($610,000 minus a $10,000 fee for the expedited grant request) to Fidelis Foundation's bank account with Private Bank Minnesota.  Depo. Exhibits 17 (Doc. 59-2 at 7), 50 (Doc. 59-5 at 58).

34.     On October 2, 2006, NCF received a $400,000 contribution to The Vennes Charitable Fund via wire transfer from Metro Gem's account at Home Federal Savings Bank in Minnesota.  Depo. Exhibits 20 (Doc. 59-2 at 17), 21 (Doc. 59-2 at 18).

35.     On October 3, 2006, NCF wired a grant of $400,000 to Fidelis Foundation's bank account with Private Bank Minnesota.  Depo. Exhibits 20 (Doc. 59-2 at 17), 81 (Doc. 59-9 at 21-22).

36.     On December 19, 2006, NCF received a $4 million contribution to The Vennes Charitable Fund via wire transfer from Metro Gem's account at Home Federal Savings Bank in Minnesota.  Depo. Exhibits 20 (Doc. 59-2 at 17), 22 (Doc. 59-2 at 24-25).

37.     On December 20, 2006, NCF wired a $4 million grant to Fidelis Foundation's bank account with Private Bank Minnesota.  Depo. Exhibits 20 (Doc. 59-2 at 17), 49 (Doc. 59-5 at 56-57).

### The Fidelis Foundation Grantees Were Primarily in Minnesota

38.     After receiving the funds involved in the Transfers via grants from NCF (as directed by Vennes), Fidelis Foundation used the funds to make grants to other charities, primarily in Minnesota, also as directed by Vennes.  *Mukamal v. CitySites Urban Media, Inc*., Case 11-03022-PGH Doc. 2 (Amended Complaint) ¶¶ 52-55 and Schedules 1-19.

39.     Specifically, Fidelis Foundation made grants to 20 charities using the funds involved in the Transfers in this case.  Of those 20, no less than 11 were Minnesota charities. (Eight other charities were scattered among North Dakota (three charities), Illinois (two charities), and Georgia, New York, and Washington, D.C.   One charity's location was not identified.)  *Id.* ¶¶ 7-26.

### Criminal Prosecution of Vennes, Harrold, and Prevost in Minnesota

40.     Vennes and the principals of the Palm Beach Funds, David Harrold and Bruce Prevost, were prosecuted in the United States District Court for the District of Minnesota for their roles in the Petters Fraud.  Doc. 65-1 (Indictment).

41.     On February 1, 2013, Vennes pled guilty to (a) aiding and abetting securities fraud and (b) money laundering.  Doc. 69-1 (Vennes Plea Hearing) at 40-41.

42.     The specific securities fraud violation admitted by Vennes was the sending of a March 2007 communication (audited financials) to prospective investors misrepresenting the PCI flow of funds and concealing Vennes's role and criminal history.   Doc. 67-1 (Second Superseding Indictment) at 27.

43.     The specific money laundering violation admitted by Vennes was an August 2008 check payable to Countrywide Home Loans for a mortgage payment on Vennes's personal residence in Shorewood, Minnesota.  *Id.* at 39.[1]

44.     On April 21, 2011, Harrold and Prevost pled guilty to all four counts of securities fraud against them.  Doc. 66-1 (Prevost Plea Hearing) at 57;  Doc. 64-1 (Harrold Plea Hearing) at 45-46.

45.     The Palm Beach Funds had been participating in the Petters purchase money lending enterprise since 2002, always through Vennes and Metro Gem.  Doc. 65-1 (Indictment) ¶¶ 11, 14-16; Doc. 66-1 (Prevost Plea Hearing) at 19-32; Doc. 64-1 (Harrold Plea Hearing) at 17-29.

46.     All communications between the Palm Beach Funds and Petters or PCI and all transaction documentation went through Vennes – a total of approximately 2,100 investment transactions investing approximately $8 billion in PCI notes.  Doc. 65-1 (Indictment) ¶¶ 13-14, 16; *id.* Doc. 66-1 (Prevost Plea Hearing) at 21-22.

### Choice of Law Provision in the PBF Transactional Documents

47.     The Promissory Notes used by Vennes in his transactions with the Palm Beach Funds all contained a choice of law provision designating Minnesota law as the governing law. Townsend Aff. ¶ 21 and Exhibit B ¶ 14.

---

[1]     Regarding Vennes's guilty plea, *see also* Plaintiff's Response to Defendant's First Set of Requests for Admissions to Plaintiff (Doc. 60) ¶¶ 119-22, 124-25.

