UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

In re:                                                      Case No. 09-36379-PGH
                                                            Chapter 11
Palm Beach Finance Partners, L.P. and
Palm Beach Finance II, L.P.,

       Debtor(s).

_____/

Barry E. Mukamal, as Liquidating Trustee,

       Plaintiff,

                                                            Adversary Pro. No. 11-02940-PGH
v.

The National Christian Foundation, Inc.,

       Defendant.

_____/

## RESPONSE TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT REGARDING CHOICE OF LAW

The choice of law analysis under Florida law seeks to determine which state has the most significant relationship to this case, but the Trustee strives mightily to avoid the significant relationship analysis by claiming a "false conflict" and by treating the four contacts of Restatement § 145 as too difficult to apply and therefore unimportant.  The Trustee is wrong.  The proper outcome of the choice of law analysis is that Minnesota law applies to the Trustee's fraudulent transfer claims.

### RESPONSE TO PLAINTIFF'S STATEMENT OF MATERIAL FACTS

1.      Not disputed.

2.      Not disputed, but incomplete.  The Vennes Plea was explicit that Vennes was "not charged with knowledge of the underlying Petters Ponzi scheme" and that Vennes was

"[w]ithout knowledge of the fact that the PCI Note transactions were part of a massive Ponzi scheme orchestrated by Petters."  Vennes Plea (Doc. 61) at 3, 10.

3.      NCF does not dispute Vennes's 1987 convictions but does dispute the characterization that Vennes was "involve[d] in the Petters' [sic] Ponzi scheme."  The Vennes Plea was explicit that Vennes was "not charged with knowledge of the underlying Petters Ponzi scheme" and that Vennes was "[w]ithout knowledge of the fact that the PCI Note transactions were part of a massive Ponzi scheme orchestrated by Petters."  Vennes Plea (Doc. 61) at 3, 10.

4.      NCF does not dispute that Deposition Exhibits 26 and 27 contain the statements quoted by the Trustee.  Doc. 59-2 at 45; Doc. 59-3 at 53.  However, those documents are internal manuals regarding charity research and grant processing and, therefore, contain only imprecise descriptions of NCF's "purpose."  NCF's purposes are more precisely set out in the Statement of Material Facts in Support of Defendant's Motion for Summary Judgment (Doc. 71) ¶¶ 1-4.

5.      Not disputed.

6.      Not disputed.

7.      Not disputed.

8.      Not disputed.

9.      Not disputed.

10.     Not disputed.

11.     Not disputed.

12.     NCF objects that this paragraph violates Local Rule 56.1(a)(3) in combining multiple statements of fact in one paragraph without separate numbering.  Subject to that objection, the multiple facts stated in this paragraph are not disputed, except that the Transfers at issue in this case were not handled as typical contributions to a DAF.  Instead, NCF agreed with

Vennes and Fidelis Foundation, in advance and as a condition of Vennes's contributions to his DAF, that Vennes could "earmark" his contributions for distribution to Fidelis Foundation – i.e., that NCF, after receiving Vennes's contributions to his DAF, would promptly grant the contributions to Fidelis Foundation.  Townsend Depo. (Doc. 57) at 44, 47, 73-74, 92 ("these would be considered earmarked contributions"; "the totality of the communications here showed earmarking"; "NCF had obligated itself to make the subsequent grant to Fidelis"; "we, NCF, told Vennes and Fidelis that that is what we were going to do.  So – and that was a condition of their gift to us, in that they would not have made that gift unless we told them we were going to do that"; "we made that commitment"; "earmarked by Vennes, but still a charitable grant by NCF").

     13.     Not disputed.

     14.     Not disputed.

     15.     Not disputed.

     16.     Not disputed, except that attorney Craig Howse attended the meeting solely in his capacity as a board member and attorney for Fidelis Foundation.  Depo. Exhibit 41 (Doc. 59-5 at 25).  It was not until eight months later that Mr. Howse had any dealings with NCF in his capacity as attorney for Vennes/MGI.  NCF's Statement of Material Facts (Doc. 71) ¶¶ 23; Depo. Exhibits 9-10 (Doc. 59-1 at 74-80).

     17.     NCF objects that this paragraph violates Local Rule 56.1(a)(3) in combining multiple statements of fact in one paragraph (including additional statements of fact in a footnote to the paragraph) without separate numbering.  Subject to that objection, the multiple facts stated in this paragraph are disputed.

          a.     Smith and Howse came to Georgia to discuss multiple issues with NCF.  In addition to the "public support test" issue, the Fidelis Foundation

representatives wanted to talk to NCF about (a) affiliating with NCF in the future regarding their Donor Advised Fund activities and their complex gift activities (because Fidelis Foundation did not want to have to "staff up" to handle these items), and (b) a potential large gift of real estate given partially into a charitable remainder trust and partially as an outright gift.   Depo. Exhibit 41 (Doc. 59-5 at 25); Depo. Exhibit 61 (Doc. 59-7 at 47).

b.  Regarding the public support test issue, the Fidelis Foundation representatives asked that NCF receive the next major gift from Fidelis Foundation's primary donor (who was not named at that time), through a DAF/Giving Fund to be set up by that donor, and then distribute the gift to Fidelis Foundation on the donor's recommendation.    The transaction was expected to occur by September 30, Fidelis Foundation's fiscal year end, or by the end of the calendar year.  Depo. Exhibit 41 (Doc. 59-5 at 25); Depo. Exhibit 61 (Doc. 59-7 at 47).

c.  Neither Smith nor Howse requested NCF's assistance, and NCF provided no assistance, in any "work-around" of IRS regulations.  Depo. Exhibit 41 (Doc. 59-5 at 25).  Neither the Internal Revenue Code ("Code") nor the Treasury Regulations thereunder prohibit or restrict a donor from contributing to a public charity and then recommending that the charity make grants to another charity.  In fact, this is the nature of donor-advised funds, as defined by Code § 4966.

d.  Some of the multiple assertions in footnote 14 are not accurate.  The Code and the Treasury Regulations thereunder speak for themselves.

