UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION
www.flsb.uscourts.gov

In re:                                              Case No. 09-36379-PGH
                                                    Chapter 11
Palm Beach Finance Partners, L.P. and
Palm Beach Finance II, L.P.,

         Debtor(s).
_____/

Barry E. Mukamal, as Liquidating Trustee,

         Plaintiff,

                                                    Adv. Case No. 11-02940-PGH
v.

The National Christian Charitable
Foundation, Inc., d/b/a The National
Christian Foundation, Inc.,

         Defendant.
_____/

## PLAINTIFF'S REPLY REGARDING DEFENDANT'S RESPONSE TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO CHOICE OF LAW [ECF NO. 87]

Barry E. Mukamal ("*Plaintiff*" or "*Liquidating Trustee*"), in his capacity as Liquidating

Trustee for the Palm Beach Finance Partners Liquidating Trust and the Palm Beach Finance II

Liquidating Trust (collectively, the "*Liquidating Trusts*"), by and through undersigned counsel,

files his Reply (the "*Reply*") to Defendant's Response to Plaintiff's Motion for Partial Summary

Judgment as to Choice of Law [ECF No. 87] (the "*Defendant's Response*").

## I.    Introduction

As with Defendant's Summary Judgment Motion,[1] Defendant's Response continues to focus, not on facts regarding the actual parties to this Adversary Proceeding, but rather on facts and circumstances relating to various non-parties in its self-serving attempt to bring relevance to the law of a jurisdiction of which no party hereto is a domiciliary.  Such is nothing but an obfuscation of the basic premise of a choice of law analysis – *i.e.* to resolve a conflict between laws, if one exists, when the parties to a lawsuit are domiciliaries of different jurisdictions, each advocating for the law of its forum state.   Indeed, the Restatement analysis, which is the current controlling law in this jurisdiction, logically directs the focus of the analysis on the parties to the proceeding.   Here, where the parties are a Florida fiduciary appointed by a Florida court and a Georgia non-profit corporation, the law of Minnesota simply has no place in the analysis.

Moreover, in cases like this one, involving fraudulent transfers, the Restatement commentary instructs that "the place where the defendant's conduct occurred will usually be given particular weight in determining the state of the applicable law."  Restatement (Second) of Conflict of Laws § 145 cmt. e (1971). Defendant's own motion and response advance no argument, nor could they based on the undisputed facts, that the Defendant's actions relevant to this proceeding occurred anywhere but Georgia.  As such, it belies logic that the Defendant's liability for its conduct in Georgia should be governed by anything other than Georgia law. Indeed, the documents recently produced by Defendant reveal that the Defendant's own mindset at the time of the Transfers is directly contrary to its current attempts to advocate for Minnesota law. As detailed below, Defendant itself clearly expressed, in certain of these newly-produced documents, a refusal to be governed by Minnesota law in connection with the proposed

---

[1] All capitalized terms utilized but not otherwise defined herein shall have the meaning ascribed to such terms in the Plaintiff's Summary Judgment Motion.

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3200 SOUTHEAST FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA 33131 • TELEPHONE (305) 358-6363
{Firm Clients/MGEM/MGEM-28/01505154.DOCX.}

transactions with MGI.   Accordingly, it is clear that NCF is now simply law shopping in seeking to have Minnesota law apply, in direct contravention of its refusal to do so at the time of the Transfers, as evidenced by actual documents in this case.   Neither the law nor the facts can countenance such an after the fact attempt by the Defendant to hide behind a law it wouldn't agree to be bound by at the time of the transactions.

## II.     <u>Newly-produced Documents</u>

Since the filing of the parties' respective responses, and as disclosed to the Court in the context of the parties' agreed motion to extend the deadline for their replies, the Defendant discovered approximately 130 pages in additional documents responsive to Plaintiff's prior discovery requests.   As outlined in the Joint Notice of Filing Additional Documents in Connection with Cross-Motions for Summary Judgment as to Choice of Law [ECF No. 95], the parties have conferred regarding such additional documents, and their relevance to the pending motions for summary judgment, and have reached agreement on the usage of such documents in connection therewith, as detailed in the Notice of Filing.

The following represents the additional undisputed facts relevant to the choice of law issue as established by the newly-produced documents, and the Plaintiff hereby supplements its original statement of material facts not in dispute[2] to include the following:

- On March 10, 2005 (4 days prior to the Smith Letter opening the Fidelis Fund), Tom Conway of NCF had a phone conversation with Mr. Smith and Mr. Howse. In Mr. Conway's handwritten notes of that conversation, he notes that Fidelis was in "[d]anger of [its] public support test failing" and was seeking NCF's assistance

---

[2] Bizarrely, Defendant's Response contains objections to certain of Plaintiff's statements of undisputed facts as violative of "Local Rule 56.1(a)(3)." *See, e.g.,* Defendant's Response, paragraphs 12, 17, 21. Local Rule 56.1(a)(3), however, is not a local rule of this Court nor is it applicable to this proceeding. Rather, it is a Local Rule for the United States District Court for the Southern District of Florida. There is nothing is this Court's local rules that makes this district court rule applicable to the instant proceeding. In contrast, this Court's local rules expressly provide that "the Local Rules of the United States District Court for the Southern District of Florida shall not apply to cases or proceedings in the Bankruptcy Court, except to the extent that Local Rules 87.1 through 87.5 of the District Court govern bankruptcy matters." Local Rule 1001-1(B). As such, any such objections are inapplicable herein and should be disregarded.

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3200 SOUTHEAST FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA  33131 • TELEPHONE (305) 358-6363
{Firm Clients/MGEM/MGEM-28/01505154.DOCX.}

to "maintain [its] public status." *See* NCF000993-994, a true and correct copy of which is attached hereto as <u>Exhibit A</u>.[3]

- In Mr. Conway's handwritten notes from the Atlanta Meeting, he once again noted that Mr. Smith and Mr. Howse came to NCF to "help them w/ public support." *See* NCF001008-09, a true and correct copy of which is attached hereto as <u>Exhibit B</u>.

