UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

In re:                                                Case No. 09-36379-PGH
                                                      Chapter 11
Palm Beach Finance Partners, L.P. and
Palm Beach Finance II, L.P.,

      Debtor(s).
_____/

Barry E. Mukamal, as Liquidating Trustee,

      Plaintiff,

                                        Adversary Pro. No. 11-02940-PGH
v.

The National Christian Foundation, Inc.,

      Defendant.
_____/

## REPLY IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

      In his efforts to avoid the application of the Minnesota law on which he relied in his Complaint, the Trustee urges this Court to ignore the roles and locations of the transferor and the intended beneficiary of the allegedly fraudulent transfers, as well as the Debtors' own oft-repeated agreement to be bound by Minnesota law and the unambiguous conclusion of the Uniform Law Commission.  Instead, the Trustee would have the Court focus solely on the formal parties to this adversary proceeding and decide these cross-motions based solely on the location of NCF in Georgia.  The Trustee's approach is a mis-application of Florida's significant relationship test.  Properly applied, the significant relationship test results in the choice of Minnesota law in this case.

<u>ADDITIONAL MATERIAL FACTS</u>[1]

**<u>Fidelis Foundation Established a DAF/Giving Fund with NCF</u>**

1.      Terry Parker of NCF and Craig Howse of Fidelis Foundation first met while attending another organization's function in Vail, Colorado in September 2004.  ECF No. 95 at 6, 13.

2.       Subsequently, Joseph Smith of Fidelis Foundation called NCF and spoke with Imani Bendu, a Donor Relations Manager, regarding opening an account for Fidelis at NCF.  *Id.* at 6.

3.      On November 18, 2004, Smith emailed Bendu regarding (a) opening an account for Fidelis at NCF with an initial balance of $100,000 and (b) the possibility of using NCF for some "back office" functions for Fidelis.  *Id.* at 6.  Smith provided NCF with Fidelis's contact information in Minnesota and its Minnesota Certificate of Incorporation number.  *Id.*

4.      Bendu responded by email on November 24, 2004.  *Id.* at 9.  Regarding the possible "back office" functions, Bendu directed Smith to Pam Segars, NCF's VP of Donor Services.  *Id.*

5.      On February 8, 2005, Smith wrote to Bendu on Fidelis Foundation letterhead, describing two "streams" of anticipated gifts from Fidelis to NCF:  one stream from Fidelis's own resources and the other from Fidelis donors who would request distributions that Fidelis

---

[1]      After the parties had filed their cross-motions and response briefs, NCF located and produced to the Trustee a number of additional documents, some of which contain information relevant to the choice of law issue.  The parties have agreed to address the additional documents in their respective Reply briefs.

[2]      The Trustee can be expected to make much of NCF's concerns about the application of Minnesota law to the confidentiality agreement, perhaps even going so far as to claim that NCF was generally unwilling to be governed by Minnesota law.  But such a characterization would

would relay to NCF.  *Id.* at 13.  Smith enclosed numerous Fidelis documents, including a confirmation letter from the IRS and Fidelis's Minnesota organizing documents.  *Id.* at 14-53.

6.      Fidelis Foundation's confirmation letter from the IRS, dated May 30, 2003, notes that Fidelis's determination letter was issued in May 2002, that Fidelis was classified as a publicly supported organization rather than as a private foundation, and that Fidelis's Advance Ruling Period would end on December 31, 2005.  *Id.* at 26.  According to the IRS, this meant that:

> Grantors and contributors may rely on the determination that your organization is not a private foundation until 90 days after the end of its advance ruling period.  If the organization submits the required information within 90 days, grantors and contributors may continue to rely on the advance determination until the Service makes a final determination of your organization's foundation status.

*Id.*

7.      By email, Bendu confirmed receipt of Smith's February 8, 2005 package and invited him to contact Tom Conway, who was responsible for Ministry Services at NCF.  *Id.* at 54.

