

**ORDERED in the Southern District of Florida on April 20, 2018.**

**Erik P. Kimball, Judge**
**United States Bankruptcy Court**

---

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF FLORIDA
## WEST PALM BEACH DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| | CASE NO. 09-36379-EPK |
| **Palm Beach Finance Partners, L.P. and** | CASE NO. 09-36396-EPK |
| **Palm Beach Finance II, L.P.,** | (Jointly Administered) |
|     Debtors. | |

_____/

**Barry E. Mukamal, as Liquidating Trustee,**

    Plaintiff,

v.                              ADV. PROC. NO.  11-02940-EPK

**The National Christian Charitable**
**Foundation, Inc., d/b/a The National**
**Christian Foundation, Inc.,**

    Defendant.

_____/

### ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT

    In this adversary proceeding, the liquidating trustee for the Palm Beach Finance Liquidating

Trust and the Palm Beach Finance II Liquidating Trust sues The National Christian Foundation, Inc.,

seeking a money judgment for claims arising in state law fraudulent transfer and unjust enrichment.

This bankruptcy case, and the present adversary proceeding, stem from one of the largest Ponzi schemes in United States history.  More than twenty years ago, Thomas Petters began soliciting investments to facilitate his purchase of overstock consumer products from manufacturers or suppliers and the sale of those products to major retailers.  Mr. Petters claimed to need the financing to bridge the time between payment to the suppliers and receipt of payment from the purchasing retailers.  Many of these investments were made directly through Petters Company, Inc.  Others were made through special purpose entities affiliated with that entity and controlled by Mr. Petters.[1]  The investments were documented with typical commercial notes and agreements and were supposedly secured by the underlying inventory.  Palm Beach Finance Partners, L.P. and Palm Beach Finance II, L.P., the debtors in this case, were formed in 2002 and 2004, respectively, to facilitate investment with the Petters enterprise.  Nearly all of the money raised by the debtors was used to purchase notes issued by Petters.  Unfortunately, the entire Petters financing scheme was a fiction.  There were no agreements to buy or sell merchandise.  There was no merchandise.  Instead, Mr. Petters and his conspirators ran a multi-billion dollar Ponzi scheme, taking in money from new investors, using some of it to pay prior investors, and absconding with the rest.  The scheme came to an end in 2008 when the Federal Bureau of Investigation arrested Mr. Petters, who was later convicted of several federal crimes and sentenced to 50 years in prison.

The principals of the debtors were originally introduced to Petters by Frank Vennes.  Mr. Vennes and his company, Metro Gem, Inc. ("MGI"), had invested in Petters transactions for several years.  The plaintiff alleges that the debtors are creditors of MGI because MGI and Mr. Vennes made material misrepresentations and omitted materially important facts relating to the Petters investments, and because MGI and Mr. Vennes breached their fiduciary duties to the debtors, thus causing damage to the debtors. The plaintiff filed a separate adversary proceeding against Mr. Vennes and MGI based

---

[1] For purposes of this order, the word "Petters" is used to indicate Petters Company, Inc. and its affiliates.

in fraudulent transfer and tort.    The parties settled that action.  Among other things, the plaintiff obtained a judgment against MGI in the amount of approximately $90.4 million and a judgment against Mr. Vennes in the amount of $6 million.

The plaintiff claims that, as creditors of MGI, the bankruptcy estates may avoid fraudulent transfers made by MGI to the defendant.  In counts 1 and 2 of the complaint, the plaintiff seeks avoidance of fraudulent transfers and a money judgment under provisions of Georgia law [*see* ECF No. 100].  These claims are based on four payments made by MGI to the defendant between January and December 2006, aggregating $9,010,000.  In count 3 of the complaint, the plaintiff seeks judgment in connection with the same transfers based in unjust enrichment.    The plaintiff also seeks prejudgment interest and an award of attorneys' fees and costs.

The claims presented in this adversary proceeding are not claims unique to bankruptcy.  They are not specifically provided for under the Bankruptcy Code itself, such as preference or fraudulent transfer claims under 11 U.S.C. §§ 547 and 548.  To the extent valid, the claims presented here were claims owned by the debtors when these bankruptcy cases were filed, became property of their bankruptcy estates under 11 U.S.C. § 541, and are now lodged with the plaintiff pursuant to the confirmed joint plan of liquidation in this case [ECF No. 444, Case No. 09-36379-EPK].  All of the claims presented in this adversary proceeding are "related to" matters within the meaning of 28 U.S.C. §§ 157(a) and 1334(b).  This adversary proceeding is a non-core matter in its entirety.

Both the plaintiff and the defendant filed motions for summary judgment.  Because certain of their requests for summary judgment address the same issues, the Court enters this single order addressing both motions.  The Court has considered the parties' motions pursuant to Fed. R. Bankr. P. 7056 and applicable law.