48.     The Security Agreements used by Vennes in his transactions with the Palm Beach Funds all contained a choice of law provision designating Minnesota law as the governing law. Townsend Aff. ¶ 22 and Exhibit C ¶ 5(b).


Dated August 5, 2014.

Respectfully submitted,

**FISHERBROYLES, LLP**

By: _/s/ David J. Myers_
David J. Myers
GA Bar No.:  533072 (admitted *pro hac vice*)

1200 Abernathy Road
Building 600, Suite 1700
Atlanta, Georgia 30328
404-825-3907 (o)
770-551-8105 (f)
dmyers@fisherbroyles.com

**SHRAIBERG, FERRARA & LANDAU, P.A.**

Bradley S. Shraiberg, Esq.
Florida Bar No. 121622

2385 NW Executive Center Drive, Suite 300
Boca Raton, Florida 33431
Telephone: 561-443-0800
Facsimile: 561-998-0047
bshraiberg@sfl-pa.com

Attorneys for National Christian Charitable Foundation, Inc.

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was furnished via

Notice of Electronic Filing to those parties registered to receive electronic filings on this the 5th

day of August, 2014.

By:  */s/ David J. Myers*
David J. Myers

UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

In re:                                                      Case No. 09-36379-PGH
                                                            Chapter 11
Palm Beach Finance Partners, L.P. and
Palm Beach Finance II, L.P.,

        Debtor(s).
_____/

Barry E. Mukamal, as Liquidating Trustee,

        Plaintiff,

                                                            Adversary Pro. No. 11-02940-PGH
v.

The National Christian Foundation, Inc.,

        Defendant.
_____/

## AFFIDAVIT OF TIMOTHY W. TOWNSEND, ESQ.

STATE OF GEORGIA

COUNTY OF FULTON

        Before me, the undersigned authority, personally appeared Timothy W. Townsend, Esq.,

who, being duly sworn according to law, deposes and states as follows:

        1.      I am General Counsel of defendant, The National Christian Charitable

Foundation, Inc. d/b/a The National Christian Foundation ("NCF"), and have held that position

since 2006.

        2.      I make this affidavit in support of NCF's motion for summary judgment in this

case.

1

3.      All statements herein are within my personal knowledge, including from my examination of NCF's records with regard to the transactions at issue in this case.

4.      I am fully competent to testify to the facts recited herein.

### The National Christian Foundation and Its Work

5.      NCF is a tax exempt or non-profit organization under § 501(c)(3) of the Internal Revenue Code, is a publicly supported organization under § 509(a)(1) of the Internal Revenue Code, and is an organization or entity described in 26 U.S.C. § 170(c)(2) – it is a foundation organized and operated exclusively for religious and/or charitable purposes, no part of the net earnings of which inures to the benefit of any private shareholder or individual, which is not disqualified for tax-exemption under Code Section 501(c)(3) by reason of attempting to influence legislation, and which does not participate or intervene in political campaigns.

6.      NCF is a particular type of non-profit organization known as a "public foundation," meaning that NCF receives contributions from donors (no single one of which contributes more than one-third of NCF's total contributions received) and in turn distributes grants to other tax exempt organizations – in NCF's case, primarily Christian organizations, whose missions NCF has determined are not antithetical to the Christian faith.

7.      NCF typically in each year, including 2005 and 2006, has expended for operating expenses other than grants 1.5% or less of its beginning liquid-asset balance derived from contributions, and has distributed the remainder of contributions it receives from donors in grants to other charities.

8.      Founded and incorporated in Georgia in 1982, NCF has at all times been a Georgia non-profit corporation with its principal place of business in Georgia.

2

9.      Any "recovery" by the Trustee in this case will necessarily be paid with funds that NCF would otherwise be distributing as grants for charitable purposes.

### Donor Advised Funds at NCF

10.     A donor to NCF – an individual, a for-profit entity, a non-profit entity, a donor advised fund, a trust, an estate, etc. – may establish a donor advised fund ("DAF") at NCF (also known internally as an NCF Giving Fund).

11.     Having established a DAF/Giving Fund at NCF, the donor may recommend grants to appropriate charitable organizations from the DAF/Giving Fund.

12.     NCF normally owns and exercises complete dominion and control of all contributions, and a donor's recommendations for grants from a DAF/Giving Fund are subject to NCF's approval.

13.     A donor establishes a DAF/Giving Fund at NCF by submitting an NCF Giving Fund Application and an initial contribution, which NCF evaluates and either accepts or rejects.

14.     When the DAF/Giving Fund is established, the donor becomes an advisor to that fund and has the option to name additional fund advisors.