18.     Not disputed, except that it is not accurate for the Trustee to lump Vennes and the Fidelis Foundation together as "the Vennes/Fidelis Parties" with regard to the April 2005 meeting, which was not attended by Vennes, MGI, or any representative of either; neither Vennes nor MGI was even named at the meeting.  Depo. Exhibit 41 (Doc. 59-5 at 25).

19.     Not disputed, except that (a) the Gift Acceptance Memorandum identified Vennes, not MGI, as the Donor/Owner of the promissory note, Depo. Exhibit 6 (Doc. 59-1 at 69) ¶ 4, and (b) it is not accurate for the Trustee to lump Vennes and the Fidelis Foundation together as "the Vennes/Fidelis Parties" with regard to the April 2005 meeting, which was not attended by Vennes, MGI, or any representative of either; neither Vennes nor MGI was even named at the meeting.  Depo. Exhibit 41 (Doc. 59-5 at 25).

20.     Not disputed, except that the Gift Acceptance Memorandum identified Vennes, not MGI, as the Donor/Owner of the promissory note.  Depo. Exhibit 6 (Doc. 59-1 at 69) ¶ 4.

21.     NCF objects that this paragraph violates Local Rule 56.1(a)(3) in combining multiple statements of fact in one paragraph without separate numbering.  Subject to that objection, the multiple facts stated in this paragraph are not disputed, except that:

   a.   Mr. Howse submitted the Giving Fund Application as counsel for Vennes, not the Vennes Parties.  Exhibit 9 (Doc. 59-1 at 74) ("Mr. Vennes, our client, wishes to open a Giving Fund"; "He is supplying the enclosed application"; "I have completed the application on his behalf and executed it as his attorney"); and

   b.   The Transfers at issue in this case were not handled as typical contributions to a DAF.  *See* ¶ 12 above.

22.     Not disputed.

23.     Not disputed.

24.     Not disputed.

25.     Not disputed.

26.     Not disputed, except that the Transfers at issue in this case were not handled as typical contributions to a DAF.  *See* ¶ 12 above.

27.     Not disputed.

28.     Not disputed.

29.     Not disputed.

30.     Not disputed.

## Additional Material Facts

NCF incorporates by reference its Statement of Material Facts in Support of Defendant's Motion for Summary Judgment (Doc. 71).

## ARGUMENT

**A.     This Is Not a "False Conflict" Case.**

Plaintiff's "false conflict" argument is a red herring.  Even when discussed in Florida cases, "false conflict" analysis is rarely (if ever) the basis for a choice of law decision.  Instead, it is almost always duplicative of the significant relationship test, which is not surprising, given that "the more comprehensive Restatement analysis should always reach the same result as the quicker decision under a false conflict analysis."  *Tune v. Philip Morris, Inc.*, 766 So. 2d 350, 353 (Fla. App. 2000).

More importantly, the false conflict argument fails in the face of Minnesota's demonstrable and significant interest in having its law applied to the alleged fraudulent transfers by its domiciliaries, Vennes and/or MGI.

1.      The "False Conflict" Analysis Is of Little to No Use in Cases Such as This.

In Florida, the "false conflict" analysis was first discussed by the Florida Court of Appeals in *Tune*, which described the three situations in which a "false conflict" might exist: "when the laws of different states are (1) the same, (2) different but would produce the same outcome under the facts of the case, or (3) when the policies of one state would be furthered by the application of its laws while the policy of the other state would not be advanced by the application of its laws."   766 So. 2d at 352.   Here, the Trustee asserts a Category 3 "false conflict."

Since *Tune*, no Florida Court of Appeals decision has disposed of a choice of law issue on the basis of the false conflict analysis in a Category 3 situation (and there have been no Florida Supreme Court cases discussing the "false conflict" analysis).   In fact, in the only Florida Court of Appeals decision discussing a party's Category 3 "false conflict" argument, the argument was only considered <u>after</u> analysis of all of the Restatement factors, and, as predicted in *Tune*, the court reached the same result under both analyses.   *Hoffman v. Ouellette*, 798 So. 2d 42, 46 (Fla. App. 2001) (auto accident in Florida between two Quebec citizens, both temporarily residing in Florida; court held that Florida law applied under the significant relationship test, then noted that "this <u>may</u> be a case of 'false conflict'" because, under the facts, Quebec's policy would not be advanced by the application of its laws, though there was no apparent disparity between applicable Florida and Quebec law).

Since *Tune*, there have been three federal district court cases in Florida discussing the "false conflict" analysis in a Category 3 situation.   In two of those cases, the "false conflict" argument was rejected outright.

In *Gulf Group Holdings, Inc. v. Coast Asset Mgmt. Corp.*, 516 F. Supp. 2d 1253 (S.D. Fla. 2007), the defendant had counterclaimed for injury to professional reputation, a cause of action recognized under California law but not recognized under Florida law.  The defendant argued that this meant there was a "false conflict," under which "the policies of California would be furthered by the application of its laws while the policies of Florida would not be advanced by the application of Florida law." *Id.* at 1271.  The court rejected the "false conflict" argument, holding that "California law does not automatically apply to this claim merely because Florida law does not recognize the cause of action." *Id.* at 1269.