- On June 16, 2005, Mr. Parker of NCF sent an internal memo to Mr. Conway concerning a conversation Mr. Parker had with Messers. Smith and Howse. Specifically, Mr. Parker stated that he told Joe and Craig as follows:

  > They could make a recommendation that we make a distribution to the Fidelis Foundation. We could then approve that distribution, but they could ask us to delay the distribution until they notified us further. Thus, all they would have to do if they ever wanted the money to come back to their Foundation would be to give us the notice to make the distribution – even if it was years later. *It is probably a little "shaky" from their part, as we could probably withdraw the approval at any time before they ask us to "pull the trigger"*, but something like this is what I had in mind.

  *See* NCF001036, a true and correct copy of which is attached hereto as <u>Exhibit C</u> (emphasis added).[4]

- On June 29, 2005, Mr. Conway of NCF sent a letter to Mr. Smith. The letter states that NCF had "gone ahead and approved the Fidelis Foundation as a pre-approved ministry," allowing them to receive distributions from NCF "whenever [they] desire." The letter further details the "two areas that you mentioned that you might need help from NCF with in relation to your maintaining your public charity status," including the proposed donation of a promissory note. In addition, Mr. Conway states as follows:

  > In the meantime, if you have other large gifts to the Fidelis Foundation, it might be wise to have them channeled through your fund here at NCF. Since grants from NCF are considered public support, this will help you in maintaining your public charity status.

---

[3] This new document (and NCF1008-09 below) lends further support to the arguments, as detailed in Plaintiff's Summary Judgment Motion, that the factors set forth in Restatement § 145(2) point to the application of Georgia law – the Transfers only occurred because MGI, Vennes and Fidelis had an IRS problem that they were reaching out to NCF to help them solve. They brought their problem to NCF in Georgia, and sought out and utilized the services of NCF in Georgia to solve the issue created by the volume of donations Vennes/MGI was making (and wanted to continue to make) to Fidelis. *See* Plaintiff's Summary Judgment Motion, pp. 21-24.

[4] This document is further evidence, as discussed in Plaintiff's Response, that (i) the Transfers were irrevocable and non-refundable upon receipt by NCF and (ii) NCF had complete dominion and control over the funds once they were transferred to NCF. *See* Plaintiff's Response, pp. 3-4.

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3200 SOUTHEAST FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA 33131 • TELEPHONE (305) 358-6363
{Firm Clients/MGEM/MGEM-28/01505154.DOCX.}

*See* NCF001041-42, a true and correct copy of which is attached hereto as <u>Exhibit D</u>.   A copy of the letter produced by NCF contains handwritten notes that NCF has confirmed were made by Mr. Parker.  Among other things, Mr. Parker circled the indented quote above and wrote "don't put this kind of thing in writing. 'Pass Through' is No No."[5]

- On August 9, 2005, Mr. Smith sent a draft confidentiality agreement relating to the proposed promissory note gift to Mr. Conway via facsimile.  The introductory letter included in the fax states, *inter alia*, that "[a]ttached is a Confidentiality and Non-Circumvention Agreement that *has been drawn up by Craig Howse, attorney for Frank Vennes, Jr.*  It is necessary for this document to be signed and returned to us prior to our sending you a sample of the promissory note and other documents that you will need for your due diligence."  Notably, the proposed draft agreement contained a paragraph providing that Minnesota law would govern.  Next to this provision, Mr. Parker's handwritten notes say "we don't know this law."  The proposed draft agreement also included a provision agreeing that MGI and Petters would be entitled to injunctive relief for any violation thereof, next to which Mr. Parker wrote "In Minnesota? No!"  *See* NCF001047-52, a true and correct copy of which is attached hereto as <u>Exhibit E</u>.

- In addition, NCF's files include a page of Mr. Parker's handwritten notes relating to the proposed confidentiality agreement, which list a series of his various concerns and issues with the proposed agreement, including the following: "We don't know Minn law. . . . we don't understand Minn law."  *See* NCF001054, a true and correct copy of which is attached hereto as <u>Exhibit F</u>.

- On August 17, 2005, Mr. Conway sent an email to Mr. Smith, copying Mr. Parker and informing Mr. Smith that NCF would not sign the confidentiality agreement and detailing the reasons why, including the following: "The agreement says that all questions shall be governed by the law of Minnesota.  We are not familiar with the laws of Minnesota and we do not want to hire an attorney to do that research for us."  *See* NCF001055, a true and correct copy of which is attached hereto as <u>Exhibit G</u>.[6]

## III.    <u>Defendant's Newly-Produced Documents Expose its Current Position for What It Is – an After-the-Fact, Self-Serving Attempt to Avail Itself of a Defense That its Own Jurisdiction Doesn't Provide</u>

The only reason that the choice of law issue is even being contested in this case is that

NCF really has no choice – it finds itself in a position where a law other than its own provides a

---

[5] Relevant to a consideration under the Restatement factors of the conduct of the Defendant giving rise to the claims herein, this document is an explicit acknowledgement by NCF that what it was agreeing to do – *i.e.* take the Transfers with a promise to pass them through to Fidelis - was improper.
[6] As discussed below, the last 3 bullet points above are clear evidence that, at the time of the Transfers, NCF was unwilling to be governed by Minnesota law.

potential defense that NCF desperately needs. If the Minnesota Exemption had not been enacted, or had not purportedly been given retroactive applicability, would NCF be contending that Minnesota law governs this case? It simply defies credulity to think so. NCF, as a Georgia non-profit that has, for its entire existence, had its principal place of business in Georgia, would otherwise want the law of its own state (and the one with which it is most familiar) to apply. Indeed, NCF's own documents establish that its mindset at the time of the transfers was exactly that – *i.e.* not to subject itself to the law of a foreign jurisdiction.