8.      On March 10, 2005, there was a telephone conference between Conway of NCF and Smith and Howse of Fidelis.  *Id.* at 60-63.  Among other things, they discussed that Fidelis wanted to "send in" $400,000 and the danger of Fidelis failing its public support test.  *Id.* at 60-61.  They set a meeting for April 18, 2005.  *Id.* at 60.

9.      The same day, Conway wrote to Smith confirming their telephone conference and confirming NCF's ability to make grants to Fidelis from Fidelis's Giving Fund at NCF "so long as Fidelis Foundation is and remains a 501(c)(3) public charity."  *Id.* at 63.  Conway invited Fidelis to submit its Giving Fund Application, supporting information, and check so that NCF

could open a giving fund for Fidelis.  *Id.*  Smith also confirmed the planned April 18 meeting.
*Id.*

10.     According to Conway's handwritten notes of the April 18, 2005 meeting, Fidelis
Foundation anticipated two upcoming gifts that would involve NCF:  a promissory note and a
golf course.  *Id.* at 75.  The Fidelis representatives told the NCF representatives that there were
three things that Fidelis wanted to do, including "use NCF as back office" and "help [Fidelis]
with public support."  *Id.* at 76.

11.     On April 20, 2005, Smith sent Conway a letter on Fidelis Foundation letterhead
following up on the April 18 meeting.  ECF No. 95-1 at 5.

12.     On May 24, 2005, Smith sent Conway an email soliciting a follow up letter from
Conway.  *Id.* at 6.  (Conway's response letter on June 29, 2005 is described in NCF's Statement
of Material Facts (ECF No. 71) ¶ 22.)

13.     On August 9, 2005, there was a telephone call between Conway and Smith in
which Smith stated his intention to send NCF a sample of the promissory note gift that Fidelis
proposed to make to NCF, for NCF's review.  *Id.* at 17.

14.     The same day, Smith sent a fax to Conway on Fidelis Foundation letterhead
enclosing a "Confidentiality and Non-Circumvention Agreement" that NCF was requested to
sign, <u>at Vennes's urging</u>, before being provided with a sample promissory note.  *Id.* at 18-23.
Smith's cover letter mentioned Vennes by name for the first time, saying that the proposed
confidentiality agreement "has been drawn up by Craig Howse, attorney for Frank Vennes, Jr."
*Id.* at 19.  Smith also mentioned Petters for the first time:  "The business transactions that are
accomplished are predicated upon a personal relationship between Mr. Vennes and Mr. Petters,

and our commitment to keep extremely confidential the names of the buyers and sellers in these

transactions." *Id.*

15.     The Confidentiality and Non-Circumvention Agreement provided that it would be

governed by Minnesota law.  *Id.* at 23 ¶ 11.

16.     In an August 17, 2005 email, Conway informed Smith in response that NCF had

never been asked to sign a confidentiality agreement and was not able to sign the agreement "for

a number of reasons":

1.     We don't have enough information to sign it.  We don't know
       enough details about the kind of business they are in, nor do we
       know much about the company they are lending the money to.
2.     Our auditors have the freedom to look at anything in our files, so
       we could not agree to the non-disclosure section.
3.     We couldn't sign the non-competition section that would restrict us
       for 5 years.  What if a donor in a similar business wanted to make a
       gift to us?  We would not want our hands tied by this agreement.
4.     We are not willing to put ourselves in a position that would expose
       us to damages were any of these requirements violated by mistake
       on our part.
5.     The agreement says that all questions shall be governed by the
       laws of Minnesota.  We are not familiar with the laws of
       Minnesota and we do not what [sic] to hire an attorney to do that
       research for us.