The plaintiff filed a motion seeking partial summary judgment that the debtors were at the time of the transfers and are now creditors of MGI, that MGI was insolvent at all relevant times, and

that certain affirmative defenses raised by the defendant fail as a matter of law [ECF No. 176].  The plaintiff argues that the debtors were creditors of MGI at the time of the transfers, focusing primarily on the claim that Mr. Vennes and MGI made negligent representations to the debtors with respect to their investments with Petters.  The plaintiff argues that MGI was insolvent at the time of the transfers because a substantial portion of MGI's assets consisted of finance receivables, payable by Petters, which finance receivables were not actually supported by collateral and Petters had no ability to pay other than to use funds taken from later investors in the Petters Ponzi scheme.  The plaintiff argues that in light of these facts the finance receivables had no value at all and MGI was continuously insolvent during the time of the transfers.   In addition, the plaintiff makes numerous specific arguments aimed at 16 of the affirmative defenses raised in the answer.

The defendant filed a motion seeking summary judgment in its favor on all claims presented [ECF No. 182].  The defendant argues that the debtors were not creditors of MGI at the time of the transfers and therefore the plaintiff does not have the authority to pursue fraudulent transfer claims under O.C.G.A. § 18-2-75[2] (count 2).  While the debtors later obtained a claim against MGI, in the form of a judgment entered by this Court, because the subject transfers did not render MGI's remaining assets unreasonably small in relation to its business or transactions the defendant argues that the trustee may not pursue fraudulent transfer claims under O.C.G.A. § 18-2-74 (count 1).  If both of these arguments are true, then the plaintiff would have no ability to pursue state law fraudulent transfer claims against the defendant.  In mirror image to the plaintiff's motion, the defendant argues that MGI was solvent at the relevant times, on the ground that MGI actually received payment in full for all finance receivables shown in its books on the dates of the transfers.  The defendant waives certain of its previously presented affirmative defenses.  The defendant challenges the plaintiff's

---

[2] The Court notes that in 2015 Georgia adopted the Uniform Voidable Transactions Act in lieu of the Uniform Fraudulent Transfer Act.  However, the law applicable to this case is the Georgia Uniform Fraudulent Transfer Act and statutory citations in this order refer to that Act.

arguments on five of the affirmative defenses addressed in the plaintiff's motion for summary judgment, which include the defendant's arguments on the solvency of MGI and that the debtors were not creditors of MGI.  In addition, the defendant argues that even if the debtors were or are creditors of MGI, any tort claims the plaintiff holds against MGI are barred by the doctrines of *in pari delicto* and unclean hands.  Finally, because the transfers in question were charitable contributions to the defendant and the defendant almost immediately transferred nearly all of the funds received from MGI to another entity, the defendant argues that it was not unjustly enriched by the transfers, except potentially with regard to a total of $25,000 in fees retained by the defendant.

The solvency or insolvency of MGI at certain times is a central issue in this litigation.  The fraudulent transfer claims presented here are brought under Georgia law [*see* ECF No. 100].  The specific statutory provisions are O.C.G.A. §§ 18-2-74 and 18-2-75.  Count 2 seeks relief under O.C.G.A. § 18-2-75 and so relies explicitly on the allegation that MGI was insolvent at the time of each of the transfers.  In count 1, the plaintiff also alleges that MGI was insolvent at the time of the transfers.  While this is not required for relief under O.C.G.A. § 18-2-74, proof of insolvency may support that claim.  With regard to count 3, as the defendant is a charitable organization it is difficult to see how the defendant was unjustly enriched by the transfers from MGI if MGI was solvent and otherwise able to pay its obligations on the relevant dates.

"A debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation."  O.C.G.A. § 18-2-72.  During the period of the transfers, essentially all of 2006, MGI's balance sheet showed significant net assets.  If MGI's balance sheet during that period is an accurate depiction of the value of MGI's assets and liabilities, at a fair valuation, then MGI was solvent and the plaintiff cannot pursue any claim under O.C.G.A. § 18-2-75.  The parties' dispute focuses on a single category of assets which represented the majority of the assets shown on MGI's balance sheet -- so-called finance receivables.  In this category, MGI's balance sheet reflects all sums owing to MGI

as a result of MGI's investment activity.  It is undisputed that the lion's share of this asset category, more than 80%, is attributable to MGI's investments with Petters.  The plaintiff argues that the finance receivables attributable to Petters should be valued at $0 because it is undisputed that Petters had no actual underlying business, there was no collateral for the finance receivables, and so Petters could make payments to MGI only from funds taken from new Ponzi scheme victims.  The defendant argues that the finance receivables attributable to Petters should be valued as shown in MGI's balance sheet as MGI had no knowledge of the Petters scheme and MGI actually received payment in full of all amounts shown as finance receivables on the dates of the transfers.  Indeed, Petters did not default in regular payment to MGI until more than two years later when the Petters scheme was shut down.

As is apparent from the definition of "insolvent" in the Georgia statute, a definition common to actions under Georgia law and the avoidance provisions of the Bankruptcy Code[3], the determination of solvency must be made as of the date of the transfer sought to be avoided.  In this case, the relevant dates span from January to December 2006.