15.     Contributions to a DAF/Giving Fund normally are invested by NCF pending distributions recommended by the fund advisors and approved by NCF.

16.     When the fund advisor has a recommendation for a grant from a DAF/Giving Fund, the fund advisor submits a grant recommendation to NCF.  NCF then conducts a due diligence review of the recommended grant, including the recipient organization (e.g., to verify the organization's tax exempt status and mission), the amount, and the purpose of the grant.

3

17.     In many cases, the recipient organization has already been approved by NCF, either because the organization has been the recipient of previous grants from NCF or because the recipient organization itself has established a DAF/Giving Fund with NCF.

18.     If a donor's grant recommendation is not approved for some reason, NCF will notify the fund advisor and will give the fund advisor the opportunity to revise the recommendation.

19.     If the grant recommendation is approved, the grant amount is distributed to the approved charity by check or wire transfer from NCF.

20.     Exhibit A to this affidavit is a true and correct copy of the wiring instructions Fidelis Foundation provided to NCF in 2005 for Fidelis Foundation's account at Private Bank Minnesota, 222 South 9th Street, Suite 3800, Minneapolis, Minnesota 55402.

21.     Exhibit B to this affidavit is a true and correct copy of the Promissory Note form used by PCI in the Petters Fraud, which was produced to NCF by the Trustee and Bates numbered by the Trustee as PBF_NCF_025937-41.

22.     Exhibit C to this affidavit is a true and correct copy of the Security Agreement form used by PCI in the Petters Fraud, which was produced to NCF by the Trustee and Bates numbered by the Trustee as PBF_NCF_025942-44.

4

**FURTHER AFFIANT SAYETH NAUGHT.**

_____
Timothy W. Townsend, Esq.

SWORN TO AND SUBSCRIBED before me this 5th day of August, 2014 by Timothy W. Townsend, Esq., who is personally known to me.

_____
NOTARY PUBLIC

Print Name: _Mary D. Carroll_
My Commission Expires: _July 19, 2017_

# EXHIBIT A

CONFIDENTIAL

## WIRING INSTRUCTIONS

| | |
|---|---|
| Bank: | **Private Bank Minnesota** |
| Bank address: | 222 South 9th Street, Suite 3800, Minneapolis, MN 55402 |
| Bank contact: | Sue Neumann (612)305-4235 |
| ABA Routing Number: | **091005836** |
| Account name: | **Fidelis Foundation** |
| Account number: | ▓▓▓▓▓▓ |

NCF000014

# EXHIBIT B

## PROMISSORY NOTE

$4,335,000
19.00% Interest

January 12, 2006
State of Minnesota

**FOR VALUE RECEIVED,** Payor hereby promises to pay to the order of Payee, or Payee's successors or assigns, the Principal Amount of this Promissory Note, together with Interest, on or before the maturity date, as follows:

1. **Payor.** Payor, as used herein, shall be Petters Company, Inc., 4400 Baker Road, Suite 200, Minnetonka, MN 55343, or such other address of which Payor shall have notified Payee in accordance with this Agreement.

2. **Payee.** Payee, as used herein, shall be Fidelis Foundation, as agent for Minnesota Teen Challenge, Trinity Christian School, Seg-Way Ministries, International Ministerial Fellowship, Bethany International and Fidelis Foundation. Payee's address is c/o Fidelis Foundation, 3189 Fernbrook Lane North, Plymouth, MN 55447 or such other address of which Payee shall have notified Payor in accordance with this Agreement.

3. **Principal Amount.** The Principal Amount is Four Million Three Hundred Thirty-five Thousand and no/100 Dollars ($4,335,000.00).

4. **Interest.** Payor shall pay Payee Interest on the Principal Amount of this Promissory Note at the rate of nineteen percent (19.00%) simple interest per annum on the outstanding Principal Amount from the date of this Promissory Note until paid in full.

5. **Payments.** The Principal Amount and accrued Interest shall be payable as follows:

   (a) Amount of Payments. The Principal Amount shall be due and payable to the Payee in lawful money of the United States of America upon receipt by the Payor of the accounts receivable due and owing to the Payor under the Purchase Order attached to the Security Agreement described in Paragraph 8 below, but in no event more than 120 days after the date of this Promissory Note. Interest that accrues hereon from time to time shall be payable upon payment of the Principal Amount. Notwithstanding the foregoing, if the Payee gives notice of demand for payment, the Principal Amount and all Interest shall be due and payable thirty (30) days from receipt of notice.