In *Chapman v. Depuy Orthopedics, Inc.,* 760 F. Supp. 2d 1310 (M.D. Fla. 2011), a products liability suit regarding a medical device that failed (in Florida) several years after implantation in the plaintiff in Virginia, the device was not manufactured in Virginia and <u>there was no Virginia party in the case</u>.  Nevertheless, the court not only rejected the "false conflict" argument – holding that Virginia had "a legitimate interest" in the case (because the medical device was installed there and the plaintiff had been treated there in connection with the device) – but also concluded that Virginia had the most significant relationship to the case. *Id.* at 1313 n.3.  (*Chapman* rebuts the Trustee's argument that the absence in this case of a formal party from Minnesota is somehow dispositive of the choice of law issue.)

In the third federal case, the court applied both the significant relationship test <u>and</u> the "false conflict" analysis.  In *Miller v. Thrifty Rent-a-Car System, Inc.*, 609 F. Supp. 2d 1235 (M.D. Fla. 2009), an Ohio resident was killed in an auto accident in South Africa, allegedly due to a faulty brake system on a rental car owned by Oklahoma corporation.  The survivor plaintiffs moved to Florida after the accident and filed suit there.  In applying the "false conflict" analysis, the court concluded that any conflict between Florida law and the law of the other concerned

jurisdictions (Ohio, South Africa, and Oklahoma) was a false conflict because the only relationship Florida had with the litigation was that several of the plaintiffs moved to Florida following the accident. *Id.* at 1245. There is no parallel to Minnesota's extensive relationship to this case.

Significantly, the court in *Miller* noted that "[i]t is unlikely that a jurisdiction's law could be chosen under the 'most significant relationship' analysis unless that jurisdiction has at least a minimal interest in applying its law. *See Restatement (Second) of Conflicts of Law* § 172 cmt. b, illus. 1." *Id.* at 1246.[1] Thus, the fact that Minnesota has the most significant relationship to this case under the Restatement factors proves, without more, that there is no "false conflict" in this case.

### 2. Minnesota, the Location of the Debtor/Transferor, Has Significant Interests in this Case (and in All Fraudulent Transfer Cases Involving Vennes/MGI).

Ultimately, the "false conflict" analysis applies here only if Minnesota can be said to have no interest at stake in this litigation. But Minnesota has significant interests at stake in this case, which arises from allegedly fraudulent transfers by a Minnesota individual and/or a Minnesota corporation to dozens of charities, giving rise to hundreds of adversary proceedings here and in Minnesota. One of Minnesota's significant interests is the application of the very law it enacted to address the precise scenario presented in this case.

Plaintiff deliberately focuses narrowly on the formal parties to this lawsuit – the Trustee (on behalf of the Palm Beach Funds) and NCF. But plaintiff's myopic focus on the formal parties to this lawsuit ignores the reality that it is Vennes/MGI's conduct that is the predicate for plaintiff's suit. In a fraudulent transfer case, the target of the plaintiff's claims is the

---

[1] Other "false conflict" cases in the Florida federal courts, both cited by the Trustee, either did not involve a Category 3 situation, *see Federacion Nacional Autonoma de Futbol de Honduras v. Traffic Sports USA, Inc.*, 2008 U.S. Dist. LEXIS 68157 (S.D. Fla. Aug. 29, 2008)

debtor/transferor who is allegedly insolvent due to fraudulent conduct toward the plaintiff and who made the allegedly fraudulent transfers as a means of avoiding creditors, including the plaintiff, and the plaintiff is required to prove the fraud and the insolvency as predicates to its fraudulent transfer claims.  (Thus, the focus of the Complaint in this Adversary Proceeding is on the actions of Petters and Vennes/MGI.  NCF appears almost as an afterthought.  *See* Complaint (Doc. 1) ¶¶ 17-20 ("The Palm Beach Funds's [sic] Investment in Petters"); ¶¶ 21-27 ("The Petters Fraud"); ¶¶ 28-31 ("The Vennes Parties Action and Transfers to the Defendant"); ¶¶ 33-40 (describing MGI's actions); ¶¶ 42-45 (same).)

In this case, the target of the plaintiff's claims is Vennes and/or MGI – targets who were located in and took all actions associated with the transfers in and from Minnesota.  Most often, as here, the debtor/transferor has made numerous transfers to numerous transferees, possibly in multiple states, and the transfers are being challenged by numerous creditors, also possibly or likely in multiple states.   Under plaintiff's approach, which ignores the debtor/transferor altogether, the laws of as many states as there are creditors or transferees will be applied to transfers originating from the same debtor/transferor – a cumbersome approach that will yield inconsistent results among similarly situated creditors and transferees, and will do so unnecessarily.

Instead, as the Uniform Law Commission has recognized in its recent amendment to the Uniform Fraudulent Transfer Act,[2] all of the transfers from a particular debtor/transferor should be litigated under the same law – the law of the state where the debtor/transferor is located at the time of the transfer.  Doc. 68-2 (UFTA Amendment) § 10(b) ("A claim in the nature of a claim

---

[2]      NCF recognizes that the ULC's amendment to the UFTA also changes the name of the Act to the Uniform Voidable Transactions Act (UVTA).   To avoid unnecessary confusion, however, NCF will refer to the Act under its former name and acronym.

under this [Act] is governed by the local law of the jurisdiction in which the debtor is located when the transfer is made."). This is not only "a simple and predictable choice of law rule for claims of the nature governed by the Act," Official Comment 1 (Doc. 68-1 at 50); this recognizes the significant interests of the state in which the debtor/transferor is located in "determin[ing] the circumstances in which a debtor's creditors, rather than the debtor's transferee, have superior rights in property transferred by the debtor." *Id.* Official Comment 2.