As detailed above, in August of 2005, prior to the First Transfer, and in connection with NCF's evaluation of the proposed donation of an MGI promissory note, NCF was sent a form of confidentiality agreement between MGI and NCF, drafted by Mr. Howse, to execute before any further documents would be shared with NCF. *See* Exhibit E. The agreement provided for Minnesota law to apply. *See* NCF001052. In considering and reviewing the proposed form of agreement, NCF made notes directly on the agreement clearly indicating that it was not willing to be governed by Minnesota law - "we don't know this law"; "In Minnesota? No!"; "We don't know Minn law. . . .we don't understand Minn law." *See* NCF001051-52, NCF001054. Moreover, in communicating their unwillingness to sign the proposed confidentiality agreement, NCF specifically identified the Minnesota governing law provision as one of the reasons they would not execute the agreement. *See* NCF001055. As such, at the time of the actual Transfers, it is clear that NCF neither thought that Minnesota law governed the transactions, nor was it willing to agree to let it govern. Certainly, NCF's "justified expectations" (for purposes of section 6(d) of the Restatement) were NOT that Minnesota law would apply.[7]

---

[7] *See, e.g., Harding v. Proko Industries, Inc.*, 765 F. Supp. 1053 (D. Kan. 1991) (the relevant inquiry is the "expectations of the parties at the time of the conduct which underlies the cause of action"); *Francis v. Starwood Hotels & Resorts Worldwide, Inc.*, No. 10-CV-02105-REB-KLM, 2011 WL 3351320 (D. Colo., Aug. 3, 2011) ("[B]ecause defendant is incorporated under the law of Maryland, application of Maryland law will protect

The mere fact that Minnesota has since changed its law in a way that NCF desires to now take advantage of, however, does not magically transform it into the jurisdiction with the most significant connections to the parties and the claims asserted in this case. Rather, as set forth in detail in Plaintiff's Summary Judgment Motion, Georgia is the jurisdiction that has the most significant contacts with the instant case under the Restatement factors. Moreover, that NCF seeks to apply Minnesota law as opposed to the law of its own state just to improve its position in this litigation for a potentially better result (which is now abundantly clear from the new documents), is simply law shopping and should not be countenanced by the Court. *See, e.g.,* *Nesladek v. Ford Motor Co.*, 46 F.3d 734, 739-40 (8th Cir. 1995) (quoting *Lommen v. City of E. Grand Forks*, 522 N.W.2d 148, 151 (Minn. Ct. App. 1994) (("One particular concern in choice-of-law methodology is to minimize forum shopping designed to influence choice of law."); Robert A. Leflar, *American Conflicts Law* § 90, at 182 (3d ed. 1977) ("Mere forum preference, as such and by itself, is not a valid *reason* for any choice-of-law result.") (emphasis in original).[8]

## IV.    The Defendant's Continued Focus on the Location of the Transferor is Misplaced, as the Transferor is NOT a Party to this Case

Throughout the Defendant's Response, as with the Defendant's Summary Judgment Motion, the Defendant argues that various cases support the Defendant's position that Minnesota law should apply because such cases also apply the law of the debtor/transferor. *See, e.g.,* Defendant's Response, p. 10-11, 14, 18-19, 21.   What the Defendant fails to acknowledge is that, in every single instance, the debtor/transferor (*or its fiduciary*) is an actual party to the suit. As such, and given the express direction in the Restatement factors to look at and consider the

---

defendant's reasonable, justified expectation that its corporate conduct would be governed and regulated by the laws of that state.").

[8] *Cf. Sheldon v. PHH Corp.*, 135 F.3d 848, 855 (2d Cir. 1998) (citing *Olmstead v. Anderson*, 400 N.W.2d 292, 303 (Mich. 1987)) (discussing a state's interest in discouraging forum shopping in connection with a choice of law analysis).

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3200 SOUTHEAST FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA  33131 • TELEPHONE (305) 358-6363
{Firm Clients/MGEM/MGEM-28/01505154.DOCX.}

"domicil, residence, nationality, place of incorporation and place of business *of the parties*" and the "place where the relationship, if any, *between the parties* is centered," it is no surprise that the result in many of such cases is to find that the Restatement factors weigh in favor of the location of the debtor/transferor. *See* Restatement (Second) of Conflict of Laws § 145(2)(c) and (d) (1971) (emphasis added).

However, as the Plaintiff has repeatedly stressed, that is not the case here. The transferor (or its fiduciary) is simply not a party in this case. Being unable to avoid that important fact, the Defendant resorts to arguing that the transferor is a party "[i]n all but formality." *See* Defendant's Response, p. 16. But that is not the standard or the applicable inquiry here. If the Restatement analysis considered the location of entities or individuals, other than the actual litigants, relevant to the choice of law analysis, it could (and would) have chosen not to limit such factors to the actual parties. The Restatement, however, specifically and intentionally uses the term party, which has a well-known and clear meaning in the litigation context. As such, the Court's analysis here, as directed by the Restatement, must properly focus, not on the location of the non-party transferor, but rather on the location of the actual parties – NCF and the Plaintiff.

## V. The Restatement Instructs, in Cases Like This One, That the Proper Focus of the Analysis is Where the Defendant's Conduct Giving Rise to the Claims Occurred

The Restatement itself instructs that, when the injury is intangible, as with cases of fraud or misrepresentation, the importance of the first two factors of § 145 is severely diminished. *See* Restatement (Second) of Conflict of Laws § 145 cmt. e (1971). While the Defendant contends such is not the case here, the Restatement commentary itself expressly states otherwise:

> "Situations do arise, however, where the place of injury will not play an important role in the selection of the state of the applicable law. . . .such as *in the case of fraud and misrepresentation*, there may be little reason in logic or persuasiveness to say that one state rather than another is the place of injury, *or when . . .injury has occurred in two or more states*.".

Restatement (Second) of Conflict of Laws § 145 cmt. e (1971) (emphasis added).  Plaintiff's claims for fraudulent transfer are no doubt claims based on fraud or misrepresentation, and Defendant's own arguments demonstrate that the injury here occurred in two or more states (more likely dozens, as investors in this Ponzi scheme are located all over the country).   Thus, the Restatement instructs that "*the place where the defendant's conduct occurred [should] be given particular weight in determining the state of the applicable law*" in this matter.   *Id.* (emphasis added).

Here, we have a Defendant that participated knowingly and willingly in a series of transactions for the purpose, and with the express intention, of assisting others in their efforts to circumvent IRS regulations.  It did so *at all times* from Georgia and in a manner that, even it acknowledges, was improper – "'Pass Through' is No No." *See* NCF001041.  As such, Georgia, as the place where the Defendant's conduct occurred, should be given particular weight in the choice of law analysis in accordance with the Restatement's express directive.

## VI.   **The Defendant's Response as to "False Conflict" is Irrelevant**

The Plaintiff's Summary Judgment Motion contains a detailed discussion and analysis of the existing case law on "false conflicts," including the one case to consider the analysis in the context of a Ponzi scheme-related fraudulent transfer action.  *See* Plaintiff's Summary Judgment Motion, p. 13-18.  Defendant's Response does not mention, let alone attempt to distinguish, most of such cases, nor does it cite to any other or further false conflict cases involving fraudulent transfer claims.  *See* Defendant's Response, p. 6-9.  Instead, Defendant cites to two cases that are easily distinguished from the instant case and are largely irrelevant, and one case that actually supports Plaintiff's position on the existence of a false conflict here.