*Id.* at 26.[2]

17.     On August 18, 2005, Smith and Howse for Fidelis (and for Vennes) had a

telephone meeting with Parker and Conway for NCF.  *Id.*

---

[2]     The Trustee can be expected to make much of NCF's concerns about the application of
Minnesota law to the confidentiality agreement, perhaps even going so far as to claim that NCF
was generally unwilling to be governed by Minnesota law.  But such a characterization would
overstate the case.  The application of Minnesota law was only one of (and the last of) at least
five reasons for declining to sign the agreement.  The subject matter in question was a
confidentiality and non-circumvention agreement, not fraudulent transfers.  And far from being
unwilling to be governed by Minnesota law, NCF was unfamiliar with and simply did not want
to incur the expense of hiring an attorney to advise it on Minnesota law regarding confidentiality
and non-circumvention agreements.  *Id.* at 26.

5

**Frank Vennes Established a DAF/Giving Fund at NCF and Made Four Contributions to Fidelis Foundation Through NCF ("the Transfers")**

18.    On December 20, 2005, Howse emailed a letter to Parker, including the promissory note that Vennes proposed to give to NCF (and through NCF to Fidelis).  *Id.* at 27.  *See also* Depo. Exhibit 63 (ECF No. 59-7 at 50-52).  Parker forwarded the promissory note to Segars to start the NCF gift acceptance process.  ECF No. 95-1 at 27.

**Choice of Law Provision in the PBF Transactional Documents**

19.    Fidelis eventually provided a sample Promissory Note, Guaranty, and Security Agreement to NCF.  ECF No. 95 at 86-94.  The Promissory Note and the Security Agreement contained provisions designating Minnesota law as the governing law.  *Id.* at 88 ¶ 14; 93 ¶ 5(b).

## ARGUMENT

### I.    Connections Between Critical Non-Party Participants Are Highly Relevant.

The Trustee insists that the Court's analysis of relationships in this case is strictly limited to the formal parties to this adversary proceeding – parties determined by the Trustee's own choice of defendants.  His overly simplistic and formalistic approach is wrong for a number of reasons.

As an initial matter, the Trustee's reliance on the word "parties" in *Restatement* § 145 is too formalistic.  The Trustee ignores the fact that § 145 is merely "The General Principle" for all tort actions.  *Restatement (Second) of Conflict of Laws* § 145 *Comment a* ("The rule of this Section states a principle applicable to all torts and to all issues in tort and, as a result, is cast in terms of great generality.  This is made necessary by the great variety of torts and of issues in tort and by the present fluidity of the decisions and scholarly writings on choice of law in torts.")  Section 145 is not a rule specifically for fraudulent transfer claims, which are not typical tort claims involving solely a plaintiff and a defendant.  By contrast, fraudulent transfer claims

6

inherently involve a transferor, who may or may not – as in the case here – be named as a defendant along with the transferee.

It is not surprising then that in fraudulent transfer cases courts routinely factor the connections of important non-party participants into the significant relationship analysis. For example, in *MC Asset Recovery LLC v. Commerzbank AG (In re Mirant Corp.)* – litigation cited by the Trustee in his briefs – the bankruptcy court considered the locations and interests of at least two groups of non-parties: the creditors of Mirant and the shareholders of Mirant. 2010 Bankr. LEXIS 6389 *53-55 (Bankr. N.D. Tex. Apr. 22, 2010). The court explicitly rejected the same argument the Trustee makes here:

> Commerzbank also argues that the location of creditors is not a relevant consideration at all because creditors are not parties to this adversary proceeding. Even so, it cannot be denied that creditors are beneficiaries of this action. Courts that have considered the application of the most significant relationship test in the context of fraudulent transfers have routinely considered the location of the beneficiaries of that action..

*Id.* at *56 (emphasis added).

An additional example from the Trustee's own cited cases is *Chapman v. Depuy Orthopedics, Inc.,* 760 F. Supp. 2d 1310 (M.D. Fla. 2011), a products liability suit regarding a medical device that failed (in Florida) several years after implantation into the plaintiff during surgery that took place in Virginia. The device was not manufactured in Virginia and there was no Virginia party in the case. Nevertheless, the court not only rejected the same "false conflict" argument made here by the Trustee – holding that Virginia had "a legitimate interest" in the case (because the medical device was installed there and the plaintiff had been treated there in connection with the device) – but also concluded that Virginia had the most significant relationship to the case. *Id.* at 1313 n.3.