When determining insolvency, it is not appropriate to take into account facts that arose at a time after the date of valuation.  A good example would be a debtor whose primary asset is mineral rights in real property for the purpose of drilling for oil.  The value of such a debtor would be based in large part on the projected value of the oil that could be extracted.  This must necessarily be founded in part on assumptions with regard to the future market value of oil, looking to data available at the time of valuation.  But if the accepted projections for the market value of oil at the time of valuation are not born out by future transactions, this does not mean the valuation as of the past date should look to what actually happened in the market after the valuation date.  Courts typically reject this as inappropriate application of hindsight.  *Mellon Bank, N.A. v. Official Comm. of Unsecured Creditors of*

---

[3] *Kipperman v. Onex Corp.*, 411 B.R. 805, 835 (N.D. Ga. 2009); *Watts v. MTC Dev., LLC (In re Palisades at W. Paces Imaging Ctr., LLC)*, 501 B.R. 896, 910 (Bankr. N.D. Ga. 2013).

*R.M.L., Inc. (In re R.M.L., Inc.)*, 92 F.3d 139, 155 (3d Cir. 1996). But while the Petters Ponzi scheme was not uncovered until long after the transfers at issue in this case, it was in full swing during all of 2006. The Petters Ponzi scheme is not a fact that came into being after the valuation dates at issue in this case. It is a fact that existed at the time of the transfers but was not discovered until a later date.

That brings us to the crux of the parties' arguments on this issue. The plaintiff asks the Court to focus on the existence of the Peters Ponzi scheme in 2006, and the fact that there was no underlying collateral for MGI's finance receivables, to conclude that the finance receivables should be attributed no value at all. From the plaintiff's point of view, it does not matter if anyone knew of the Petters Ponzi scheme, other than its proponents, at the time of the transfers. The defendant asks the Court to focus on the fact that MGI did not know of the Petters Ponzi scheme at the relevant times, along with the fact that MGI actually received funds equal to the finance receivables on its books in 2006. From this data, the defendant argues that MGI's finance receivables should be given full value for purposes of solvency analysis.

It does not matter that MGI was ignorant of the Petters Ponzi scheme when it was making the transfers to the defendant. Purely subjective knowledge with regard to facts which may impact the value of one's assets is rarely relevant to valuation of the assets. Such a standard would cause the Court to value the same assets differently when owned by different parties, an arbitrariness not supported in the law.

The defendant argues that because all of the Petters finance receivables shown on MGI's books during 2006 were actually paid, meaning that MGI received payments from Petters equal to the contractual amounts owed, that the Petters finance receivables on MGI's books should be given full value for purposes of solvency analysis. This is an example of inappropriate use of hindsight in valuing an asset. On the date of each of the transfers, MGI's books showed amounts owing from Petters. On each of those dates, Petters had no actual business enterprise and could make payment to MGI

only by bilking other investors. That MGI later received payment from Petters does not change the fact that Petters never had the legal ability to pay MGI.

When valuing an asset or an entity, it is common to consider a hypothetical sale. *Lawson v. Ford Motor Co. (In re Roblin Indus., Inc.)*, 78 F.3d 30, 35-36 (2d Cir. 1996); *Syracuse Eng'g Co. v. Haight*, 110 F.2d 468, 471 (2nd Cir. 1940); *In re Coated Sales, Inc.*, 144 B.R. 663, 668-69 (Bankr. S.D.N.Y. 1992). Under one concept of the hypothetical sale, the Court assumes a transaction involving a willing seller and a willing buyer with all relevant knowledge. *In re Coated Sales, Inc.*, 144 B.R. at 668. The Court is not constrained by what was known at the time of valuation, but may apply facts in existence at the time of valuation even if those facts did not come to light until later. In other words, the hypothetical buyer is assumed to be omniscient. The Court may take into account circumstances on the valuation date that were discovered at a future time, even facts purposely concealed at the time of valuation. Under this view, such consideration does not implicate improper hindsight as it involves applying current awareness of facts actually in existence at the time of valuation rather than application of facts that did not exist at the time of valuation. *Id.* Returning to the Court's example above, of the debtor whose primary asset is mineral rights, while reliance on actual oil prices as of dates after the time of valuation would involve inappropriate application of hindsight, taking into account the later discovery that the debtor's oil reserves were larger than previously thought would not be prohibited as it involves only the recognition of the debtor's assets at the time of valuation.

In the present case, assuming a willing buyer with all relevant knowledge, including the fact that the finance receivables payable by Petters were not backed by any collateral and could be paid ultimately only from new Petters Ponzi scheme victims, it is obvious that most of MGI's finance receivables had no value at the times relevant to this case.