   (b) Place of Payments. Payments shall be paid at the address set forth in Paragraph 2 above or as may be modified as provided herein.

   (c) Application. Payments received by Payee under this Promissory Note shall first be applied to all accrued Interest on the date the payment is credited and then to the unpaid Principal Amount until the entire indebtedness is paid in full.

PBF_NCF_025937

6.  **Payor's Right to Prepay.** Payor has the right to make prepayments of all or any part of the Principal Amount at any time before it is due without penalty or premium. Any prepayment will be applied first to Interest through the date of such prepayment and second to the outstanding Principal Amount. Any prepayment will not postpone the due date of any subsequent amount due unless Payee otherwise agrees in writing to a change.

7.  **Dishonored Checks.** Payee may collect the maximum processing fee for each check of Payor which is dishonored and returned as provided by state law, from time to time.

8.  **Security Interest.** This Promissory Note is secured by a security interest granted to Payee in certain personal property pursuant to a Security Agreement between Payor and Payee, of even date herewith (the "Security Agreement").

9.  **Default.** An Event of Default shall mean and include for the purposes of this Promissory Note any one or more of the events as follows:

    (a) Payor shall fail to pay, when due, any amount due and payable under this Promissory Note and shall fail to cure such default within fifteen (15) days after receiving from Payee a written notice of such default; or

    (b) The occurrence of any event of default under any loan agreement, credit facility, term loan or any other agreement entered into by Payor for the use of borrowed funds, with respect to which (i) the creditor has accelerated the maturity of the indebtedness of Payor to such creditor, or (ii) the creditor has initiated action to collect such indebtedness; or

    (c) There shall have been filed or commenced against Payor an involuntary case under any applicable bankruptcy, insolvency or other similar laws now or hereafter in effect or an action shall have been commenced to appoint a receiver, liquidator, assignee, custodian, trustee, sequestrator (or similar official) of Payor or for any substantial part of Payor's property or for the winding-up or liquidation of Payor's affairs and such action or proceeding shall not have been dismissed within sixth (60) days; or

    (d) Payor shall commence a voluntary case under any applicable bankruptcy, insolvency or other similar laws now or hereafter in effect; or shall consent to the entry of an order for relief in an involuntary case under any such law; or shall consent to the appointment of or taking possession by a receiver, liquidator, assignee, trustee, custodian, sequestrator (or other similar official) of Payor or of any substantial part of Payor's property; or shall make any general assignment for the benefit of creditors; or shall take any action in furtherance of any of the foregoing;

2

PBF_NCF_025938

(c) Payor shall default in the performance by Payor of any of Payor's covenants or commitments under the Security Agreement, which default is not cured by Payor within the cure period set forth in the Security Agreement.

10. **Remedies.** Upon the occurrence of an Event of Default, Payee may, at Payee's option, declare the unpaid Principal Amount and any accrued Interest thereon immediately due and payable upon written notice to Payor and may exercise any and all rights it may have under the Security Agreement, under any other agreement with the Payor, and by law. Payor agrees to pay Payee all costs of collection of this Note incurred by Payee, including but not limited to legal expenses and reasonable attorney's fees, paid or incurred by Payee on account of such collection, whether or not suit is filed with respect thereto and whether such cost or expense is paid or incurred, or to be paid or incurred, prior to or after entry of judgment. Interest on any amount due Payee after an Event of Default shall accrue at the rate set forth in paragraph 4 until all amounts are paid in full.

11. **Waiver.** Payor hereby waives demand, presentment, protest, notice of protest and notice of dishonor of this Promissory Note.

12. **Non-Waiver.** The waiver by Payee of an Event of Default or other breach of this Promissory Note by the Payor shall not be construed as a waiver of any other Event of Default or breach by Payor.

13. **Notices.** All notices given pursuant to this Promissory Note shall be given in writing and shall be effective upon receipt. All such notices shall be delivered by hand or sent by registered or certified mail, postage prepaid and return receipt requested, to the other party at the addresses set forth in Paragraphs 1 and 2 (or such other addresses as may have been provided to the other party in accordance with the terms of this Paragraph). Notice given by hand shall be effective upon receipt and notice sent by registered or certified mail shall be deemed given three (3) days after being mailed.

14. **Governing Law.** This Promissory Note shall be governed by, construed and interpreted pursuant to the laws of the State of Minnesota.

3

PBF_NCF_025939

IN WITNESS WHEREOF, the undersigned Payor has executed and acknowledged receipt of a copy of this Promissory Note on the date written below.