The Trustee's insistence on formalism ignores the reality that <u>all</u> fraudulent transfer cases brought as bankruptcy adversary proceedings, by definition, will not include the debtor/transferor as a formal party to the claw-back litigation. Yet the ULC rightly sees the interests of the (non-party) debtor/transferor's state as predominant.

Minnesota has significant interests in (i) deterring fraud by its residents, (ii) determining whether, when, and how its citizens are deemed to be insolvent, (iii) deterring fraudulent transfers by its residents, and (iv) defining which transactions of its residents are deemed to be fraudulent transfers. These interests are on both the challenging creditor's side and the transferor/transferee's side of the challenged transfers. Such two-sided interests are true of all tort-related laws.[3]

With the 2012 charitable contribution amendment to the MFTA, Minnesota has stated another legitimate interest: its interest in protecting charities from at least some claw-back

---

[3]     *See Cortes v. Am. Airlines, Inc.*, 177 F.3d 1272, 1300 (11th Cir. 1999) ("the primary purpose underlying Florida's compensatory damages scheme is 'to shift the losses resulting when wrongful death occurs from the survivors of the decedent to the wrongdoer,'" but "a secondary purpose underlying Florida's compensation scheme is that damages awards are sufficient to compensate survivors of a decedent while not posing an excessive and unfair burden upon domiciliary defendants"); *Miller*, 609 F. Supp. 2d at 1244 ("the general policies implicated by tort law are deterring tortious behavior and ensuring compensation for tort victims" but "[j]urisdictions may balance these concerns with the competing policies of encouraging investment and protecting defendants from excessive tort judgments").

actions, both due to the economic hardship such claw-back suits impose directly on the charities and due to the economic consequences for the state itself, because charities take on countless services for the poor that would otherwise place additional strain on the state's budget.  *See* Doc. 62 (Minnesota House of Representatives Congressional Meeting Minutes) at 5-8, 10, 13, 15, 18-19 (describing the peculiar financial hardship on charities, the impact on state budgets of decreased charitable activity, the relative insignificance of the charitable contribution exemption on investors' total recovery, the Trustee's disproportionate leverage against charities in claw-back proceedings, etc.).  Ironically, while plaintiff claims Minnesota has no actual interest in this dispute, his entire motion is an attempt to contravene the interests Minnesota sought to address in passing the 2012 amendment to the MFTA.[4]

Plaintiff has cited only one case applying the false conflict analysis to a fraudulent transfer – *Janvey v. Alguire*, 2013 U.S. Dist. LEXIS 82568 (N.D. Tex. Jan. 22, 2013) – and that case underlined applied the law of the debtor/transferee's state.  *Janvey* supports NCF's, not plaintiff's, choice of law argument.

As an initial matter, there are a host of essential distinctions between *Janvey* and this case that plaintiff fails to address.  First, in *Janvey* the debtor/transferor necessarily was a formal party to the case, which was an SEC enforcement action against the debtor/transferor in which the court appointed a receiver, who in turn sued the net winner investors to rescind fraudulent transfers of net winnings from the alleged defrauder.[5]

---

[4]      Significantly, Georgia and Florida likewise have legislatively declared the same interests by their own charitable contribution amendments to their fraudulent transfer statutes.  *See* O.C.G.A. § 18-2-81; Fla. Stat. § 726.109(7).

[5]      It should also be noted that the court in *Janvey* conceded that it was "guessing" about Texas courts' application of the "false conflict" analysis.  *Id.* at *43-44 n.4 ("Texas courts are not explicit about whether the mechanics of false conflicts analysis are separate from the Restatement choice-of-law analysis.  In *Duncan*, in fact, the Court appears to treat its false

Second, the other "state" in *Janvey* was the country of Antigua and, unlike Minnesota in this case, it was established in *Janvey* that Antigua had no connection to the litigation. Some net winner investors argued in *Janvey* that Antigua had an interest in the receiver's suit against them because the fraudulent CDs that were part of the Ponzi scheme were purchased from an Antiguan corporation. *Id.* at *40, *48-49. The court disagreed because the Antiguan corporation was a sham and because no net winner investor was a domiciliary of Antigua – in fact, no one with any connection to the case (other than the sham corporation) was located in Antigua. *Id.* at *49. There is no parallel here as to either aspect of the *Janvey* holding.

Third, whereas in *Janvey* it was pre-established that the defendant in the underlying action had committed fraud, there has been no determination – and thus plaintiff still must prove – that Vennes/MGI was a knowing participant in the Petters fraud. The record to this juncture, however, reveals only that Vennes consistently has denied knowledge of the Petters fraud, as all parties acknowledged at the time of Vennes's guilty plea on two indictment counts that were not predicated on knowledge of the Petters fraud. Doc. 61 (Vennes Plea Agreement) at 6, 10 ("Defendant is not charged with knowledge of the underlying Petters Ponzi scheme"; Vennes was "[w]ithout knowledge of the fact that the PCI Note transactions were part of a massive Ponzi scheme orchestrated by Petters").

Thus, unlike Antigua in *Janvey*, Minnesota does have domiciliaries who are intimately connected to this case – including the debtor/transferor(s) (Vennes/MGI) and the beneficiary recipient of the Transfers (Fidelis Foundation). As the court in *Janvey* explicitly recognized, a

---

conflicts analysis as an application of Section 6 of the Restatement. . . . [T]he Court <u>guesses</u> that the choice-of-law analysis in the false conflicts situation, under Texas law, is a distinct analysis based solely on governmental interests. Accordingly, the Court will first apply a governmental-interest analysis to determine whether any potential conflict is a false one.") (citations omitted; emphasis added).

state whose citizens' transfers are being challenged does have an "interest in protecting its citizens from the rescission of transfers that are later found fraudulent." 2013 U.S. Dist. LEXIS 82568 at *49.