Specifically, (i) the parties in *Gulf Group Holdings* had a contract with an express choice of law provision;[9] and (ii) the events relevant to the product liability claims in *Chapman* all took place in the jurisdiction where the asserted false conflict existed.[10]   Conversely, here, there is no contract between the parties (and so no express choice of law provision)[11] and the majority of events relevant to Plaintiff's claims took place in Georgia (not the false conflicts state of Minnesota).   Moreover, for purposes of the false conflicts inquiry, a state has an actual interest in a dispute if its relationship to the dispute is *within the scope of the policies of the law sought to be applied*.[12]   As such, it is without question that, as in *Chapman*, a state has an interest in claims relating to medical care provided within its borders.   It is equally without question, however, that the same cannot be said here.   The basic policy of constructive fraudulent transfer law is the protection of creditors (not the transferee).   Here, the creditor to be protected by the claims asserted is a Florida court-appointed fiduciary for two Delaware entities that had their principal place of business at all times in Florida.   And here, the Defendant's conduct took place, not in the jurisdiction for which it advocates, but in its home state of Georgia.   As such, and as with the only other case to consider the false conflicts issue in the context of a fraudulent transfer claim, Minnesota does not have an interest *in this dispute* because "no defendant asserts his or

---

[9] *See Gulf Group Holdings v. Coast Asset Management*, 516 F. Supp. 2d 1253, 1271 (S.D. Fla. 2007) (finding no false conflict between the laws of Florida [plaintiff's domiciliary] and California [defendant's principal place of business], even though asserted claim for injury to professional reputation was only recognized under California law, where "the parties' contract was governed by Florida law and [plaintiff's] work was conducted in Florida").

[10] *Chapman v. Depuy Orthopedics, Inc.*, 760 F. Supp. 2d 1310 (M.D. Fla. 2011) (finding that Virginia had a legitimate interest in a product liability suit involving the failure of certain hip-replacement components where the plaintiff lived in Virginia at the time of the surgeries, which all took place in Virginia).

[11] Notably, as detailed above, Defendant was presented with a confidentiality agreement to sign in connection with the original proposed donation of a promissory note, and it refused to do so on several grounds, including noting that it would not agree to be bound by a Minnesota choice of law provision therein. *See supra* Section III.

[12] *See Janvey v. Alguire, et al.*, No. 3:09-cv-00724-N-BL, 2013 WL 2451738, at *11 (N.D. Tex. Jan. 22, 2013), *appeals dismissed* (5th Cir. 13-10194, 13-10195, 13-10102, 13-10100) (Jun 13, 2013), *appeals dismissed* (5th Cir. 13-10212, 13-10204) (Jul 15, 2013) (*citing Sandefer Oil & Gas, Inc. v. AIG Oil Rig of Texas, Inc.*, 846 F.2d 319, 322 (5th Cir. 1988)).

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3200 SOUTHEAST FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA 33131 • TELEPHONE (305) 358-6363
{Firm Clients/MGEM/MGEM-28/01505154.DOCX.}

her right to [Minnesota] law as [a Minnesota] citizen." *Janvey*, 2013 WL 2451738, at *4.[13] As

such, any conflict with Minnesota law in the instant case is a false one.

This result is only further supported by the final case cited by Defendant in its response to

Plaintiff's false conflicts argument. *Miller* involved wrongful death claims relating to an

accident that occurred in South Africa, killing an Ohio resident, as a result of mechanical failures

on a rental car owned by an Oklahoma corporation. *Miller v. Thrifty Rent-a-Car System, Inc.*,

609 F. Supp. 2d 1235 (M.D. Fla. 2009).    As discussed in Plaintiff's Summary Judgment Motion,

the Court in *Miller* found a false conflict as to Florida law (and therefore rejected defendant's

attempt to take advantage of an affirmative defense available to it *only* under Florida law),

because the policy behind the law to be applied was the protection of defendants and the

limitation of excessive tort judgments, which the court in *Miller* stated "are implicated when the

defendant is a resident of the jurisdiction." *Id.* Because the defendant was an Oklahoma

corporation, the Court found that Florida lacked an interest in applying its law (including the

affirmative defense unique to Florida). *Id.* Likewise, Minnesota has no interest here in applying

its own charitable organization exception where the Defendant is not a resident of Minnesota.

*See, e.g., Foster v. United States*, 768 F.2d 1278, 1283 (11th Cir. 1985) ("a limit on recovery

---

[13] Defendant, at pp. 12-14, sets forth a host of purported distinctions between this case and *Janvey*. None are persuasive. First, the fact that the result in *Janvey* was to apply the law of the debtor/transferor is easily distinguished on the basis that the debtor/transferor was a party to the proceeding in *Janvey*. Such is not the case here. Second, although Defendant asserts that the false conflicts jurisdiction in *Janvey* (Antigua) had no interest in the dispute, such is simply not the case. Just like in this case, the investments underlying the Ponzi scheme in *Janvey* were sold by an entity in the alleged false conflicts jurisdiction (and so the transfers of money also came out of the false conflicts jurisdiction). Third, Defendant asserts that *Janvey* is distinguishable unless Plaintiff can establish that Vennes/MGI was a knowing participant in the fraud. No such showing is required under the analysis in *Janvey*, however. *Janvey* instead found that, because the entity from which the transfers were made existed "solely to perpetuate a worldwide fraud," such jurisdiction had no legitimate interest in the dispute. The same can be said here. The Vennes Plea itself states that the primary business of MGI from 1995 until 2008 was obtaining funds for investment in the Petters *Ponzi* scheme. *See* Vennes Plea [ECF No. 61], p. 4.