7

Numerous other fraudulent transfer cases assess non-party interests for the significant relationship analysis. *See, e.g., Silica Tech, L.L.C. v. J-Fiber GmbH*, 2009 U.S. Dist. LEXIS 73700 *64, 71 (D. Mass. May 19, 2009) (considering location of non-party scientists and <u>non-party transferor</u> of intellectual property rights); *ASARCO LLC v. Americas Mining Corp.*, 382 B.R. 49, 62-63 (S.D. Tex. 2007) (considering location of <u>non-party current owner of disputed asset</u>); *Weinman v. Fidelity Capital Appreciation Fund (In re Integra Realty Res., Inc.)*, 198 B.R. 352, 362 (Bankr. D. Colo. 1996) (considering location of non-party creditors and <u>non-party shareholders who received the challenged distribution</u>); *In re Consol. Capital Equities Corp.*, 143 B.R. 80, 85 (Bankr. N.D. Tex. 1992) (considering location of non-party creditors); *Murphy v. Meritor Sav. Bank (In re O'Day Corp.)*, 126 B.R. 370, 391 (Bankr. D. Mass. 1991) (considering location of non-party creditors); *Ferrari v. Barclays Bus. Credit, Inc. (In re Morse Tool, Inc.)*, 108 B.R. 384, 387 (Bankr. D. Mass. 1989) (considering location of non-party creditors and <u>non-party third party to the leveraged buyout transaction that was allegedly a fraudulent transfer</u>).

The interests of numerous non-parties here are at least as significant as those of the creditor beneficiaries in *Mirant* and the other non-party participants in the above cases. The Complaint is littered – indeed, primarily concerns – facts about multiple non-parties, including Petters, Vennes/MGI, the Palm Beach Funds, Prevost, and Harrold. Its ultimate objective, moreover, is to set aside the charitable contributions of a non-party (Vennes/MGI) – charitable contributions as to which non-party Fidelis Foundation was the intended (and actual) beneficiary.

The Trustee further underscores the obvious interests of non-parties to this matter in two other ways. First, his discovery requests focus extensively on non-parties. Indeed, five of his requests for production (Nos. 1-3, 5, and 6) and three of his interrogatories (Nos. 1, 2, and 10)

seek material concerning non-parties Vennes/MGI, Howse, and Fidelis Foundation.  ECF No. 97-1 at 8, 16-17.  Second, many of the non-parties referenced by the Trustee – Vennes/MGI and Fidelis included – are parties to other adversary proceedings filed by the Trustee, which involve the exact same transfers at issue here.  *See Mukamal v. Metro Gem, Inc.*, Case No. 11-03041, ECF No. 1; *Mukamal v. Fidelis Fndn.*, Case No. 11-03030, ECF No. 2 ¶ 32.  It would be nonsensical for the Court to consider Vennes/MGI's and Fidelis Foundation's connections for purposes of the choice of law analysis in those adversary proceedings but not in this adversary proceeding.

The Trustee's artificial ban on consideration of the connections of non-parties is contrary both to law and common sense.  Vennes/MGI and Fidelis Foundation in particular – the Minnesota transferor and the Minnesota intended beneficiary of the transfers – have significant interests at stake, and those interests and connections rightly should be taken into account in the significant relationship analysis.