One might argue that the hypothetical sale that forms the basis for valuing an asset or entity should not be based on a buyer assumed to know all relevant facts, as such a valuation may differ

from a sale that could have taken place at the time of valuation.  Markets are not perfect and neither are potential buyers. An alternative approach is to assume a hypothetical buyer who is a sort of reasonable person for purposes of valuation.  Under this approach, the Court will not rely on facts that existed at the time of valuation but that were then unknowable, that were known only by a select few and so were in effect unknowable, or that could only be ascertained by a herculean effort requiring comparably outsized time, effort, or expense.  Returning again to the Court's example above, of the debtor whose primary asset is mineral rights, whether the Court would take into account larger oil reserves not known to the debtor itself at the time of valuation would depend on the evidence presented.  If a reasonable buyer would have investigated and discovered the debtor's larger oil capacity, then the Court would take into account the augmented value.  If a reasonable buyer would not have discovered the debtor's extra oil reserves, because technology would not have permitted discovery at the time, or the time and/or expense required to do so was outside the norm for due diligence, for example, then the Court would not take into account the extra capacity.

From the facts presented here, the Petters Ponzi scheme was discoverable by potential investors exercising reasonable diligence.  The defendant makes much of the fact, undisputed for purposes of these motions, that no one discovered the Petters scheme until years after the transfers in question.  But the plaintiff's own allegations indicate that reasonable diligence would have uncovered the scheme.  Petters claimed to buy goods from a small number of suppliers and to sell the same goods to a small group of purchasers.  There is nothing unusual about an investor or lender seeking to confirm the existence of a borrower's business transactions so as to ascertain the borrower's ability to pay.  Surely, any direct contact with Petters' claimed suppliers or Petters' claimed end purchasers would have revealed the fraud.  Discovering the fraud would not have required effort beyond the means of the typical commercial lender or investor or otherwise outside the norm in finance transactions.  That a series of investors failed to undertake commercially appropriate diligence

does not mean their actions were reasonable. The defendant suggests that Petters discouraged investor contact with any of the Petters transaction parties. This is not dispositive, as Petters' refusal to allow potential investors to do appropriate diligence itself indicates a material concern. Even if the Court values MGI's finance receivables based on a hypothetical transaction involving a reasonably diligent buyer rather than an omniscient buyer, the Court concludes that MGI's finance receivables owing from Petters, more than 80% of that category of assets, had no value on the transfer dates relevant to this case.

This does not end the analysis. The plaintiff asks the Court to start with the proposition that the finance receivables due from Petters had no value and from that determine that MGI was insolvent. Logic does not support this conclusion. The plaintiff assumes that the devalued Petters finance receivables leave a vacuum on MGI's balance sheet for which there is no substitute. The plaintiff argues that MGI's investment with Petters was entirely void in light of the Petters scheme. But the case law cited by the plaintiff for this proposition indicates only that MGI did not have a claim for profit on its investments, not that MGI lost its right to repayment of its principal investment. MGI actually invested funds with Petters. There is nothing in the law that erased MGI's claim for return of its principal investment, whether that claim is based in contract, tort or equity.

The question, then, is how to value MGI's claims against Petters as they existed at the time of the transfers. It is tempting to take into account the fact that MGI received payment from Petters, which apparently included not only return of MGI's principal investment but also supposed investment returns. While the investment returns would be subject to recovery in any eventual bankruptcy case of Petters, in most circumstances investors in Ponzi schemes are permitted to retain payments to the extent they represent return of their principal investment. *Perkins v. Haines*, 661 F.3d 623, 627 (11th Cir. 2011); *Mukamal v. Mansour (In re Palm Beach Fin. Partners, L.P.)*, No. 11-02987, 2013 Bankr. LEXIS 5762, at *9-12 (Bankr. S.D. Fla. Sept. 12, 2013). One might argue that because most

of what MGI received from Petters was return of its principal investment, then the finance receivables relating to those payments had actual value equal to the portion of the payments attributable to return of principal. But this is another example of inappropriate application of hindsight. On the transfer dates, there was no way to know that MGI would receive future payments from Petters, which could only be made by Petters defrauding new investors. Even if such payments were to be made thereafter, it was impossible to know whether any portion or all of such then future payments might be subject to avoidance, for example as a preference under 11 U.S.C. § 547, in the inevitable liquidation of Petters.[4] The value of MGI's claims against Petters as of the transfer dates must be determined without taking into account that MGI thereafter received payments from Petters ostensibly on account of those claims.

Because there is no evidence before the Court with regard to the value of MGI's claims against Petters as of the transfer dates, neither party is entitled to summary judgment on the issue of insolvency.

To obtain relief under section 18-2-74 (count 1), the plaintiff must prove that MGI "was engaged or was about to engage in a business or transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction." The defendant argues that this provision requires a causal relationship between the transfers at issue and the debtor's capital position as it relates to the debtor's business or transaction. The defendant argues that "if MGI's assets were unreasonably small, for any reason, that condition existed both before and after the Transfers through NCF, and on a large enough scale that the Transfers themselves had no meaningful impact on MGI's assets." The defendant's legal argument is supported by the text of the statute itself.