PETTERS COMPANY, INC., Payor

Dated: January 12, 2006

By: _____
Its: _____

4

PBF_NCF_025940

## GUARANTY

In consideration for the loan of monies to the Payor in which the undersigned has an interest, the undersigned unconditionally guarantees to Payee the payment of all amounts due and owing Payee and the performance of all obligations of Payor pursuant to the Promissory Note to Fidelis Foundation dated January 12, 2006 for the principal amount of Four Million Three Hundred Thirty-five Thousand and no/100 Dollars ($4,335,000.00), without the necessity of Payee bringing any action of proceeding against Payor. The undersigned further waives any defenses other than payment, which could be brought against Payee by Payor to defeat this Guaranty.

Dated: _____

_____
Thomas J. Petters

5

# EXHIBIT C

## SECURITY AGREEMENT

THIS AGREEMENT is by and between Petters Company, Inc., a Minnesota corporation, having its address at 4400 Baker Road, Minnetonka, MN  55343 (hereinafter referred to as "Debtor"), and Fidelis Foundation, a Minnesota nonprofit Corporation, whose address is 3189 Fernbrook Lane North, Plymouth, MN 55447, (hereinafter referred to as "Secured Party").

For valuable consideration as set forth in the Promissory Note entered into by Debtor dated January 12, 2006, the parties agree as follows:

1.    Security Interest.    Debtor hereby grants to Secured Party a security interest under Article 9 of the Uniform Commercial Code in the following described property to secure payment of indebtedness owed to Secured Party:

Merchandise as reflected or referred to in the Purchase Order attached hereto as Exhibit A or as reflected or referred to in any future documentation, including bills of lading, which relate back to Exhibit A;

Any other merchandise which Debtor has or will acquire rights in or use of to the extent funds advanced by the Secured Party has enabled Debtor to acquire an interest in such merchandise; and

Any and all accounts receivables and proceeds which Debtor may acquire through the disposal of such merchandise.

This Security Interest is granted to secure payment of funds loaned to Debtor which has enabled or is intended to enable Debtor to acquire rights in or use of certain merchandise, which the parties understand and anticipate that Debtor intends to resell as a part of its business.  The Secured Party agrees that Debtor may, in the ordinary course of Debtor's business, transfer title to or dispose of the merchandise or goods in which a security interest has been granted in a manner consistent with the Representations and Agreement set forth herein and Debtor agrees that, in the event of such disposition, the Secured Party's interest will extend to all accounts receivable generated and all proceeds received relating to such disposition.

PBF_NCF_025942

2.      Representation and Agreements.

Debtor represents and warrants to the Secured Party and agrees as follows.

(a)      All funds provided by the Secured Party will be advanced towards the purchase of the merchandise described in Exhibit A, or, in the event of any change in the merchandise described therein, towards the purchase of such other merchandise regarding which the Secured Party has been provided prior notice and an amendment has been made to this Security Agreement referencing the actual merchandise acquired.

(b)      Once acquired, the merchandise will be owned free and clear by Debtor until sold during the ordinary course of Debtor's business, and, during such time, the merchandise will be free and will remain free from all security interest, liens, claims and encumbrances.

(c)      Debtor agrees to use reasonable care in its handling of the merchandise and to keep the merchandise adequately insured in the event Debtor takes or maintains physical custody of the merchandise.

(d)      Debtor agrees to sign any financing statements that are required by the Secured Party to perfect this security interest.

3.      Default.

In the event of default by Debtor of any obligation evidenced by the Promissory Note referred to above, the Secured Party may declare the entire obligation immediately due and payable and will have all of the remedies of a secured party under the Uniform Commercial Code. Events of default will include any failure to pay amounts as due under the terms of the Promissory Note, and any breach of the Representations and Agreements set forth in this Security Agreement. In the event of default, Debtor will be responsible for any costs of collection, including court costs and attorney fees.

4.      Modification.

No modification of this Agreement will be effective unless it is in writing and is signed by all parties. This Agreement binds and benefits all parties and successors.

PBF_NCF_025943

5.    Additional Provisions.

(a)    This Agreement, including any attachments, is the entire agreement between the Parties.

(b)    This Agreement is governed by the laws of the State of Minnesota.

(c)    Pursuant to Paragraph 1, Insurance through The Maryland Netherlands Credit Insurance Company is covered and a coverage binder has been received by Metro Gem, Inc., and Metro Gem, Inc. shall be listed as loss payee.

Debtor:                                  PETTERS COMPANY, INC.

                                         By:
                                         Its:

Personal Guarantee:                      THOMAS J. PETTERS

Secured Party:                           By:
                                         Its:

Witness:

PBF_NCF_025944