Perhaps the most glaring omission from the Trustee's discussion of *Janvey* is that the court there reached the same conclusion NCF urges on the facts here and the same conclusion specified by the Uniform Act's choice of law provision:  the chosen law in *Janvey* was that of the state in which the debtor/transferor was located at the time of the transfers – Texas.  *Id.* at 46. Because the debtor/transferor was located there, the majority of all the proceeds from the sales of CDs came through the debtor/transferor's Texas bank and the debtor/transferor paid the salaries of its employees in Texas.  *Id.* at 46-47.  In this case, the parallel facts are true of Vennes/MGI and Minnesota.

In short, it cannot be reasoned legitimately from *Janvey* that the debtor/transferor's state has no interest in fraudulent transfer claims regarding the debtor/transferor's transfers.  Much less does *Janvey* support the non-application of the debtor/transferor state's law.[6]

Minnesota's significant and legitimate interests in this case mean that there is a true conflict here.  As a result, plaintiff's "false conflict" argument should be rejected.

**B.    Minnesota Has the Most Significant Relationship to This Case.**

NCF has already discussed each of the four contacts identified in Restatement § 145 in its Motion for Summary Judgment (Doc. 70 at 10-17), which it incorporates here to avoid mere

---

[6]      The Trustee's other non-Florida cases have no application here.  *Greaves v. State Farm Ins. Co.*, 984 F. Supp. 12 (D.D.C. 1997), involved a Category 1 "false conflict" – the laws of the competing states were the same.  *Erny v. Merola*, 171 N.J. 86 (2002), discussed and applied New Jersey's "governmental-interest" analysis, not a "false conflict" analysis.    Minnesota's significant interests at stake in this case distinguish this case from *Farrell v. David Davis Ent., Inc.*, 1996 U.S. Dist. LEXIS 481 (E.D. Pa. Jan. 22, 1996), and *Duncan v. Cessna Aircraft Co.*, 665 S.W.2d 414 (Tex. 1984).

repetition.  (For the Court's convenience, NCF will adopt the Trustee's outline numbering of subsections 1 through 4, *infra*.)  In subsections 1-3 below, NCF will confine itself to the specific arguments made by the Trustee regarding the § 145 contacts.  In subsection 4, NCF will address the factors identified in § 6 of the Restatement.

1. **Minnesota Is the Place of Injury and the Place Where the Conduct Causing the Injury Occurred.**

The fact that the place of the injury and the place where the conduct causing the injury occurred may be difficult to assess in some fraudulent transfer cases does not mean that those factors carry no weight in cases, such as here, where those factors can in fact be assessed.  This is not a case where the transfer in question is a corporate parent's guaranty of a subsidiary's loan that was syndicated by the original lender to other lenders, *cf. MC Asset Recovery, LLC v. Commerzbank A.G. (In re Mirant)*, 675 F.3d 530 (5th Cir. 2012), or a transfer of stock among a group of five parent and wholly-owned-subsidiary corporations, *cf. ASARCO, LLC v. Americas Mining Corp.*, 382 B.R. 49 (S.D. Tex. 2007).

The Restatement commentary cited by the Trustee merely acknowledges that these factors are of less importance in cases where they are difficult to assess.  As NCF demonstrated in its Motion for Summary Judgment, however, this is not such a case.  *See* NCF's Motion for Summary Judgment (Doc. 70) at 10-12.

Further, the "defendant" whose conduct should be focused on here pursuant to the Restatement commentary (which is a comment about tort cases generally, not fraudulent transfer cases) is the debtor/transferor:  Vennes/MGI.  As explained earlier, Vennes/MGI is the target of the plaintiff's claims – the persons against whom the plaintiff is required to prove the fraudulent conduct and insolvency as predicates to its fraudulent transfer claims, and the persons who made the transfers in question.

As a result, the Trustee's attempt to avoid the impact of these two factors is unavailing. For the numerous reasons discussed in NCF's Motion for Summary Judgment (including the Minnesota criminal prosecutions), the injury occurred in Minnesota and the vast majority of the conduct causing the injury occurred in Minnesota. *Id.*

       **2.**       **Location of the Parties.**

The Trustee ignores reality in saying that "no resident of Minnesota is a party to this action." In all but formality, Vennes and/or MGI are defendants in this fraudulent transfer action because they are the debtor/transferor(s).

Interestingly, the Trustee seeks to have it both ways when it comes to persons who are formal parties and persons who are not formal parties. When it comes to Minnesota domiciliaries Vennes/MGI – central participants as the debtor/transferor(s) – the Trustee insists that the significant relationship analysis be confined to named parties to the litigation. But then the Trustee points out, conveniently, that "although not actually parties to the instant proceedings, the investors/creditors whose interests the Plaintiff represents are located all over the United States, as well as internationally." Plaintiff's Motion at 23. Of course, the Trustee ignores the fact that every Promissory Note and Security Agreement documenting the 2,100 transactions entered into by those investors/creditors specified that Minnesota law would govern any disputes involving those transactions.

Again, it is nonsensical to contend that the hundreds of adversary proceedings in this court –in all of which the Trustee pled only Minnesota law and all of which arise out of transfers from the same debtor/transferor in the same location – should be decided according to many different states' laws depending solely on the transferee/defendant's location.

3.      **Minnesota Is the Place Where the Relationship of the Parties Is Centered.**

The fact that Fidelis Foundation initiated its relationship with NCF and that Vennes initiated his relationship with NCF favors application of Minnesota law, because Fidelis and Vennes acted from Minnesota.  As the Trustee concedes, NCF did not solicit the relationships.