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3200 SOUTHEAST FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA 33131 • TELEPHONE (305) 358-6363
{Firm Clients/MGEM/MGEM-28/01505154.DOCX.}

should not be applied when there is no domiciliary defendant because it advances no policy behind the limitation.").[14]

## VII.  Conclusion

It is undisputed that the Defendant is a Georgia non-profit corporation that has, for its entire existence, had its principal place of business in Georgia. It is further undisputed that the conduct of the Defendant which gives rise to the claims asserted by the Plaintiff in this case occurred at all times in Georgia. With the newly-produced documents, it is now clear that the Defendant's own mindset at the time of the Transfers was that Minnesota law did not apply. Indeed, were it not for Minnesota's enactment of an exemption of which the Defendant now wishes to avail itself, it defies logic to think that the Defendant would be advocating to this Court for the application of Minnesota law. In light of (i) the law shopping motive behind the Defendant's current position, (ii) the Restatement's directive to give particular weight to the Defendant's conduct in cases such as this one, and (iii) the fact that fraudulent transfer law is designed to protect creditors, not transferees, the appropriate result here is to find that Georgia law governs.

---

[14] The Defendant asserts, in its response, that this approach will lead to the potential application of "the laws of as many states as there are creditors or transferees" and potentially "inconsistent results among similarly-situated creditors and transferees." *See* Defendant's Response, p. 10. This argument, however, is a red herring. First, given the fact that the majority of states have adopted the UFTA, the substantive law of the majority of jurisdictions is substantially similar and so a focus on the location of the defendant and its conduct, as the Restatement directs, will not produce wildly differential results. Second, specific to this case, the Defendant is the only "donation" transferee being pursued by Plaintiff – all of Plaintiff's other claims relating to MGI donations have been resolved consensually. So, there is absolutely no risk of inconsistent results among similarly-situated defendants in these cases. Third, even if there were other charity defendants, as discussed in Plaintiff's Summary Judgment Motion and herein, this Defendant is, by no means, similarly-situated to other charitable organizations that may innocently receive a contribution from an insolvent entity. This Defendant participated knowingly and willingly in a series of transactions for the purpose, and with the express intention, of avoiding the application of certain IRS regulations, which the Defendant itself describes as a "Pass-through NO-NO." *See* NCF001041-42. As such, its conduct is particularly relevant to the analysis here.

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3200 SOUTHEAST FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA  33131 • TELEPHONE (305) 358-6363
{Firm Clients/MGEM/MGEM-28/01505154.DOCX.}

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was served on November 17, 2014, via the Court's Notice of Electronic Filing upon the Registered Users listed on the attached Exhibit 1.

> s/ Peter D. Russin
> Peter D. Russin, Esquire
> Florida Bar No. 765902
> prussin@melandrussin.com
> Jessica L. Wasserstrom, Esquire
> Florida Bar No. 985820
> jwasserstrom@melandrussin.com
> MELAND RUSSIN & BUDWICK, P.A.
> 3200 Southeast Financial Center
> 200 South Biscayne Boulevard
> Miami, Florida 33131
> Telephone: (305) 358-6363
> Telecopy: (305) 358-1221
>
> *Attorneys for the Plaintiff*

# Mailing Information for Case 11-02940-PGH

### Electronic Mail Notice List

The following is the list of **parties** who are currently on the list to receive email notice/service for this case.

- **Michael S Budwick**   mbudwick@melandrussin.com, ltannenbaum@melandrussin.com;mrbnefs@yahoo.com
- **Francis L. Carter**   flc@flcarterpa.com
- **David J Myers**   myers@fsblegal.com
- **Peter D. Russin**   prussin@melandrussin.com, ltannenbaum@melandrussin.com;mrbnefs@yahoo.com
- **Bradley S Shraiberg**   bshraiberg@sfl-pa.com, dwoodall@sfl-pa.com;vchapkin@sfl-pa.com;lrosetto@sfl-pa.com;scusack@sfl-pa.com;blee@sfl-pa.com
- **Jessica L Wasserstrom**   jwasserstrom@melandrussin.com, ltannenbaum@melandrussin.com;mrbnefs@yahoo.com

**EXHIBIT 1**

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3200 SOUTHEAST FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA 33131 • TELEPHONE (305) 358-6363
{Firm Clients/MGEM/MGEM-28/01505154.DOCX.}

3-10-09    Joseph Smith, Craig Howse.

Craig is an attorney
one client - client was
The Harvest Fdn created - Craig oversaw it - all volunteers.
Now 7 donors. 4 DAF's.
VP g devel. Northwestern College.
Craig on Board.
Donor is not on Board.
Not very diversified
   600,000 in Cash
Land donated in Nov. $250,000
Wants investment advice
3 options
   - MMF
   - Growth Fund
   - Balance Fund -
Primary donor - money in, money out
Wants to send in $400k
Wants to be able to get it back to buy.

Two needs.
   1. Wants to be able to talk to donor q investment
      options
   2. How we maintain public Status.
Monday - Meeting April 18th. 1:00pm.

Paul Sentman. (Laura)
Dave Gibson - Edina.

CONFIDENTIAL NCF000993

EXHIBIT A

Danger of public support test failing (23%)

Letter to Joseph
 — we can grant to the PA's.
 — Send a DooF form. — already have Living Fund
                                    Application.

Two potential gifts
1. → 8 M Land.
2.


Interested in PL DAF

4-18-06 | Fidelis Foundation    9/30   Y/E.                    Craig Howse
                                                              Joe Smith

Started at Harvest Fdn. - out of Craig's office - 3 to 4 years ago.
Started October -

Client used Northwestern College Fdn - they became
unflexible.

$4.9 M promissory notes

Three pronged objective:

1. Work w/ individuals - work thru Gods purpose for indiv.

2.    "    - organization - "   -    -    -  for organ.
      - Boardsmanship
      - Puts high value on being theologically sound
      - High value on the church -

3. Flexible tool for donors.


Four years ago - Joe ~~came~~ got involved on board

7 years for FCA - Basketball coach - went to work for NW
College - was devel. director for NW College for 3 years.
Jan 03 - 2 years ago - Joe came on board.
Paul Fentman - Dick Lunborg - Paul still on the board
of NW College.

Two gifts

1. Promissory note - 2 year note - 1.5 - 4.9.    ⇒ Could fix them
   - Contract w/ Ministry - Preapproved ministry     ½ interest
   - 2% - Fee quoted by TAP.    (Need 2.8 m)
   - Earning 19%. - pays in 2 years.

2. Golf Course - worth $10M - CRT + Outright gift
   - Land transfer in 05-06.
   - Sale 07

CONFIDENTIAL NCF001008

EXHIBIT B

Three things they want to do.