## II.    Connections Regarding NCF's Subsequent Transfer of the Funds Are Relevant.

The Trustee continues his attempt categorically to exclude non-party connections by declaring that "all" facts concerning the subsequent transfers from NCF to non-party Fidelis Foundation are "completely irrelevant," because, in his view, it should not matter that the funds "ultimately ended up in the hands of a Minnesota non-profit corporation (Fidelis)."  Plaintiff's Response at 3.  Contrary to the Trustee's blithe description, however, the funds transferred by Vennes/MGI did not merely "end up" at Fidelis.  The record indisputably establishes that Vennes/MGI's explicit, pre-stated purpose for the transfers to NCF was that NCF would then **immediately** transfer the funds on to Fidelis, a pre-approved charitable recipient.  NCF Statement of Material Facts (ECF No. 71) ¶¶ 21-23, 27, 32-37.  It was not happenstance that the

funds transferred to NCF went to Fidelis – it was the pre-determined intention of the transferor, and it was accomplished almost immediately after each of the transfers. The Trustee asks this Court to ignore the reality that the transfers to NCF were not isolated transactions.

*Restatement (Second) of Conflict of Laws* § 145 makes clear that courts are not to apply the four identified contacts in the Restatement in a rote manner, but rather are to consider any significant fact for purposes of the significant relationship analysis. *See* § 145(2) ("Contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include . . . .") (emphasis added). Where, as here, the transfers in question are merely the first step of a two-step transfer, the intentions and the actions of both the transferor and the intended beneficiary of the transfers are just as relevant to the significant relationship analysis as those of NCF.

**III.    The Choice of Law Provision in PBF's Investment Documents Is Relevant.**

The Trustee next seeks to set aside any consideration of the promissory notes and security agreements executed between non-parties Petters and the Palm Beach Funds and its investors. Plaintiff's Response at 6. The Trustee is obviously correct that the choice of law provision in the PBF investment documents is not binding on the formal parties to this adversary proceeding, and NCF does not argue (and never has argued) otherwise. However, the ubiquitous choice of law provision in these investment documents is relevant to the significant relationship analysis even if it is not binding for purposes of the allegedly fraudulent transfers.

The Palm Beach Funds – the entities represented by the Trustee – entered into or brokered 2,100 investment transactions in the Petters Scheme (the scheme that underlies the Trustee's assertion that NCF's transferor, Vennes/MGI, was a tort debtor of the Palm Beach Funds and was insolvent). Those 2,100 transactions were documented with 2,100 Promissory

Notes and 2,100 Security Agreements.  Each of those Promissory Notes and each of those Security Agreements contained a choice of law provision designating Minnesota law as the governing law for any disputes regarding those transactions, to which the Palm Beach Funds agreed 2,100 times.

The relevance of the choice of law provision in these investment documents is straightforward:  there is no possible unfairness in having the Debtors' fraudulent transfer claims against NCF (and other transferees of Vennes/Metro Gem) likewise be governed by Minnesota law.

## IV.    The Uniform Law Commission's Choice of Law Conclusion Is Persuasive.

The Trustee next dismisses the choice of law conclusion of the Uniform Law Commission (ULC).  Despite the fact that he himself relied upon the recent activity of the ULC in his own motion for summary judgment, Plaintiff's Motion (ECF No. 63) at 28 n.27), he now flatly deems the ULC "wholly inapplicable" when it comes to its recent amendment concerning choice of law.  Plaintiffs' Response at 6-7.  The Trustee once again conflates legal enforceability with relevance.  NCF does not contend that the ULC's amendment of the Uniform Act is binding authority, but there is no doubt that the ULC's action – and the reasons for it – are relevant as persuasive authority.  Yet the Trustee makes no effort to refute the ULC's rationale for the choice of law amendment, instead simply dismissing it.

But dismissal is not rebuttal, particularly when the authority being dismissed is the body that developed the Uniform Act and is supremely familiar with its workings, its day-to-day applications, and its inter-relationship with other laws.  According to the chairman of the Drafting Committee, of the several amendments adopted this year by the ULC, it was the choice of law amendment that "drove the project [to amend the Uniform Act], trying [to] figure out

whose state's fraudulent transfer law should apply in connection with a particular transaction." Transcript, Third Session Amendments to Uniform Voidable Transactions Act (July 12, 2014) (ECF No. 98-1) at 7. After careful and thorough consideration, that body concluded that the appropriate choice of law approach for fraudulent transfers is one that focuses on the location of the transferor. Its approach is sound and is consistent with other authorities.