---

[4] One might argue that the eventual bankruptcy of Petters was, from the point of view of the transfers, a future event not yet known and that to take into account Petters' bankruptcy is itself an inappropriate application of hindsight. But there is no other alternative. On the dates of the transfers, Petters was operating a massive Ponzi scheme. There was no legitimate business. The reasonably foreseeable outcome for Petters was liquidation under the federal bankruptcy laws.

The statute directs the Court to consider the "remaining assets" of the debtor/transferor, that is, the assets left after the transfer sought to be avoided. This requires a comparison of the transferor's capital condition before and after the transfer in question. The plaintiff must show that the transfer at issue left the debtor with unreasonably small capital. *See Pioneer Home Builders, Inc. v. Int'l Bank of Commerce (In re Pioneer Home Builders, Inc.)*, 147 B.R. 889, 894 (Bankr. W.D. Tex. 1992); *Bakst v. United States (In re Kane & Kane)*, No. 10-01022-EPK, 2013 Bankr. LEXIS 1139, at \*26-28 (Bankr. S.D. Fla. Mar. 25, 2013).

In most cases, the determination of whether a transferor was left with unreasonably small capital after a transfer is a fact intensive analysis, and so typically not subject to summary judgment. *In re Kane & Kane*, 2013 Bankr. LEXIS 1139, at \*23-26. Here, although it is undisputed that MGI continued in business for years after the transfers in question, this is not dispositive as the determination of unreasonably small capital, like insolvency, must be done as of the date of the transfer in question. If MGI was at the time hopelessly unable to meet its financial obligations because its primary assets were valueless, the transfers did not cause MGI to be left with unreasonably small capital as it already had unreasonably small capital. If MGI was from the point of view of that time projected to have sufficient cash flow to continue to meet its financial obligations, the transfers were just a drop in the bucket, not large enough in relation to MGI's overall business to materially detract from its overall capital condition. But, as discussed above, neither of these views as to valuation of MGI's assets is correct. Because it is not possible at this stage of the case to ascertain the financial status of MGI on the relevant dates, it is also not possible to compare that financial status to the transfers at issue to determine whether they caused MGI to be left with unreasonably small capital. The defendant is not entitled to summary judgment on this issue.

The plaintiff's claim under section 18-2-74 (count 1) requires that the plaintiff be a creditor of MGI, with a claim arising either before or after the dates of the transfers. MGI is liable to the debtors'

estates as a result of a judgment entered by this Court, and so the plaintiff (as fiduciary for the debtors' estates) holds a claim against MGI sufficient to support relief under section 18-2-74.

The plaintiff's claim under section 18-2-75 (count 2) requires that the debtors were creditors of MGI prior to the dates of the transfers. To support the existence of such pre-transfer claims, the plaintiff points to its complaint against MGI filed in another adversary proceeding in this Court. Adv. Proc. No. 11-03041. Although the plaintiff's separate complaint against MGI sets out claims based in several legal theories, in its summary judgment motion here the plaintiff focuses on the claim that Mr. Vennes, as principal of MGI, made negligent representations to the debtors about Petters. The plaintiff argues that section 18-2-71 requires that the plaintiff hold only "a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, legal, equitable, secured, or unsecured." The plaintiff argues that, because the debtors' pre-transfer claims against MGI need not be liquidated or proven prior to pursuing a fraudulent transfer claim under section 18-2-75, the plaintiff need not present any evidence to support the pre-transfer claims at this stage of the present fraudulent transfer case. The plaintiff argues that merely stating the basis for the pre-transfer claims, by reference to the separately filed complaint against MGI, is sufficient to avoid summary judgment on the fraudulent transfer claims under section 18-2-75. The defendant argues that, as with any component of a claim subject to a motion for summary judgment, the plaintiff must point to evidence to support each of the material allegations underlying the alleged pre-transfer claims of the debtors against MGI. The defendant also argues that the plaintiff cannot prove any pre-transfer claim by the debtors against MGI because, at the time of the transfers, MGI had not suffered any damages. The defendant then attacks each of the claims presented in the plaintiff's separate complaint against MGI. The defendant argues that all of the plaintiff's tort claims against MGI are barred under the doctrine of *in pari delicto*. In this regard, the defendant argues that the debtors perpetuated the Petters Ponzi scheme in the same way that the

plaintiff argues MGI perpetuated the Petters Ponzi scheme, and so the debtors are at least as much at fault for their own harm. Finally, the defendant argues that the judgment entered by this Court against MGI in favor of the plaintiff did not establish any pre-transfer claim against MGI as it was a consent judgment arising from a settlement and thus not a determination on the merits, and even if the consent judgment is considered a ruling on the merits the defendant is entitled to contest the underlying claims anew in this action.