Also, the Trustee mis-describes the Georgia meeting, which was solely with representatives of Fidelis Foundation and for the purpose of furthering the relationship between Fidelis and NCF.  NCF's Statement of Material Facts (Doc. 71) ¶¶ 20-21.  The meeting was not attended by Vennes, MGI, or any representative of either; neither Vennes nor MGI was even named at the meeting.  *See* Depo. Exhibit 41 (Doc. 59-5 at 25).[7]  It is therefore not accurate for the Trustee to lump Vennes and the Fidelis Foundation together as "the Vennes/Fidelis Parties."

4.      **Relative Interests of the States Under Restatement § 6.**

a.      **Policy Considerations (Factors (b), (c), and (e)).**

The Trustee again artificially narrows the focus of its analysis, this time considering only one policy underlying fraudulent transfer law.  It is true that one policy behind fraudulent transfer law is the protection of creditors from fraudulent transfers.  But that is not the only relevant underlying policy, nor does it end the inquiry by requiring the Court to choose the law of the state most protective of putative creditors.

The policies underlying fraudulent transfer law also necessarily include protecting both debtor/transferors and, perhaps even more importantly, their transferees from unfounded or overbroad fraudulent transfer claims.  That is why, for example, the Uniform Act insists that

---

[7]      Attorney Craig Howse attended the meeting solely in his capacity as a board member and attorney for Fidelis Foundation.  Depo. Exhibit 41 (Doc. 59-5 at 25).  It was not until eight months later that Mr. Howse had any dealings with NCF in his capacity as attorney for Vennes/MGI.  NCF's Statement of Material Facts (Doc. 71) ¶ 23; Depo. Exhibits 9-10 (Doc. 59-1 at 74-80).

there is no fraudulent transfer unless the debtor/transferee is in fact insolvent at the time of the transfer (something the Trustee has yet to establish regarding Vennes/MGI in this case). The protection of innocent transferees from unfair fraudulent transfer claims is also the reason for the long-standing movement toward explicit protection of charitable transferees – a movement that has included an amendment by Congress to the Bankruptcy Code (in 1998) and amendments to their respective fraudulent transfer statutes by all three states connected to this case. *See* 11 U.S.C. §§ 544(b)(2), 548(a)(2); Minn. Stat. 513.41(12); O.C.G.A. § 18-2-81; Fla. Stat. § 726.109(7).

Completely absent from the Trustee's analysis is any recognition that Minnesota, Florida, and Georgia share an explicit policy interest in protecting charitable transferees. All three states amended their fraudulent transfer statutes to protect gifts to bona fide charities, and all three did so within the last three years. Clearly, all three states are "on the same page" in their desire to protect innocent charities from the hardships associated with claw-back litigation.[8]

The Trustee relies heavily upon the Fifth Circuit's decision in *Mirant*, but that case presented wholly different facts and issues than those presented here: (i) the debtor/transferor sought to avoid its own transfer, 675 F.3d at 532; (ii) the policies of New York law (which,

---

[8]     There are excellent policy reasons for Congress and the state legislatures to protect charitable contributions. *See* Doc. 62 (Minnesota House of Representatives Congressional Meeting Minutes) at 5-8, 10, 13, 15, 18-19 (describing the peculiar financial hardship on charities, the impact on state budgets of decreased charitable activity, the relative insignificance of the charitable contribution exemption on investors' total recovery, the Trustee's disproportionate leverage against charities in claw-back proceedings, etc.) In addition, the equities strongly favor charitable transferees over investors – after all, the investors chose to do business with the debtor/transferor to make a profit, knowingly accepting some level of risk of loss of their investment, and with the opportunity (and even legal obligation) of due diligence, often in the face of explicit written warnings about the risks and their due diligence obligations. Charitable organization transferees have none of those characteristics. As between the profit-seeker who is on notice of risk and the charitable transferee, it is certainly a legitimate choice for federal and state lawmakers to see the charitable transferee as one who should receive additional protection.

pursuant to the Uniform Act, treated guarantees as transfers) and Georgia law (which, at the time

of the transfer, did not) directly clashed, but there is no such clash here, where all three states

seek to protect charitable contributions from fraudulent transfer claims; and (iii) the specific facts

of *Mirant* made it "nearly impossible" to define what conduct caused the injury, to locate where

the injury occurred, or to identify where the relationship between the parties was centered, *id.* at

537 – locations that are readily ascertained in this case.[9]

The Trustee's other cited cases are equally unsupportive of his arguments.  *Meiselman v.*

*Hamilton Farm Golf Club, LLC*, 2011 U.S. Dist. LEXIS 98594 (D.N.J. Sept. 1, 2011), actually

undercuts the Trustee's argument because the court there had no difficulty applying the

Restatement § 145 contacts to the fraudulent transfer at issue.  As for the remaining cases --

*Judge*, 908 F.2d 1565, *Walker,* 2003 U.S. Dist. LEXIS 25660, *Cortes,* 177 F.3d 1272, and *Foster*

*v. United States*, 768 F.2d 1278 (11th Cir. 1985) -- Minnesota's multiple interests in this case

sharply distinguish them and preclude any notion that they are applicable, much less analogues

to this case.