1. Wants to use NCF as back ffice
   - PL DAF

2. Blbbb Help them of public support

3. Our A/c no established properly
   - move it into a ministry fund, instead of DAF

Then need this → - Need letter agreement of fidelis

CONFIDENTIAL NCF001009



# THE NATIONAL CHRISTIAN FOUNDATION℠

## *Memorandum*

**To:**        Tom Conway

**From:**    Terry Parker

**Date:**    June 16, 2005

**Subject:**    **FIDELIS FOUNDATION/JOE SMITH & CRAIG HOWSE**

Tom, what I told to Joe and Craig was that they could make a recommendation that we make a distribution to the Fidelis Foundation. We could then approve that distribution, but they could ask us to delay the distribution until they notified us further. Thus, all they would have to do if they ever wanted the money to come back to their Foundation would be to give us the notice to make the distribution--even if it was years later. It is probably a little "shaky" from their part, as we could probably withdraw the approval at any time before they ask us to "pull the trigger", but something like this is what I had in mind.

1100 Johnson Ferry Road, Suite 900, Atlanta, Georgia 30342 ~ Voice 404.252.0100  Fax 404.252.5177
www.nationalchristian.com

CONFIDENTIAL NCF001036

EXHIBIT C

*TAP*



**BOARD OF DIRECTORS**

Terry A. Parker
*Chairman of the Board,*
RETIRED – WOMBLE, CARLYLE,
SANDRIDGE & RICE, PLLC

Ronald W. Blue
PRESIDENT,
CHRISTIAN FINANCIAL
PROFESSIONALS NETWORK

Anthony Wauterlek
PRIVATE INVESTOR

Sandra T. Johnson
THE SANDRA AND WILLIAM B.
JOHNSON FOUNDATION

James C. Blankemeyer
FOUNDER & CHAIRMAN OF THE
BOARD, METOKOTE CORPORATION

Larry A. Burkett
1939 – 2003
FOUNDING BOARD MEMBER

**MANAGEMENT**

Terry A. Parker
CHAIRMAN,
BOARD OF DIRECTORS

David H. Wills
PRESIDENT

Kenneth M. Bowers
CHIEF OPERATING OFFICER

David D. Johnson
CHIEF FINANCIAL OFFICER

Thomas M. Conway
EXECUTIVE VICE PRESIDENT,
MINISTRY/ADVISOR SERVICES

Gregory L. Sperry
EXECUTIVE VICE PRESIDENT,
GIFT PLANNING SERVICES

David M. Worland
EXECUTIVE VICE PRESIDENT,
AFFILIATE SERVICES

Pamela Segars
VICE PRESIDENT,
DONOR/COMPLEX GIFT SERVICES

June 29, 2005

Mr. Joseph L. Smith
President
Fidelis Foundation
3189 Fernbrook Lane N.
Plymouth, MN 55447

Dear Joe:

Terry and I appreciated the time with you and Craig in April. As we mentioned, we have changed the Fidelis Foundation Giving Fund to a ministry fund. We have also gone ahead and approved the Fidelis Foundation as a pre-approved ministry, which means that you can make distributions out of your FF Giving Fund here at NCF back into you Foundation whenever you desire.

There were two areas that you mentioned that you might need help from NCF with in relation to your maintaining your public charity status. If I remember correctly, they were:

1. A potential large gift of real estate. I believe it was a golf course. You thought that it might be given partially into a CRT and partially as an outright gift. You mentioned that the land could transfer in 2005 or 2006 with a sale to take place in 2007. It would be best for your public charity status for that gift to come through NCF and then we could distribute it to you after it liquidates and when you request it.

2. The second was a gift of a promissory note. I believe you said it was a 2 year note and you might receive a ½ interest in the note. If you have further information on this, it might be good for us to get started on the process. I know you have a September 30th year end and it will take some time for us to do due diligence on the note before we can agree to accept it. So once you have more firm information on it, I would suggest we move forward.

1100 Johnson Ferry Road, Suite 900, Atlanta, Georgia 30342   VOICE 404.252.0100   FAX 404.252.5177
www.nationalchristian.com

CONFIDENTIAL NCF001041

EXHIBIT D

Mr. Joseph L. Smith
June 29, 2005
Page Two

In the meantime, if you have other large gifts to the Fidelis Foundation, it might be wise to have them channeled through your fund here at NCF.  Since grants from NCF are considered public support, this will help you in maintaining your public charity status.

If other issues come up for you, please feel free to give us a call.

Yours in Christ,

**NATIONAL CHRISTIAN FOUNDATION**


Tom Conway
Executive V.P., Advisor and Ministry Services

cc: Terry Parker

P.S.  If you see Paul or Laura Sentman at church, please say hello from me.

CONFIDENTIAL NCF001042

08/09/2005  10:06    7635770151              HOWSE ANDTHOMPSON              PAGE  01

# FIDELIS FOUNDATION
### 3189 Fernbrook Lane North
### Plymouth, MN 55447
### (763) 201-1268
*"Serving others in Jesus' name"*

CONFIDENTIAL

## FACSIMILE TRANSMISSION COVER PAGE

The information contained in this facsimile message is privileged and confidential and is intended only for the use of the individual or entity named below. If you, the reader of this message, are not the intended recipient or the employee or agent responsible for delivering it to the intended recipient, you are hereby notified that you are strictly prohibited from disseminating, distributing or copying the information contained in this facsimile message.

DATE: 8/9/05                          FAX NO:

TO: Tom Conway                        OF: NCF

FROM: JOE SMITH

TOTAL NUMBER OF PAGES (incl. cover page): 6

DOCUMENTS BEING TRANSMITTED: Confidentiality Agreement

COMMENTS OR INSTRUCTIONS:

Fidelis Foundation, 3189 Fernbrook Lane North, Plymouth, MN  55447
Phone: (763) 201-1268          FAX:  (763) 577-0151

CONFIDENTIAL NCF001047

EXHIBIT E

# FIDELIS FOUNDATION
3189 Fernbrook Lane N
Plymouth, MN 55447
*"Partnering with others for faithful service"*

August 9, 2005

Tom Conway
National Christian Foundation
1100 Johnson Ferry Road, #900
Atlanta, GA 30342

Dear Tom:

Attached is a Confidentiality and Non-Circumvention Agreement that has been drawn up by Craig Howse, attorney for Frank Vennes, Jr. It is necessary for this document to be signed and returned to us prior to our sending you a sample of the promissory note and other documents that you will need for your due diligence.