For instance, the court in *Ferrari v. Barclays Bus. Credit, Inc. (In re Morse Tool, Inc.)*, 108 B.R. 384, 387 (Bankr. D. Mass. 1989), observed that the transferor's location (and, usually therefore, the location of the assets at the time of the transfer) are "the known common foci in a fraudulent conveyance action." The court explained:

> [B]ecause the creditors and the transferee have had no direct dealings with each other, but have both dealt with the debtor and the debtor's assets, it would be reasonable to look to the site of the (allegedly) fraudulently conveyed assets to supply the applicable law. This would promote certainty, predictability, and the protection of justified expectations. . . .
>
> . . . . The authorities accordingly have shown a preference for applying the law of the site of the conveyed property. *See* 4 *Collier on Bankruptcy* par. 544.02, at 544-13 to 544-14 and fn. 17 (15th ed. 1989) ("The tendency of the courts is to treat the law of the site of property at the commencement of the case as governing to the extent that § 544(a) refers to non-bankruptcy law." *Id.*) and cases cited therein; *In re Kaiser Steel Corporation*, 87 B.R. 154 (Bankr. D. Colo. 1988) ("Under Section 244 [of the *Restatement (Second) of Conflicts*], the law of the courts of the site of conveyed property will usually apply to resolve questions of fraud and the validity of the conveyance at issue." Id. at 159). *See also Uniform Commercial Code* § 9-103(1)(b) (adopted in both Connecticut and Massachusetts) (The law of the site of the property governs the perfection and effect of perfection of a security interest.).

108 B.R. at 387-88 (footnote omitted).

The court's analogy to U.C.C. § 9-103(1)(b) in *Morse Tool* parallels the ULC's analogy to U.C.C. § 9-301, for the same reasons expressed by the ULC. As the court put it:

> The Uniform Commercial Code does not govern a fraudulent conveyance claim, but its choice-of-law rules which have been widely adopted, are meant to apply to issues similar to fraudulent conveyance issues. That is, fraudulent

conveyance law and the law governing the perfection of security interests both
deal with the effect of a transfer of an interest in property on a third-party.

108 B.R. at 388 n.7.  *See also* Doc. 68-1 (UVTA Draft) at 46, Comment 1 ("Basing choice of
law on the location of the debtor is analogous to the rule set forth in U.C.C. § 9-301 (2014),
which provides that the priority of a security interest in intangible property is generally governed
by the local law of the jurisdiction in which the debtor is located. The analogy is apt, because the
substantive rules of this Act are a species of priority rule, in that they determine the
circumstances in which a debtor's creditors, rather than the debtor's transferee, have superior
rights in property transferred by the debtor.").

Rather than reckon with the substance of the ULC's choice of law amendment, the
Trustee relies on *Feuerbacher v. Moser*, 2012 U.S. Dist. LEXIS 44396 (N.D. Tex. Mar. 29,
2012). But *Feuerbacher* does not help the Trustee, for two reasons.  First, the location of the
transferor and the transferee in *Feuerbacher* were at least as important to the court in that case as
was the location of the creditors:

> In the case at bar, most of the factors under [*Restatement*] § 145 weigh in favor of
> applying Texas, rather than Colorado, law.  First, the "injury" from the fraudulent
> transfer was suffered by Billie [the transferor] (due to her loss of her interest in
> the Colorado Property) and her creditors (due to the loss of the property available
> to satisfy their claims against her).  <u>Second, the Feuerbachers [the transferor and
> the transferee] were both Texas residents at all times relevant to this lawsuit.</u>
> Comparatively, more of Billie's creditors . . . list a Texas mailing address.  In fact,
> it appears from the record that Billie does not have any creditors in Colorado.

*Id.* at *33-34 (emphasis added) (citation omitted).