A plaintiff may simultaneously seek liquidation of a claim against an entity and also recovery of a fraudulent transfer made by that entity to another, with the goal of facilitating collection on the primary claim once it is proven. But that the primary claim need not have been liquidated or proven prior to commencement of a fraudulent transfer action, seeking relief from the recipient of a transfer from the claimant's alleged obligor, does not mean that one may obtain a fraudulent transfer judgment without ever proving the primary claim against the transferor. It is obvious from the statute itself that one cannot obtain recovery from someone's transferee unless one first obtains a right to collect from the transferor. *See* O.C.G.A. § 18-2-77. The fraudulent transfer action is a collection activity. One must have a legally enforceable right to payment before one may collect. *Jahner ex rel. Jahner v. Jacob*, 515 N.W. 2d 183, 184-85 (N.D. 1994); *Remington-Rand, Inc. v. Emory Univ.*, 196 S.E. 58 (Ga. 1938) ("The right to equitable relief . . . is dependent upon the right to enforce the debt.").

The defendant in this case seeks summary judgment on all components of the plaintiff's claim under section 18-2-75 (count 2). One element of the plaintiff's case is to prove that the debtors have claims against MGI that were in existence at the time of the subject transfers. By its motion for summary judgment, the defendant challenges the existence of pre-transfer claims of the debtors against MGI.

A motion for summary judgment is a substitute for trial on some or all issues presented in a complaint or counterclaim. As with the defendant's motion for summary judgment here, it may

constitute a request that the Court enter judgment without trial on the grounds that there are no material facts in dispute and the Court can apply the law to the undisputed facts. If, when challenged by a motion for summary judgment, a party seeking relief is unable to provide evidence to support an element of its case, judgment may be entered against it. At trial, the plaintiff would be required to put on evidence to support its allegation that the debtors have pre-transfer claims against MGI that could support relief under section 18-2-75. At trial, the plaintiff would not be permitted to simply rely on the bald allegations in its separate complaint against MGI to prove this element of its case. In response to the defendant's motion for summary judgment, the plaintiff should have presented affidavits, transcripts or other admissible evidence to support each factual element of the debtors' negligent misrepresentation claims against MGI. Instead, the plaintiff presented only its substantially unsupported separate complaint against MGI. Amazingly, in a reply brief the plaintiff states that the allegations in the separate complaint against MGI "as Defendant well knows, are based on (among other things) the uncontroverted testimony of Bruce Prevost and the investment summary MGI gave to [the debtors]" [ECF No. 202, p. 8], yet the plaintiff did not point the Court to any testimony of Mr. Prevost in connection with these motions. The plaintiff failed to adequately respond to the defendant's motion for summary judgment on whether the debtors have pre-transfer claims against MGI. The defendant is entitled to summary judgment on this issue. As a result, the plaintiff may not obtain any relief in this action under section 18-2-75 (count 2).

The defendant also argues that the plaintiff failed to show that the debtors had pre-transfer claims against MGI as the debtors at that time were being paid by Petters and so had not suffered any damages as of those dates. The defendant argues that without damages there is no pre-transfer claim against MGI, and so no basis for a fraudulent transfer claim against the defendant under section 18-2-75 (count 2). Yet, assuming the plaintiff could prove the other elements of a negligent misrepresentation claim against MGI, it is obvious that the debtors suffered damages at the time of

their investments. Petters had no actual business; it was entirely a Ponzi scheme. The debtors were undoubtedly harmed by giving money to Petters. That Petters later stole from new Ponzi scheme victims to make payments to the debtors does not negate that harm. The only issue with regard to damages would be the amount. The defendant is not entitled to summary judgment based on this argument.

Finally, on this issue, the defendant argues that the consent judgment against MGI in favor of the plaintiff, which resulted from a settlement, is not an adjudication on the merits of the pre-transfer claims presented in the plaintiff's separate complaint against MGI, and so the defendant would be able to challenge the existence of such pre-transfer claims against MGI. This is undoubtedly the case and the plaintiff conceded the point [ECF No. 202, p. 8]. The plaintiff's consent judgment against MGI does, however, represent a present claim by the plaintiff against MGI and so supports relief under section 18-2-74 (count 1).

The defendant's answer lists 22 affirmative defenses [ECF No. 29].[5] The plaintiff challenges affirmative defenses 1, 2, 3, 4, 5, 6, 8, 9, 10, 11, 14, 15, 16, 18, 19 and 20 [ECF No. 176]. In its response, the defendant withdraws affirmative defenses 1, 2, 3, 4, 5, 6, 14, 16, 18, 19 and 20 [ECF No. 184]. This leaves affirmative defenses 8, 9, 10, 11 and 15.

In affirmative defense 10, the defendant argues that the debtors are not creditors of MGI. As discussed above, the Court agrees that the plaintiff failed to show at summary judgment that the debtors were in fact creditors of MGI on the dates of the transfers and the Court will enter summary judgment in favor of the defendant on the claims under section 18-2-75 (count 2). The plaintiff is a creditor of MGI at this time as the plaintiff holds a judgment against MGI entered by this Court, and

---

[5] Certain of the defenses labelled as affirmative defenses are not in fact affirmative defenses but arguments attempting to negate elements of the plaintiff's claims. The defenses at issue are nonetheless subject to partial summary judgment.

that judgment supports the relief requested under section 18-2-74 (count 1). Affirmative defense 10 is no longer at issue in this case.