The Trustee's repeated conclusion that Minnesota has no interest in this case because

NCF is not a Minnesota domiciliary is facile.  Minnesota has a significant interest in every

transfer made by its domiciliaries Vennes and MGI, regardless of who the transferee is or where

the transferee is located.  Minnesota also has an interest in any transfer, such as all four Transfers

---

[9]     *Mirant* is not only distinguishable (and, as a Fifth Circuit case, non-precedential for this
Court), but it is also dangerously close to a result-driven decision.  Rather than weighing the
relevant factors and concluding that, objectively, New York had the most significant relationship
to the dispute, the Fifth Circuit seems to have discounted Georgia's interest in the case because
New York law was more protective of creditors and would yield a positive result for the plaintiff
that Georgia law would not.  But, as the United States Supreme Court has repeatedly warned,
choice of law decisions cannot rightly be founded on a results-oriented analysis.  *See O'Melveny*
*& Myers v. FDIC*, 512 U.S. 79, 88 (1994) ("[T]here is no federal policy that the fund should
always win. Our cases have previously rejected 'more money' arguments remarkably similar to
the one made here.") (citations omitted).

here, that were intended to and did directly and immediately benefit a Minnesota domiciliary (Fidelis Foundation), which in turn passed the Transfers on to numerous other transferees, the vast majority of which were also Minnesota domiciliaries.

Consideration of "the relevant policies of [the] interested states and the relative interests of those states in the determination of the particular issue, [and] the basic policies underlying the particular field of law," Restatement § 6(c), (e), favors the application of Minnesota law in this case because all three states seek to protect charitable transferees. At a minimum, the "policy considerations" factors of § 6 do not alter the application of the § 145 contacts, which strongly favor Minnesota as the state with the most significant relationship to this case.

### b.    Uniformity (Factors (a) and (f)).

Once again, the Trustee misperceives the relevant "approach taken by the majority of states and jurisdictions." Plaintiff's Motion at 28. Protection of charitable contributions is the <u>unanimous</u> approach of all three states with connections to this case, as well as of the federal government.[10] The unanimity of the affected states makes it irrelevant whether any other states identify such transactions as fraudulent transfers.

The Trustee is careful to say that Georgia and Florida did not act to protect charitable contributions "in a manner applicable to this cause of action." Plaintiff's Motion at 28. But courts have frequently recognized the significance of a state's amendment or repeal of applicable law, even when the change is not retroactively effective in the case before the court. For example, in *Foster*, 768 F.2d 1278, the Florida wrongful death statute that was less protective of

---

[10]    The Trustee is correct that the ULC has so far declined to amend the UFTA to protect charitable contributions. Plaintiff's Motion (Doc. 63) at 28 n.27. The ULC's inaction is irrelevant, however, given that Minnesota, Georgia, and Florida have individually enacted such protection. In addition, the ULC <u>has</u> amended the UFTA to designate the law of the debtor/transferor's state as the applicable law, which accomplishes the same result in this case.

survivors than the Illinois statute was amended after the cause of action arose to afford more protection.  In light of the amendment, even though it was not retroactively applicable to the claim before the court, the Eleventh Circuit held that the fact of the amendment "does indicate Florida's lesser interest in the choice of law decision." *Id.* at 1284 n.12.  As the court put it, "It is highly unlikely that the Illinois conflicts law would implement a discarded Florida provision as applied to an Illinois domiciliary." *Id.* at 1284 n.12.  Here, it should be highly unlikely that the Florida conflicts law would implement a discarded Georgia or Florida provision as applied to one Georgia and multiple Minnesota domiciliaries. *See also Mirant*, 675 F.3d at 538 ("Georgia has little interest in applying its now-repealed statute").

The Trustee's citation of *Taylor v. Community Bankers Securities, LLC*, 2013 U.S. Dist. LEXIS 86485 (S.D. Tex. June 20, 2013), is ironic.  In *Taylor*, the court determined that the Restatement factors resulted in the application of the law of Texas – the location of the debtor/transferor.  This was largely because, due to the debtor/transferor's presence in Texas, the conduct causing the injury occurred there. *Id.* at *15-16 ("With regard to the conduct at issue, the alleged fraud was centered at Evolution's office in The Woodlands, Texas. The PPMs that the Noteholders received listed Evolution's Texas office as the place of payment related to the investments, and the PPMs were distributed to investors at the direction of Evolution's Managing Director, who was also located in Texas. Accordingly, these contacts related to the alleged fraudulent conduct weigh heavily in favor of the application of Texas law.").  The very same things are true of Minnesota in this case.

Contrary to the Trustee's argument, "the Restatement's goal of uniformity of result," Plaintiff's Motion at 29, would be dis-served by the application of anything other than Minnesota law.  There are hundreds of adversary proceedings in this Court and in the Minnesota

Bankruptcy Court arising from allegedly fraudulent transfers by Vennes or MGI.  The best way to achieve uniformity of result in those hundreds of cases is to apply Minnesota law because the transferors were in Minnesota and the transfers occurred in Minnesota.  Hence the Uniform Law Commission's recent amendment of the UFTA to specify that the appropriate choice of law in fraudulent transfer cases is the law of the state in which the transferor is located at the time of the transfer.

Thus, the uniformity interest is served at least as well, if not better, by the application of Minnesota law in this case.

   c.    **Ease in Determination/Application of the Law to Be Applied (Factor (g)).**

This factor favors the forum state only if there is some difficulty in determining and applying the law of one of the competing jurisdictions.  *See, e.g., Cortes*, 177 F.3d at 1303 ("the process of determining and applying Colombian law would be extremely complicated, expensive, and time consuming").  Minnesota is not Colombia; its statutes and court decisions are just as readily accessible to this Court as is the law of Florida, and certainly just as readily accessible as the law of Georgia.