As you can tell, this information is considered highly confidential and sensitive to us. The business transactions that are accomplished are predicated upon a personal relationship between Mr. Vennes and Mr. Petters, and our commitment to keep extremely confidential the names of the buyers and sellers in these transactions. We cannot overemphasize the need for confidentiality in the guarding of these documents and the information that they contain.

Should you have questions about the content of the Confidentiality Agreement feel free to contact G. Craig Howse, Esquire, at (763) 557-0150. While time is important, we do not want you to feel rushed or pressured. Our phone conference at 1 p.m. (CST) on August 18th can be pushed back if you feel that would be helpful to you or Terry.

Serving together,

Joseph L. Smith
President

*1 Corinthians 4:2 "Now it is required that those who have been given a trust must be found faithful"*
Phone: (763) 201-1268     Fax: (763) 577-0151     E-mail: joe.smith@fidelisfoundation.org

CONFIDENTIAL NCF001048

## CONFIDENTIALITY AND NON-CIRCUMVENTION AGREEMENT

This Confidentiality and Non-Circumvention Agreement, hereinafter Agreement, is made and entered into this the _____ day of August, 2005, by and between Metro Gem, Inc., P. O. Box 97, Excelsior, Minnesota 55331, hereinafter MGI, and National Christian Foundation , 1100 Johnson Ferry Road, Suite 900, Atlanta, GA 30342, hereinafter Foundation; and

WHEREAS, MGI will provide to Foundation Confidential Information regarding the business operations of MGI and Petters Company, Inc., hereinafter Petters, which Information is "Proprietary Information," as defined below; and

WHEREAS, the Proprietary Information is provided to the Foundation in conjunction with a possible gift by MGI of a Promissory Note between MGI and Petters; and

WHEREAS, it is extremely important for the protection of the business of MGI and Petters and for the protection of the relationship between Petters and MGI, that the Proprietary Information remain confidential; and

WHEREAS, the Foundation understands the importance of maintaining confidentiality of the Proprietary Information received and any additional Proprietary Information provided in the future; and

WHEREAS, the Foundation agrees to keep as confidential any information disclosed in the past, or to be disclosed or otherwise made available to the Foundation in the future;

IT IS THEREFORE HEREBY AGREED, in exchange for the delivery of Confidential Information by MGI to Foundation and the mutual promises contained herein, as follows:

1.   **Delivery of Proprietary Information.**  MGI pursuant to this Agreement has agreed in the future to grant the Foundation access to Proprietary Information. For purposes of this Agreement, "Proprietary Information" means all financial statements, information, documents, systems, procedures, software programs, ideas, customer-client lists, marketing or product plans, and other creations of Petters or MGI relative to Petters. Foundation understands that access to this proprietary, confidential, trade secret and business information is of significant value to MGI and Petters and that the unauthorized use or the disclosure of such information could result in significant business or financial loss to MGI and Petters which may be difficult to measure in monetary amounts. Foundation understands and agrees that any such Proprietary Information which has been or is received from MGI or Petters will be received and retained in confidence to be used for the sole purpose of considering tax acceptance of a gift, and the managing and collecting loans to Petters by Foundation, and for no other reason. *viability of note & its collection in adverse circumstances,*

CONFIDENTIAL NCF001049

2.   **Non-Disclosure of Proprietary Information**. Foundation agrees that it has and it will keep confidential and that it has not and that it will not make any unauthorized use or disclosure of any Proprietary Information of MGI or Petters "generated" or otherwise acquired during the course of discussions or conduct of business with MGI or Petters, whether past, present or future. Foundation has not and will not disclose such information to any party other than Foundation's officers, employees, accountants and attorneys, whose receipt of such information is necessary to manage and collect the loan to Petters. Foundation will inform any party to whom this Proprietary Information has been and is made available of the confidential nature of such information and the restrictions upon its use and disclosure as set forth herein. Foundation assumes full responsibility for insuring that any party to whom they have delivered or deliver the Proprietary Information shall comply with the conditions of non-disclosure, confidentiality and non-competition as set forth herein, and Foundation agrees to have its directors and officers execute this Agreement by which they agree to be bound by the terms and conditions herein.

3.   **Use of Proprietary Information**. Foundation acknowledges that Proprietary Information to be received from MGI or Petters has been and is provided only to allow Foundation to consider acceptance of a gift of a promissory note and to manage and collect a loan to Petters, and Foundation shall not use said Proprietary Information for any other purpose. To protect against the unauthorized use and disclosure of the Proprietary Information, Foundation agrees to keep an accurate account of all information received from MGI or Petters, and the number of copies made of said information. Foundation also agrees to record the name, address and relationship to Foundation of the parties to whom Proprietary Information was made known with a specific description of the information provided to said party. Foundation will instruct the parties to whom this information is given not to duplicate the information and that it shall not be made a permanent part of their files. Foundation will provide to MGI, upon his request and in a timely fashion, a list of all parties to whom any Proprietary Information has been disclosed with a description of the Proprietary Information so provided to said persons.

**Non-Competition**. Foundation agrees that it has and that it will use the Proprietary Information provided exclusively for the purposes designated above. Foundation agrees that the Proprietary Information has not and shall not be supplied to or used for the benefit of any competitor of MGI or Petters or by Foundation to compete with MGI and Petters. During the term of this Agreement and for a period of five (5) years immediately following the termination of all loan arrangements and any other agreement with Petters or MGI, Foundation shall not, in any way, directly or indirectly, own, manage, operate, or be employed by or consult with any business engaged in the business of which MGI or Petters is involved now or at any time hereafter while this Agreement is in effect.

*Members of credit committee*
*would need our atting. accnt, etc. to sign. They don't want to sign!!*
*Very costly in time of our people + our accountants atty would do this.*
*impossible - we don't know what the business is until we sign - and then it is too late.*
*Childbros 601 & IRS — Our attys*
*Can't control Coppin Crewe*
*they won't sign — & we won't want them.*
*Same for Coffey & J. of above*
*too costly time consuming our people already have too many jobs!!!*
*Can't control J. of & donors*

CONFIDENTIAL NCF001050

5.    **Non-Circumvention.**  Foundation warrants, covenants and represents to MGI that during the term of this Agreement and for a period of five (5) years after termination of any loan agreement with MGI or Petters, Foundation will not, without the permission of MGI, engage in any loan transaction with Petters, or with one of Petters subsidiaries, or related corporations or entities, except that the Foundation may enter into an Agreement with Petters for the extension or renewal of the Promissory Note between Petters and MGI which MGI has gifted to the Foundation.  The Foundation agrees that it will not circumvent MGI or any of MGI's related entities in seeking to establish a loan or business relationship with Petters or its related corporations, entities or subsidiaries.