Second, the creditors whose location the court considered in *Feuerbacher* were not
formal parties to that lawsuit.  The same is true of the creditors in this case whose location the
Trustee asks the Court to consider.  Plaintiff's Response at 8.  This further contradicts the
Trustee's illogical and erroneous argument that the significant relationship test confines itself
narrowly to the location of named parties.

13

**V.**      **Plaintiff's Summary Judgment Motion Is Inconsistent with the Complaint.**

With the benefit of almost two full years of investigation after the commencement of the bankruptcy case, the Trustee chose to plead <u>Minnesota</u> law "or other applicable law."  Thus, it is fair to conclude that at the outset of this adversary proceeding, the facts known to the Trustee supported Minnesota law as the law most likely to be applicable to his claims against NCF.

This conclusion is borne out by the factual allegations emphasized in the Trustee's Complaint, which contain numerous mentions of Minnesota connections and very few mentions of Georgia or Florida connections.  *Compare* Complaint (ECF No. 1) ¶¶ 10-16, 18, 24-27, 33, 42, and Prayer for Relief (a) (Minnesota) *with* ¶ 7 (Georgia) and ¶ 1 (Florida).

The Trustee now stresses that his Complaint was filed "in the early stages of the Plaintiff's investigation of Vennes/MGI, and with limited bank records and other information." Plaintiff's Response at 8.  But the Trustee does not complete the argument – he does not point to any information obtained <u>after</u> the filing of the Complaint that differed from the information he had available before and that would have changed his assessment of the likely applicable law. This is because there are no new or previously unknown facts relevant to choice of law that would reasonably cause him to alter his initial conclusion.  If anything, the record only confirms the Trustee's initial conclusion:  the injury occurred in Minnesota, the conduct causing the injury occurred in Minnesota, the transferor (Vennes/MGI) was in Minnesota, the transferee (NCF) is in Georgia, the ultimate beneficiary of the transfers (Fidelis Foundation) is in Minnesota, the Trustee is in Florida, the relationship among the participants was centered in Minnesota, and so forth.

The only significant change after the Complaint was filed was Minnesota's adoption of a charitable contribution amendment to its Fraudulent Transfer Act.[3] It is this amendment – and not any new fact gleaned through the discovery process – that has caused the Trustee's about-face and his current argument that something other than Minnesota law now applies to his claims against NCF.

## CONCLUSION

For the foregoing reasons, defendant NCF's motion for summary judgment should be granted and the Court should apply Minnesota law to the Trustee's claims.

Dated November 17, 2014.

Respectfully submitted,

**FISHERBROYLES, LLP**

By: _/s/ David J. Myers_____
David J. Myers
GA Bar No.: 533072 (admitted *pro hac vice*)

1200 Abernathy Road
Building 600, Suite 1700
Atlanta, Georgia 30328
404-825-3907 (o)
770-551-8105 (f)
david.myers@fisherbroyles.com

**SHRAIBERG, FERRARA & LANDAU, P.A.**

Bradley S. Shraiberg, Esq.
Florida Bar No. 121622

---

[3]    As NCF noted in its Response to Plaintiff's Motion for Partial Summary Judgment, there are well-founded justifications for Minnesota's charitable contribution amendment (and for subsequent similar amendments in Georgia and Florida). *See* ECF No. 87 at 12. *See also* J. Davis, Choosing Among Innocents: Should Donations to Charities Be Protected from Avoidance as Fraudulent Transfers?, 23 *U. Fla. J.L. & Pub. Pol'y* 407, 422 (2012) (concluding that charitable donations should be protected, in part because "the defrauded investors are the better risk bearers").

2385 NW Executive Center Drive, Suite 300
Boca Raton, Florida 33431
Telephone: 561-443-0800
Facsimile: 561-998-0047
bshraiberg@sfl-pa.com

Attorneys for National Christian Charitable
Foundation, Inc.

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was furnished via Notice of Electronic Filing to those parties registered to receive electronic filings on this the 17th day of November, 2014.

By: */s/ David J. Myers*
David J. Myers