In affirmative defense 15, the defendant argues that MGI was solvent on the relevant dates. As discussed above, neither party is entitled to summary judgment on the issue of MGI's insolvency. Affirmative defense 15 remains at issue in this case. The Court notes that insolvency is an element of the plaintiff's claim for which the plaintiff has the burden of proof, and so this is not actually an affirmative defense.

In affirmative defense 8, the defendant argues that the debtors' tort claims against MGI are barred in light of the doctrine of *in pari delicto*. The defendant relies in part on a decision of the Seventh Circuit, *Peterson v. McGladrey LLP*, 792 F.3d 785 (7th Cir. 2015). In *McGladrey*, a bankruptcy trustee for funds that had been established to raise investment for the Petters enterprise sought a judgment against one of the funds' auditors on a claim based in accounting malpractice. The trustee claimed that McGladrey had failed to "perform the sort of spot checks that would have revealed that Petters had no business other than recycling investors' funds while skimming some off." *Id.* at 786. McGladrey claimed that if it was culpable so were the funds and so the doctrine of *in pari delicto* barred McGladrey's liability. *Id.* Instead of trying to show that the funds' principal was involved in the Petters scheme itself, McGladrey argued that the funds' principal "committed a fraud of his own." *Id.* at 787. McGladrey showed that the funds' principal had represented to investors that their investments were secured by Petters' inventory and that buyers from Petters made payments into lockbox accounts controlled by the funds rather than by Petters. McGladrey showed that the funds' principal knew these statements to be false and made the representations to obtain investments in the funds. *Id.* The trial court concluded that McGladrey's alleged malpractice and the misrepresentations of the funds' principal lead to the same harm to the investors, that elimination of either of these acts would have prevented loss to the investors. *Id.* The issue before the Seventh Circuit was whether, for purposes

of *in pari delicto*, the alleged wrongdoing of the plaintiff and the defendant must be identical, meaning

the same misconduct, or whether the doctrine applies where the parties "commit different misconduct

that contributes to a single loss." *Id.* Looking to the history of the doctrine of *in pari delicto*, and finding

no contrary law, the Seventh Circuit determined that a tort claim may be barred by *in pari delicto* where

the plaintiff's own conduct was at least equally responsible for the harm to it even if that conduct is

not the same as the allegedly wrongful conduct of the defendant. *Id.* at 787-88. The Seventh Circuit

focused on wrongful acts that resulted in the same eventual harm, not requiring that those wrongful

acts be identical in nature or coordinated toward that harm. The *McGladrey* decision is well reasoned

and the Court adopts the analysis of the Seventh Circuit in full.

The facts presented in *McGladrey* are very similar to the facts of this case.[6] The principals of

the debtors in this case were convicted of securities fraud based in part on their having assured the

debtors' investors that the purchasers of inventory through Petters were making payments to a bank

account controlled by the debtors. The debtors' principals knew these statements to be false and they

made these misrepresentations to obtain further investments. As in McGladrey, the debtors' actions

were at least equally the cause of harm to the debtors as the alleged actions of MGI. If the Court's

analysis stopped here, the defense of *in pari delicto* would bar all relief requested by the plaintiff in this

case.

The plaintiff points out that the debtors' former management, the people actually involved in

making knowingly false representations to the debtors' investors, were removed from control in 2008

and replaced with steering committees of limited partners. In other words, the injured investors took

---

[6] The plaintiff's attempt to distinguish *McGladrey* is unavailing. All of the "facts" pointed to by the plaintiff in its
argument [ECF No. 186] are things not in any way relied on, or in many instances even mentioned, by the Seventh
Circuit in the decision addressed here.

control of the debtors.  The steering committees thereafter retained a chief restructuring officer who later filed voluntary bankruptcy petitions commencing this case.

All of the claims pursued by the plaintiff in this case are state law claims that became property of the debtors' bankruptcy estates under 11 U.S.C. § 541.  With regard to such claims, the plaintiff, as trustee for the debtors' estates, is subject only to the defenses that were available against the debtors at the time this bankruptcy case was filed.  *Official Comm. of Unsecured Creditors of PSA, Inc. v. Edwards*, 437 F.3d 1145, 1149-51 (11th Cir. 2006).  Because the wrongdoers were removed from control of the debtors long before this bankruptcy case was filed, on the petition date the debtors would not have been subject to the *in pari delicto* defense and so neither is the plaintiff.  *Scholes v Lehmann*, 56 F.3d 750 (7th Cir. 1995) ("the defense of *in pari delicto* loses its sting when the person who is *in pari delicto* is eliminated").