The Minnesota amendment is straightforward and, contrary to the Trustee's argument, has been discussed at length in at least one Minnesota decision.  *See Kelley v. College of St. Benedict*, 2012 U.S. Dist. LEXIS 153802 (D. Minn. Oct. 26, 2012).  The Minnesota amendment has also been explored by this Court, which did not appear to have any difficulty understanding it.  *See Mukamal v. CitySites Urban Media, Inc*., Case 11-03022-PGH Doc. 165 at 13 (March 21, 2013).  The only reason the Trustee emphasizes the newness of the Minnesota amendment and the alleged lack of "guidance" about it is that the Trustee intends, if Minnesota law is held to apply, to assert creative grounds to avoid the straightforward application of the plain terms of the

statute.  *See* Plaintiff's Expedited Motion to Strike Portions of Defendant's Motion for Summary Judgment (Doc. 73) at 3-4 ("it is the Plaintiff's position that the Minnesota exemption should not apply, regardless of whether the Defendant is (and was at the time of the transfers) a 501(c)(3) qualified charitable organization"; questioning whether the Minnesota amendment "applies to the non-traditional facts presented in this case").

The simple fact is that there is no reason to doubt this Court's ability to determine and apply Minnesota law in this case.

### d.      Protection of Justified Expectations (Factor (d)).

Given that Petters, Vennes, MGI, and Fidelis were located in Minnesota, and given that they and the Palm Beach Funds (and all other investors in the PCI Notes) had agreed that Minnesota law would apply to any and all disputes arising out of their transactions, the "expectation[] of the parties at the time of the conduct which underlies the cause of action," *Harding Proko Inds., Inc.*, 765 F. Supp. 1053 (D. Kan. 1991), was that Minnesota law would apply to the Vennes/MGI transfers.

In addition, the central conduct at issue in this case is the conduct of Vennes/MGI – whether Vennes knowingly defrauded the Palm Beach Funds into investing in the Petters enterprise, whether Vennes or MGI were therefore (as tort debtors to the Funds) insolvent at the time of the Transfers, the purposes of the Transfers to NCF (and back to Fidelis Foundation), the Transfers themselves, etc. – all of which was Minnesota-based.  And, as the Trustee helpfully points out, Vennes and MGI, as domiciliaries of Minnesota (and, for MGI, as a business incorporated in Minnesota), would have had the "reasonable, justified expectation that [their] conduct would be governed and regulated by the laws of that state."  *Francis v. Starwood Hotels & Resorts Worldwide, Inc.*, 2011 U.S. Dist. LEXIS 85215 at *12 (D. Colo. Aug. 3, 2011).

In any event, there was at least as much of an expectation by the parties to the Transfers that they would be governed by Minnesota law as that they would be governed by Georgia law.

   5.    **Summary of Results Under the Restatement Factors.**

As NCF demonstrated in its Motion for Summary Judgment, the four contacts of Restatement § 145 strongly favor Minnesota as the state with the most significant relationship to this case.  The above analysis of the Restatement § 6 factors yields the same result – all of the factors either favor application of Minnesota law or provide no reason to alter the conclusion that Minnesota has the most significant relationship.

<u>**CONCLUSION**</u>

The Trustee begins and ends his Motion claiming that NCF "seeks to improve its position in the litigation for a potential better result."  Plaintiff's Motion for Partial Summary Judgment (Doc. 63) at 2, 30.  Unlike the Trustee, however, NCF has never argued for anything other than the straightforward application of Minnesota law.  In this and in the other hundreds of adversary proceedings, the Trustee's Complaint relied solely on Minnesota law for his fraudulent transfer claims.    There was no surprise in this reliance on Minnesota law, given that the debtor/transferors were located in Minnesota and that all criminal prosecutions (including those of the Palm Beach Funds' principals) were in Minnesota.[11]  The only thing that changed after the filing of the Complaint in this case was not the place of the injury, the place of the conduct causing the injury, the location of the parties, or the location where the parties' relationship was centered – the pertinent factors for the choice of law analysis – but rather the charitable contribution amendment to Minnesota's fraudulent transfer statute (the only statute cited in the

---

[11]    A cynic (like the Trustee) might suggest that the Trustee's reliance on Minnesota law in the adversary proceeding complaints was also related to the longer statute of limitations applicable to fraudulent transfer claims under Minnesota law.  Minn. Stat. § 541.05(2), (6).

Trustee's Complaint).  Only then did the Trustee take the position that some law other than Minnesota's – any law other than Minnesota's – applies to his fraudulent transfer claims.

NCF's position is simple, logical, and consistent with the approach promulgated by the leading legal authorities in the field of fraudulent transfer law.  If one sets aside the possibility that the outcome might be different under Minnesota, Georgia, or Florida law and engages in a straightforward, objective assessment of all the contacts in this case to determine which state genuinely has the most significant relationship, that assessment will conclude that Minnesota is the state with the most significant relationship to this case.

For the foregoing reasons, plaintiff's motion for partial summary judgment should be denied.  Instead, NCF's motion for summary judgment on choice of law should be granted and Minnesota law should be applied to the Trustee's claims in this case.

Dated September 12, 2014.

Respectfully submitted,

**FISHERBROYLES, LLP**

By: _/s/ David J. Myers_____
David J. Myers
GA Bar No.:  533072 (admitted *pro hac vice*)

1200 Abernathy Road
Building 600, Suite 1700
Atlanta, Georgia 30328
404-825-3907 (o)
770-551-8105 (f)
dmyers@fisherbroyles.com

**SHRAIBERG, FERRARA & LANDAU, P.A.**

Bradley S. Shraiberg, Esq.
Florida Bar No. 121622

2385 NW Executive Center Drive, Suite 300
Boca Raton, Florida 33431

Telephone: 561-443-0800
Facsimile: 561-998-0047
bshraiberg@sfl-pa.com

Attorneys for National Christian Charitable
Foundation, Inc.

<u>**CERTIFICATE OF SERVICE**</u>

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was furnished via Notice of Electronic Filing to those parties registered to receive electronic filings on this the 12th day of September, 2014.

By: _/s/ David J. Myers_
David J. Myers