6.    **Continuing Restriction.**  The limitations and restrictions on the use or disclosure of Proprietary Information as set forth above shall continue until such information is generally known to the public.  Neither the execution of this Agreement, nor the past or future furnishing of any Proprietary Information hereunder shall be construed as MGI or Petters granting to Foundation either expressly, by implication, estoppel, or otherwise, any license under any invention, patent, copyright, or trade secret, now or hereafter owned or controlled by such party.

7.    **Injunctive Relief.**  Because MGI and Petters' Proprietary Information and the products and services derived therefrom are unique, peculiar and of great value to MGI and Petters, MGI and Petters shall be entitled to injunctive relief to restrain Foundation from violating or threatening to violate any provisions contained herein.  Proceedings may be initiated against Foundation or such party's legal representatives or assigns.  This right is not exclusive and is in addition to any other remedies available to a party.  MGI and Petters shall be entitled to its reasonable costs and attorney's fees in enforcing this provision.

8.    **Damages.**  In addition to injunctive relief, MGI or Petters, as a third party beneficiary of this Agreement, have a right to collect direct and consequential damages from the Foundation for breach of this Agreement.  Such damages include attorney's fees and costs in pursuing such an action and will be paid to MGI and/or Petters by Foundation upon entry of final judgment for MGI and/or Petters or upon a settlement between the parties.

9.    **Waiver of Breach.**  The waiver by MGI or Petters of a breach of any provision of this Agreement by Foundation shall not operate or be construed as a waiver of any subsequent breach by such party.

10.   **Entire Agreement.**  This Agreement contains the entire agreement of the parties. It may not be changed orally, but only by an agreement in writing signed by the party against whom enforcement of a waiver, change, modification, extension or discharge is sought.

CONFIDENTIAL NCF001051

*don't review this law*

11.  **Construction**. This Agreement and all questions arising in connection therewith shall be governed by the laws of the State of Minnesota. In case any provision of this Agreement shall be held illegal or invalid for any reason, such determination shall not affect the remaining provisions of this Agreement, and the Agreement shall be construed and enforced as if said illegal or invalid provision had never been included herein.

11.  **Execution**. This Agreement may be executed simultaneously in any number of counterparts, each copy of which shall be deemed an original, but all of which together shall constitute one and the same instrument. A party's execution and FAX transmittal of a copy of this Agreement to the other party shall constitute that party's acceptance of the Agreement, conditional on the other party's execution and FAX transmittal of the Agreement within 24 hours. On the date of the execution and FAX transmittal of the Agreement, each party agrees to transmit on the same date an executed copy to the other party by U.S. mail. The parties agree that the holding of executed duplicate copies of this Agreement by the other party shall also constitute a binding and enforceable Agreement, subject to the first sentence hereof.

NATIONAL CHRISTIAN FOUNDATION        METRO GEM, INC.

By: _____          By: _____
Terry Parker, CEO                     Frank E. Vennes, Jr., CEO

CONFIDENTIAL NCF001052

What basin are they in?

We don't have any enough information to figure it?

Can't do anything for 5 years.
 — they want damages.
We don't know minn law.

Can't figure — too much risk to figure.
 — we don't want to hire a lawyer.

We don't understand the figure.
We don't want to get in trouble w/ IRS.
Exposure for damages — we don't understand minn
law —
We need to feel our auditors —

CONFIDENTIAL NCF001054

EXHIBIT F

Page 1 of 1

**Tom Conway**

From:     Tom Conway
Sent:     Wednesday, August 17, 2005 9:42 AM
To:       Joseph L Smith (joe.smith@fidelisfoundation.org)
Cc:       Terry Parker; Tom Conway (tconway@nationalchristian.com)
Subject: Confidentiality agreement

Hi Joe,

Terry has been out traveling and we were just able to hook up yesterday.  I showed him the confidentiality agreement you faxed to us and we discussed.  I'm afraid we are not able to sign it for a number of reasons:

1. We don't have enough information to sign it.  We don't know enough details about the kind of business they are in, nor do we know much about the company they are lending the money to.
2. Our auditors *and attorneys + consultants + staff* have the freedom to look at anything in our files, so we could not agree to the non-disclosure section.
3. We couldn't sign the non-competition section that would restrict us for 5 years.  What if a donor in a similar business wanted to make a gift to us?  We would not want our hands tied by this agreement.
4. We are not willing to put ourselves in a position that would expose us to damages were any of these requirements violated by mistake on our part.
5. The agreement says that all questions shall be governed by the laws of Minnesota.  We are not familiar with the laws of Minnesota and we do not what to hire an attorney to do that research for us.

As I mentioned to you in an earlier email, we handle donor issues with extreme confidentiality here at the Foundation.  However, we have never been asked to sign a confidentiality agreement, and because of the items stated above, we are not in a position to sign the one you sent us.

We have a conference call scheduled for tomorrow at 1:00pm.  If this email will keep us from having that call, please let me know.

Thanks,

Tom Conway
Executive Vice President, Advisor & Ministry Services
National Christian Foundation
1100 Johnson Ferry Rd., Suite 900
Atlanta, GA 30342
phone: (404) 591-1078
fax: (404) 252-5177
tconway@nationalchristian.com
www.nationalchristian.com

*"Therefore, my beloved brethren, be steadfast, immoveable, always abounding in the work of the Lord, knowing that your toil is not in vain in the Lord" 1 Cor.15:58*

CONFIDENTIALITY NOTICE: This electronic mail transmission is for the use of the named individual or entity to which it is directed and may contain information that is privileged or confidential. It is not to be transmitted to or received by anyone other than the named addressee (or a person authorized to deliver it to the named addressee). It is not to be copied or forwarded to any unauthorized persons. If you have received this electronic mail transmission in error, delete it from your system without copying or forwarding it, and notify the sender of the error by replying via email, so that our address record can be corrected. Thank you for your cooperation.

8/17/2005

CONFIDENTIAL NCF001055

EXHIBIT G