The defendant argues that the Eleventh Circuit in *Edwards, supra*, rejected the analysis of the Seventh Circuit in *Scholes*, but this is not accurate.  The Eleventh Circuit rejected only the argument that appointment of a bankruptcy trustee should be given the same effect as appointment of a receiver, automatically terminating the *in pari delico* defense.  *Edwards*, 437 F.3d at 1151.  In light of 11 U.S.C. § 541, the trustee in *Edwards* obtained the debtor's state law claims subject to whatever defenses were available against the debtor on the bankruptcy petition date.  *Edwards*, 437 F.3d at 1150, 1152.  In *Edwards*, the debtor would have been barred from making the claims later alleged by the trustee, under the doctrine of *in pari delicto*, and so the trustee likewise was barred.  *Edwards*, 437 F.3d at 1156.  *Scholes* stands for the proposition that a debtor may no longer be subject to the *in pari delicto* defense when the persons responsible for the wrongdoing have been removed from control.  In this case, the debtors' management was replaced long before bankruptcy with a committee of the very investors who were harmed by the prior wrongdoing.  This had the same effect as appointment of the receiver in *Scholes*.  Indeed, as with the receiver in *Scholes*, the committee of limited partners that took over the

debtors had as their primary goal protecting the interests of the innocent investors.  *Scholes*, 56 F.3d at 754.  At the time the debtors filed their bankruptcy petitions, they had been cleansed of the bad actors and were no longer subject to the *in pari delicto* defense.  As a result, under the holding in *Edwards*, the trustee is also free from the *in pari delicto* defense.

The defense of *in pari delicto* does not bar the debtors' claims against MGI and thus does not bar recovery in this case.  For the same reasons, affirmative defense number 9 (unclean hands) must fail.  The plaintiff did not come to the Court with unclean hands.  Affirmative defenses 8 and 9 will not be considered at trial.

In affirmative defense 11, the defendant argues that the "plaintiff's claims are barred because they result in a multiple recovery."  The plaintiff responds saying that the transfers at issue aggregate $9,010,000 and that recovery from each of the potential fraudulent transfer defendants would never cause the plaintiff to be paid in full on its $90,427,889 judgment against MGI.  But this is mixing apples and oranges.  Just because the fraudulent transfer claims are brought in an effort to collect on the plaintiff's much larger judgment against MGI does not mean that the plaintiff can recover the same transfers over and over again.  *Kassman v. Am. Univ.*, 546 F.2d 1029, 1033, 1035 (D.C. Cir. 1976).  With regard to the fraudulent transfer claims, the plaintiff may of course recover from the defendant as initial transferee of MGI, and also from any subsequent transferee, but the aggregate of actual recoveries may not exceed the total of the transfers themselves, meaning $9,010,000.  The same principle applies to the plaintiff's claim based in unjust enrichment, as that claim is also an attempt to recover from the defendant value given by MGI to the defendant by way of the transfers.  If a judgment is entered in this case against the defendant on any theory, the judgment must be reduced by the sum of the actual amounts received by the plaintiff from subsequent transferees of the same transfers (not including amounts that were allocated to the Petters bankruptcy trustee pursuant to a prior settlement between the bankruptcy estates).  The Court does not currently have sufficient

information presented in the context of these motions to determine the exact amount of any such reduction, which may be determined at trial.

Finally, the defendant seeks summary judgment in its favor on the plaintiff's claim based in unjust enrichment (count 3). The defendant argues that it could not have been unjustly enriched as the transfers from MGI were charitable contributions to the defendant and the defendant almost immediately transferred nearly all funds received from MGI to another charitable entity, except with regard to a total of $25,000 in fees retained by the defendant. However, at a minimum, there is a material dispute of fact as to whether the defendant obtained sufficient control over the donated funds such that the defendant became the owner of the funds and thus subject to a claim for unjust enrichment. Indeed, the evidence pointed to by the defendant tends to support the conclusion that the defendant maintained unfettered discretion over the funds received from MGI. Specifically, it appears that the defendant retained complete authority to refuse to donate funds received from MGI in the manner MGI requested. That the defendant nevertheless donated most of the funds to the charity requested by MGI likely does not change this analysis. In any case, the defendant is not entitled to summary judgment in its favor on the plaintiff's unjust enrichment claims.

For the foregoing reasons, the Court hereby ORDERS and ADJUDGES as follows:

1. The defendant's request for summary judgment on count 2 of the complaint is GRANTED. After trial, the Court will enter judgment in favor of the defendant on count 2.

2. The plaintiff's request for summary judgment is GRANTED as to defendant's affirmative defenses 8 (*in pari delicto*) and 9 (unclean hands), which affirmative defenses will not be considered at trial. In light of the Court's rulings above, affirmative defense 10 (debtors' creditor status) is no longer at issue in this case and will not be considered at trial.

3. The defendant's request for summary judgment with regard to its affirmative defense 11 (multiple recovery) is GRANTED IN PART such that any judgment entered against the

defendant in this case shall be reduced by the total sum actually received by the plaintiff from subsequent transferees of the same transfers (without taking into account any recoveries shared with the Petters bankruptcy trustee pursuant to a prior settlement between the bankruptcy estates).  The amount of the reduction will be determined at trial.

4.  All other relief requested in the cross motions for summary judgment [ECF Nos. 176 and 182] is DENIED.

5.  This adversary proceeding will proceed to trial on counts 1 and 3.

###

*Copies to all parties of record.*