

**ORDERED in the Southern District of Florida on March 20, 2019.**



Erik P. Kimball, Judge
United States Bankruptcy Court

---

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF FLORIDA
## WEST PALM BEACH DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| | CASE NO. 09-36379-EPK |
| **Palm Beach Finance Partners, L.P. and** | CASE NO. 09-36396-EPK |
| **Palm Beach Finance II, L.P.,** | (Jointly Administered) |
|     Debtors. | |

_____/

**Barry E. Mukamal, as Liquidating Trustee,**

    Plaintiff,

v.                                                  ADV. PROC. NO.  11-02940-EPK

**The National Christian Charitable**
**Foundation, Inc., d/b/a The National**
**Christian Foundation, Inc.,**

    Defendant.

_____/

### ORDER GRANTING MOTION FOR SUMMARY JUDGMENT ON COUNT 1

In count 1 of this adversary proceeding, the sole remaining request for relief, the liquidating

trustee for the Palm Beach Finance Liquidating Trust and the Palm Beach Finance II Liquidating

Trust sues The National Christian Foundation, Inc. seeking a money judgment for claims arising in state law fraudulent transfer. This Court previously granted summary judgment in favor of the defendant on counts 2 and 3 of the complaint, leaving only count 1 for trial. ECF Nos. 241 and 259. The Court assumes familiarity with its *Order on Cross Motions for Summary Judgment* [ECF No. 241] and will not repeat the background of the case except as necessary for purposes of this order. After the Court's prior summary judgment ruling, the defendant filed its *Defendant NCF's Motion for Summary Judgment on Count I* [ECF No. 270], the motion at issue here, in which it argues again that it is entitled to summary judgment on count 1 of the complaint. The Court heard argument on the motion on January 4, 2019. The Court has considered the motion, the response [ECF No. 277], and the reply [ECF No. 288] consistent with Fed. R. Civ. P. 56, made applicable here by Fed. R. Bankr. P. 7056, and applicable law.

This bankruptcy case, and the present adversary proceeding, stem from one of the largest Ponzi schemes in United States history. More than twenty years ago, Thomas Petters began soliciting investments to facilitate his purchase of overstock consumer products from manufacturers or suppliers and the sale of those products to major retailers. Mr. Petters claimed to need the financing to bridge the time between payment to the suppliers and receipt of payment from the purchasing retailers. Many of these investments were made directly through Petters Company, Inc. Others were made through special purpose entities affiliated with that company and controlled by Mr. Petters.[1] The investments were documented with typical commercial notes and agreements and were supposedly secured by the underlying inventory. Palm Beach Finance Partners, L.P. and Palm Beach Finance II, L.P., the debtors in this case, were formed in 2002 and 2004, respectively, to facilitate investment with the Petters enterprise. Nearly all of the money raised by the debtors was used to purchase notes issued by Petters. Unfortunately, the entire Petters financing scheme was a fiction.

---

[1] For purposes of this order, the word "Petters" is used to indicate Petters Company, Inc. and its affiliates.

There were no agreements to buy or sell merchandise. There was no merchandise. Instead, Mr. Petters and his conspirators ran a multi-billion dollar Ponzi scheme, taking in money from new investors, using some of it to pay prior investors, and absconding with the rest. The scheme came to an end in 2008 when the Federal Bureau of Investigation arrested Mr. Petters, who was later convicted of several federal crimes and sentenced to 50 years in prison.

The principals of the debtors were originally introduced to Petters by Frank Vennes. Mr. Vennes and his company, Metro Gem, Inc. ("MGI"), had invested in Petters transactions for several years. The plaintiff alleges that the debtors are creditors of MGI because MGI and Mr. Vennes made material misrepresentations and omitted materially important facts relating to the Petters investments, and because MGI and Mr. Vennes breached their fiduciary duties to the debtors, thus causing damage to the debtors. The plaintiff filed a separate adversary proceeding against Mr. Vennes and MGI based in fraudulent transfer and tort. The parties settled that action. Among other things, the plaintiff obtained a judgment against MGI in the amount of approximately $90.4 million and a judgment against Mr. Vennes in the amount of $6 million.

The plaintiff claims that, as creditors of MGI, the bankruptcy estates may avoid fraudulent transfers made by MGI to the defendant. In count 1 of the complaint, the plaintiff seeks avoidance of fraudulent transfers and a money judgment under O.C.G.A. § 18-2-74,[2] a Georgia state law fraudulent transfer claim. *See* ECF No. 100. These claims are based on four payments made by MGI to the defendant between January and December 2006, aggregating $9,010,000. The plaintiff also seeks prejudgment interest and an award of attorneys' fees and costs.

The fraudulent transfer claims presented in count 1 are not claims unique to bankruptcy. They are not specifically provided for under the Bankruptcy Code itself, such as preference or fraudulent

---

[2] The Court notes that in 2015 Georgia adopted the Uniform Voidable Transactions Act in lieu of the Uniform Fraudulent Transfer Act. However, the law applicable to this case is the Georgia Uniform Fraudulent Transfer Act and statutory citations in this order refer to that Act.

transfer claims under 11 U.S.C. §§ 547 and 548.  To the extent valid, the claims presented here were claims owned by the debtors when these bankruptcy cases were filed, became property of their bankruptcy estates under 11 U.S.C. § 541, and are now lodged with the plaintiff pursuant to the confirmed joint plan of liquidation in this case [ECF No. 444, Case No. 09-36379-EPK].

To obtain relief under O.C.G.A. § 18-2-74, the plaintiff must prove that MGI did not receive "a reasonably equivalent value in exchange for the transfer" and that MGI "was engaged or was about to engage in a business or transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction."  The first of these two elements, that MGI did not receive reasonably equivalent value, is not disputed in this case.  The focus of the present motion for summary judgment is on the second element, whether MGI was engaged or was about to engage in a business or transaction for which its remaining assets were unreasonably small.  In ruling on the prior cross-motions for summary judgment, the Court held that to prove this element of its claim the plaintiff must show that the transfer sought to be avoided bears a causal relationship with, at a minimum, MGI's distressed capital position immediately following the transfer.  ECF No. 241.  In other words, as an initial matter the plaintiff must show that, as a result of the transfer, MGI did not have remaining assets sufficient to maintain its business.  When this question was previously addressed by the Court, the parties had not provided sufficient evidence to permit the Court to ascertain the financial status of MGI at the relevant times and so it was not possible to compare the financial status of MGI before and after the transfers to determine whether any of the transfers caused MGI to be left with unreasonably small assets.  As a result, the Court previously denied summary judgment on count 1.

Georgia, like every other state, provides for avoidance of a transfer made for less than reasonably equivalent value where the transferor's remaining assets are unreasonably small in relation to its business or the transaction. O.C.G.A. § 18-2-74.  Georgia, like every other state, also provides

for avoidance of a transfer made for less than reasonably equivalent value when the transferor is insolvent or is rendered insolvent by the transfer. O.C.G.A. § 18-2-75.  But the two measures of financial distress at the core of these claims—insolvency and unreasonably small assets—are distinct both in terms of the evidence required to prove them and, importantly for this case, the creditors that may pursue them.

"A debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation."  O.C.G.A. § 18-2-72.  This definition of "insolvent" in the Georgia statute is essentially the same as the definition of insolvency relied on for the avoidance provisions of the Bankruptcy Code. *Kipperman v. Onex Corp.*, 411 B.R. 805, 835 (N.D. Ga. 2009); *Watts v. MTC Dev., LLC (In re Palisades at W. Paces Imaging Ctr., LLC)*, 501 B.R. 896, 910 (Bankr. N.D. Ga. 2013).  To determine whether a debtor is insolvent, the Court must compare the debtor's debt obligations with the debtor's assets, at fair value, as of the relevant date.  This is often described as the balance sheet test.

Neither the Georgia statute, nor the parallel provisions of other uniform statutes or the Bankruptcy Code, provide a definition of "unreasonably small assets" (or "unreasonably small capital" as stated in the Bankruptcy Code).  Whether a transfer or obligation leaves a debtor undercapitalized is a question of fact to be determined on a case-by-case basis. *Smith v. Litchford & Christopher, P.A. (In re Bay Vista of Va., Inc.),* 428 B.R. 197, 225-26 (Bankr. E.D. Va. 2010).  Unreasonably small capital refers to the inability to generate sufficient profits to sustain operations. *Moody v. Sec. Pac. Bus. Credit, Inc.*, 971 F.2d 1056, 1070 (3d Cir. 1992). "Because an inability to generate enough cash flow to sustain operations must precede an inability to pay obligations as they become due, unreasonably small capital would seem to encompass financial difficulties short of equitable [in]solvency." *Id.*  "[T]he 'unreasonably small capital' test of financial condition is 'aimed at transferees that leave the transferor technically solvent but doomed to fail.'" *Kipperman v. Onex Corp.*, 411 B.R. 805, 836 (N.D. Ga. 2009)

(citations omitted). In determining whether a debtor was left with unreasonably small assets, the Court often is called upon to review a debtor's historic and contemporaneous business activities, relevant market data, the ebb and flow of income and expense over time, the availability of additional capital or lines of credit, the prospect for new business, and a variety of inter-related issues that affect whether the enterprise will continue. To meet the burden of proof on this issue typically requires expert testimony and/or substantial financial data from which the Court may ascertain the debtor's capital structure and business prospects around the time of the transfer in question. *See Kipperman,* 411 B.R. at 836-37; *see also In re TOUSA, Inc.,* 680 F.3d 1298, 1303 (11th Cir. 2012); *United States v. Menotte,* 484 B.R. 835 (S.D. Fla. 2012), *aff'd,* 745 F.3d 1342 (11th Cir. 2014); *Asarco LLC v. Ams. Mining Corp.,* 396 B.R. 278, 396-98 (S.D. Tex. 2008); *Daley v. Chang (In re Joy Recovery Tech. Corp.),* 286 B.R. 54, 76-77 (Bankr. N.D. Ill. 2002); *Official Comm. of Unsecured Creditors of Toy King Distribs., Inc. v. Liberty Savs. Bank, FSB (In re Toy King Distribs., Inc.),* 256 B.R. 1, 142 (Bankr. M.D. Fla. 2000). The Court should consider "all reasonably anticipated sources of operating funds, which may include new equity infusions, cash from operations, or cash from secured or unsecured loans over the relevant time period." *Moody,* 971 F.2d at 1072 n.24 (quoting Bruce A. Markell, *Toward True and Plain Dealing: A Theory of Fraudulent Transfers Involving Unreasonably Small Capital,* 21 Ind. L. Rev. 469, 496 (1988)).

A transaction or obligation leaves a debtor with unreasonably small assets when it creates an unreasonable risk of the debtor becoming insolvent, but not necessarily a likelihood that the debtor will become insolvent. John H. Ginsberg et al., *Befuddlement Betwixt Two Fulcrums: Calibrating the Scales of Justice to Ascertain Fraudulent Transfers in Leveraged Buyouts,* 19 Am. Bankr. Inst. L. Rev. 71, 92 (2011) (citing *In re Healthco Int'l, Inc.,* 208 B.R. 288, 302 (Bankr. D. Mass. 1997)). The state of unreasonably small assets differs from balance sheet insolvency. It is possible that a debtor will have assets at fair value which exceed its debts, but the assets are not sufficiently liquid to meet the debtor's payment obligations and its business is not otherwise adequate to generate cash flow, borrow, or acquire capital

investment to meet obligations as they come due. Such a debtor would be solvent but would suffer from unreasonably small assets. Bruce A. Markell, *Toward True and Plain Dealing: A Theory of Fraudulent Transfers Involving Unreasonably Small Capital,* 21 Ind. L. Rev. 469, 493-94 (1988). The opposite may also be true. A debtor may have regular cash flow or other access to funds sufficient to support timely payment of its obligations, but the actual sum of its assets at fair value may be less than the aggregate of its debts. Such a debtor would not suffer from unreasonably small assets but would be insolvent. Too frequently, insolvency and unreasonably small assets are equated in the case law, or at least no distinction is drawn. In many cases this is because insolvency and unreasonably small assets have occurred in tandem or have arisen so close in time as to support claims under either theory. In some cases, however, courts place an inappropriate gloss on these standards, failing to distinguish them. But, it is clear that insolvency is not the same as unreasonably small assets.[3]

Both of these standards—insolvency and unreasonably small assets—stem from the Statute of Elizabeth, enacted in 1571. 13 Eliz. c. 5 (1571). The Statute of Elizabeth was aimed at curtailing transfers made with actual intent to delay, hinder, or defraud creditors. *Id.* § 1. As it would be unusual for a debtor to admit fraudulent intent, the courts developed a number of "badges of fraud," a series of indicia gleaned from the facts of particular cases tending to lead to the conclusion that a transfer was made with fraudulent intent. Markell, *supra*, at 474. A common badge of fraud involved the transfer of assets without consideration, typically called a voluntary conveyance. *Id.* at 474 (citations omitted). The law developed such that voluntary conveyances were subject to avoidance only where the transferor was insolvent after the transfer. *Id.* at 474-75 (citations omitted). Insolvency was defined as an excess of liabilities over assets. *Id.* at 475 (citations omitted). This is substantially the same as the balance sheet insolvency test used under the Uniform Fraudulent Conveyance Act, as well as under

---

[3] "[T]he application of a *per se* rule subsuming unreasonably small capital within insolvency would appear unwarranted. Its blind application produces an antinomy; the automatic extension of standing to future creditors upon proof of insolvency—which is a result consciously not included in the statute." Markell, *supra*, at 494.

the parallel provisions of the Uniform Fraudulent Transfer Act (as adopted in the Georgia statute at issue in this case), the Uniform Voidable Transactions Act ("UVTA"), and the Bankruptcy Code.

From nearly the emergence of fraudulent transfer law, existing creditors of the transferor had standing to pursue recovery of fraudulently transferred assets.  As the law of fraudulent conveyances developed, subsequent creditors, meaning parties to whom the transferor later became indebted, also sought relief.  Recovery was permitted where such subsequent creditors were able to show that the challenged transfer was made with intent to hinder, delay, or defraud future creditors such as themselves. *Id.* at 475-76 (citing mostly 19th Century decisions in the United States).  To prove such a case, a subsequent creditor was required to show a connection between the transferor's intent and the harm to the subsequent creditor. *Id.* at 476 (citations omitted).  In other words, the standing of a subsequent creditor to seek avoidance of a transfer depended in part on its ability to show a causal connection between the transfer and nonpayment of the debt owing to the subsequent creditor.

In cases brought by subsequent creditors, there developed a new badge of fraud.  The badge of insolvency was found lacking in its ability to remedy fraudulent conveyances as to future creditors. To remedy this shortcoming, courts found evidence of actual fraudulent intent where the transferor was left technically solvent following the challenged transfer but the risk of the transferor's continued business was placed on its creditors. *Id.* (citing numerous early decisions in the United States).  "This risk shifting was seen as a species of fraud." *Id.* at 477.  Where a transfer left the transferor without the ability to obtain ongoing capital to operate its business and placed the risk of failure to a great extent on creditors who continued to trade with the transferor, this was found to indicate intent to harm subsequent creditors.  The standards developed at that time are the precursor to the unreasonably small assets standard in present law.

Over time, some of the case law addressing subsequent creditor fraudulent transfer claims began to drop the requirement of proof of actual intent to harm future creditors.  In some decisions,

subsequent creditors needed only to show that the transfer was without consideration and that the transferor's business thereafter lacked reasonable assets or access to capital to cover its foreseeable risks, at which point the burden of disproving a presumption of fraud shifted to the defendant. *Id.* at 481 (cases cited).

This was the state of the law at the time the Uniform Fraudulent Conveyance Act ("UFCA") was initially adopted by many states in 1918. Id. at 482. In the drafting of the UFCA, there was apparently considerable dispute over the ability of subsequent creditors to avoid constructively fraudulent transfers. *Id.* at 483-84. In the end, section 5 of the UFCA included a provision permitting subsequent creditors to avoid transfers made "without fair consideration when the person making it is engaged or is about to engage in a business or transaction for which the property remaining in his hands after the conveyance is an unreasonably small capital." UFCA § 5. Notably, section 5 of the UFCA explicitly does away with the need to prove actual intent. *Id.* The Bankruptcy Act of 1898 included this same standard. Markell, *supra*, at 484. The Bankruptcy Code, enacted in 1978, adopted nearly the same language, replacing the term "fair consideration" with "reasonably equivalent value" and permitting the avoidance of "obligations incurred" as well as transfers. 11 U.S.C. § 548(a)(1)(B). The Uniform Fraudulent Transfer Act ("UFTA"), adopted in 1984, likewise incorporated the reasonably equivalent value test and extended the potential for avoidance to obligations incurred. UFTA § 4(a)(2); Markell, *supra*, at 486. The UFTA replaced "unreasonably small capital" with "unreasonably small assets," a change intended to avoid confusion with corporate law concepts of capital. Markell, *supra*, at 486.

As a result of the historical development of fraudulent transfers at common law under parallel theories of relief, there is an important distinction between creditors who may pursue claims under the insolvency approach and creditors who may pursue claims under the unreasonably small assets approach. Under state law, including the UFCA, the UFTA, the UVTA, constructive fraud claims

based on insolvency may be brought only by creditors in existence at the time of the transfer or obligation sought to be avoided. Subsequent creditors may not rely on the insolvency of the transferor at the time of the transaction as the basis for a claim. There is some support for the view that this is because subsequent creditors have a better opportunity to determine the transferor's solvency following the transfer and may decline to do business with the transferor. Markell, *supra*, at 492. But constructive fraud claims based on unreasonably small assets may also be brought by those to whom the transferor became indebted after the transfer or obligation.

Beginning with the common law development of the right of subsequent creditors to avoid conveyances where the transferor was left with insufficient capital, through case law under the UFCA, the UFTA, the Bankruptcy Act, and the Bankruptcy Code, the law has consistently required some level of connection between the transfer sought to be avoided and the transferor's failure to pay the subsequent creditor. "An essential element of this formulation is the presence of a connection between the disputed transfer and non-payment of the creditor's claim. This requirement is historical; section 5 [of the UFCA] was distilled from cases which allowed creditors to attack a transfer only if they could somehow connect their non-payment with some universally agreed inference that the transferor, at a relevant time, knowingly left itself with too little reserves." *Id.* at 499. "The last prerequisite to finding inadequate capital is that the transfer must directly lead to non-payment." *Id.* at 504-06 (discussing several cases). Under much of the subsequent creditor case law, developing now in its third century, the causation element is not just a connection between the transfer sought to be avoided and the transferor's weakened financial state. Many courts require the causal connection to go further, requiring a showing that the transfer and the resulting financial distress are connected to the non-payment of the creditor's claim itself. A leading commentator has suggested that the subsequent creditor must show that "but for the transfer and the inadequacy of the transferor's resources, the plaintiff's claim would have been paid." *Id.* at 508.

In the sole remaining count of the complaint, the plaintiff is a subsequent creditor of MGI, seeking to avoid transfers made by MGI long before the plaintiff obtained a judgment against MGI. Under the facts of this case, the plaintiff cannot show that any of the transfers resulted in MGI having unreasonably small assets as the plaintiff conceded that MGI had unreasonably small assets before any of the transfers at issue in this case. But the plaintiff argues, for a second time in the present motion, that there is no need under the law for the plaintiff to show a causal connection between the transfers sought to be avoided and MGI's distressed financial condition. The plaintiff argues that the fact that MGI had unreasonably small assets after each of the transfers is sufficient to support the plaintiff's claims. There is little support for this position and the support that does exist flies in the face of more than 200 years of case law.

In its argument, the plaintiff focuses only on the causal connection between a transfer sought to be avoided and the financial condition of unreasonably small assets. The text of the statute itself supports the conclusion that there must be some connection between the transfer and the transferor's financial distress. As the Court pointed out in its prior order on cross-motions for summary judgment, the statute directs the Court to consider the "remaining assets" of the transferor, that is, the assets left after the transfer sought to be avoided. This requires a comparison of the transferor's capital condition before and after the transfer in question. As a start, the plaintiff must show that the transfer at issue left the debtor with unreasonably small capital. *Pioneer Home Builders, Inc. v. Int'l Bank of Commerce (In re Pioneer Home Builders, Inc.)*, 147 B.R. 889, 894 (Bankr. W.D. Tex. 1992); *Bakst v. United States (In re Kane & Kane)*, No. 10-01022-EPK, 2013 Bankr. LEXIS 1139, at *26-28 (Bankr. S.D. Fla. Mar. 25, 2013); *Murphy v. Nunes (In re Terrific Seafoods, Inc.)*, 197 B.R. 724, 736 (Bankr. D. Mass. 1996). Indeed, much of the case law addressing fraudulent transfer claims brought by subsequent creditors, developed over generations, indicates that the plaintiff needs to show more.

In its response, the plaintiff quotes extensively from a particular article, John H. Ginsberg et al., *Befuddlement Betwixt Two Fulcrums: Calibrating the Scales of Justice to Ascertain Fraudulent Transfers in Leveraged Buyouts*, 19 Am. Bankr. Inst. L. Rev. 71 (2011) (the "ABI Article").  But the plaintiff misconstrues the primary arguments in that article.  In the end, the ABI Article supports the Court's legal conclusions in this case.

The ABI Article was prompted by the authors' perception of unnecessary uncertainty in fraudulent transfer litigation based on unreasonably small capital, particularly in the context of failed leveraged buyouts. *Id.* at 71-91.  The primary purpose of the ABI Article is to provide "recommendations to make the law clearer and its outcomes more predictable" with regard to "constructive-fraudulent-transfer law generally, not merely as it applies to leveraged buyouts." *Id.* at 90.  The authors' recommendations focus on clarifying the meaning of "unreasonably small capital." *Id.* at 72.

In the ABI Article, the authors begin by stating a common definition of unreasonably small capital— "A transferor is left with 'unreasonably small capital' if it was 'reasonably foreseeable' at the time of transfer that the transferor would be left with insufficient cash-flow to sustain operations." *Id.* at 90-91. But the authors find this test too vague to guide parties to transactions or the courts.  The authors review a number of weaknesses in the analyses utilized in the case law which make it difficult and expensive to try fraudulent transfer cases using this theory. *Id.* at 92-98.  A review of this portion of the ABI Article will find it replete with references to the fact that, to present a fraudulent transfer claim based on unreasonably small assets, there must be at least a connection between the transfer sought to be avoided and the debtor's financial distress.  In describing and quoting from the case law, the authors use language such as "[a] transferor is left with", "as a result was left with insufficient assets", "a transaction leaves a company with unreasonably small capital" and the like.  *Id.* (internal quotations and citations omitted).  It is clear from the ABI Article that every decision analyzed by the

authors considered the effect of a challenged transfer on a debtor's ability to continue in business to determine whether that transfer was in fact the cause of the debtor's financial distress. In other words, the case law described in the ABI Article indicates a pervasive requirement that there be a causal relationship between the transfer sought to be avoided and the debtor's lack of assets necessary to address the foreseeable needs of its business.

A significant portion of the ABI Article is focused on three different approaches, found in the case law, of tying a challenged transfer to a debtor's precarious financial condition and the non-payment of creditors. The first approach described by the authors would support avoidance of a transfer "if insolvency was reasonably foreseeable at the time of the transfer" even if the "specific conditions precipitating insolvency were unforeseeable" at the time of the transfer. The second approach would necessitate a "specific-proximate-cause test" linking the transfer with non-payment of the plaintiff's claim. The third approach would require an "actual-cause test" connecting the transfer with non-payment of the plaintiff's claim. *Id.* at 99.

In defense of the first approach to "causation" addressed in the ABI Article, the authors argue that a transfer that "leaves the transferor undercapitalized harms creditors" by increasing the risk that the transferor will become insolvent and by increasing the risk that when the transferor does become insolvent that insolvency will be more severe. *Id.* at 100. The authors' entire analysis is based on the underlying premise that fraudulent transfer law requires that the transfer under scrutiny be the cause of the transferor's financial weakness—that the transfer be the event that "leaves the transferor undercapitalized." *Id.* This is the initial level of "causation" required by this Court in its prior order on cross-motions for summary judgment in this case. ECF No. 241. In our case, at a minimum the plaintiff must show that when MGI made a payment to the defendant, MGI was, as a result of that payment, placed at risk of becoming insolvent. The causal link required by this Court is a link between the transfer and MGI turning down the path toward insolvency.

In the ABI Article, the authors go on to criticize two other approaches to "causation" found in the case law. The second and third approaches discussed in the article are best described by the questions the authors pose to illustrate those approaches.

The second approach would require a court to ask "whether the circumstances precipitating insolvency were reasonably foreseeable." Ginsberg et al., *supra,* at 101. In other words, a court would need to determine, from the point of view of the date of the transfer, whether the circumstances that actually resulted in the debtor's insolvency were reasonably foreseeable to the parties to the transfer. If they were not, then the transfer would not be subject to avoidance. Under this approach, the "causation" required to be shown is between the transfer and the reasonably foreseeable circumstances that result in the later failure of the debtor. The transfer must not simply create credit risk for existing and future creditors of the debtor, as with the first approach, but must create circumstances where specific conditions are foreseeable which will and do in fact lead to the insolvency of the debtor. A defendant may defeat such a claim by offering evidence indicating that an intervening act or circumstance, such as adverse market conditions not foreseeable at the time of the transfer, was in fact the cause of the transferor's insolvency. As the authors point out, this is the type of causation required by the Third Circuit in its seminal decision in *Moody*, where the court required "a link between the challenged conveyance and the debtor's insolvency" based on factors foreseeable at the time of the conveyance. *Id.* at 101-02 (quoting *Moody*, 971 F.2d at 1071, 1074-75). Note that this second approach does not require the plaintiff to show that its loss was directly caused by the transfer but only that, based on foreseeable circumstances at the time of the transfer, the transfer precipitated the transferor's eventual insolvency.

The third approach requires an even more direct "causation" between the challenged transfer and the eventual failure of the debtor. In the ABI Article, the authors define the third approach with the question "whether the transferor would have become insolvent even without the transfer." *Id.* at

104. The third approach differs from the second in that, rather than looking primarily to the defendant to point out intervening circumstances that were not foreseeable at the time of the transfer and that resulted in the transferor's insolvency, the third approach would require the plaintiff to affirmatively prove that the later insolvency of the transferor depended on the specific transfer sought to be avoided. In other words, but for the transfer the transferor would not have become insolvent. This third approach to proving "causation" in the context of unreasonably small assets would markedly constrict matters where avoidance actions would be successful. Even so, the authors of the ABI Article were able to cite decisions where this approach was used. *Id.* at 104. A leading commentator on bankruptcy law has suggested that this is the appropriate approach to causation. Markell, *supra*, at 504-05.

In the end, the authors of the ABI Article rejected the second and third approaches to "causation" on the grounds that those approaches fail to remedy harm to creditors in many cases where the fraudulent transfer statutes are intended to apply. Ginsberg et al., *supra,* at 104-05. But, contrary to the plaintiff's argument, the authors of the ABI Article confirm that fraudulent transfer law in the context of subsequent creditor claims almost universally requires some level of causation. In the view of the authors of the ABI Article, the level of causation required to be proven should be in the form of a connection between the challenged transfer and the financial condition of the debtor that creates undue risk for existing and future creditors. *Id.* at 90-105.

In its prior ruling on summary judgment, this Court did not require the plaintiff to show a connection between a transfer sought to be avoided and reasonably foreseeable circumstances that would lead to MGI's failure, nor did the Court require the plaintiff to show that any transfer at issue in this case was the but for cause of MGI's eventual failure. This Court required only the minimum required under most of the case law, exactly the "causation" proposed as appropriate in the ABI Article. The plaintiff must show that a transfer the plaintiff seeks to avoid in count 1 resulted in MGI

becoming financially distressed such that there was then an unreasonable risk of MGI's eventual failure. The Court notes that, among the types of causation reviewed in the ABI Article, this is the most plaintiff-friendly option.

The chief objection to this view is that a transfer made at a time when a debtor is already in a position where its assets are unreasonably small, when it is already foreseeable that the debtor will become insolvent, is not actionable. A transfer that deepens a debtor's already existing financial instability cannot form the basis of a claim based on unreasonably small assets. The transfer subject to the avoidance action must be the transfer that brought about the condition of unreasonably small assets, thus creating an unreasonable risk of insolvency and payment default. Perhaps it seems initially strange that where a debtor makes a series of transfers some of which are before its assets are so depleted as to put it into the requisite financial uncertainty, and some of which fall after that point, only one of the transfers may be subject to avoidance as only that one transfer will be the straw that broke the camel's back, being the cause of the debtor having unreasonably small assets. But it must be kept in mind that the claim in question is one that may be brought by a creditor that did not exist at the time of the transfer. For such a creditor, the right obtained is a retrospective one unique to this provision of the law. It is reasonable to require that such a subsequent creditor, at a minimum, be able to point to the transfer sought to be avoided as the reason that the debtor was placed in a position leaving that future creditor at risk. If the debtor was already in financial distress before the transfer in question such that it was foreseeably doomed to insolvency, the recipient of the transfer should not be placed under the burden of a risk it did not create.

In its response, the plaintiff cites several decisions for the proposition that "[m]any courts find there is no requirement to show a causal link between the transfers at issue and the unreasonably small capital condition." Resp. 9 n.39, ECF No. 277. It is useful to review each of the cited decisions.

In *Askenaizer v. Anderson (In re Catco Recycling, LLC)*, No. 15-1012, 2016 WL 556173 (Bankr. D.N.H. Feb. 10, 2016), there is no discussion at all with regard to the connection between the alleged transfers and the allegation that the debtor had unreasonably small assets after the transfer. Presumably, the plaintiff wants the Court to note that the court in *Catco* permitted a claim under the unreasonably small assets theory where the facts seem to support the conclusion that the debtor had unreasonably small assets before the transfer date. Not only is there no analysis of the issue in *Catco*, but the plaintiff in that case was entitled to relief as a result of the debtor's insolvency and so the unreasonably small assets claim was not necessary to the relief granted. *Id.* at *9.

The plaintiff cites *Official Comm. of Unsecured Creditors of TOUSA, Inc. v. Citicorp N. Am. (In re TOUSA, Inc.)*, 422 B.R. 783 (Bankr. S.D. Fla. 2009) (subsequent history omitted), stating that the court in that case found "that the Conveying Subsidiaries were insolvent before the relevant transaction, were rendered more deeply insolvent by the transaction, and were left after the transaction with unreasonably small capital." Resp. 9 n.39, ECF No. 277. This description does not follow from the text of the *Tousa* decision. The *Tousa* decision is extensive, comprising 105 pages in its reported form. The court's anlaysis of the "unreasonably small capital" issue takes up less than one page. It is true that the court in *Tousa* pointed to the evidence of balance sheet insolvency as proof that the relevant transferors also had unreasonably small capital. *In re Tousa, Inc.*, 422 B.R. at 862. But the court in *Tousa* ends its analysis of the issue with the statement that the relevant transferors "faced considerable risk of failure <u>as a result of the transaction</u>." *Id.* (emphasis added). The court in *Tousa* thus explicitly pointed to the challenged transaction as the cause of the transferors' financial distress. This is consistent with this Court's view on the required causation.

The Court does not understand why the plaintiff cited *Manning v. Wallace (In re First Fin. Assocs.)*, 371 B.R. 877 (Bankr. N.D. Ind. 2007). In that case, all relief based in fraudulent transfer law, under the Bankruptcy Code and under the Indiana version of the UFTA, was based on the transferor's

insolvency and not on the theory of unreasonably small assets. Indeed, in that decision the words "unreasonably small" appear only in the headnotes and in quotations from the relevant statutes. The quote in the plaintiff's response, referring to the debtor having been "under water throughout its operations between 1996 and 1999" occurs in a paragraph where the court concludes that the debtor was insolvent within the meaning of section 101(32) of the Bankruptcy Code. *Id.* at 898.

In *Doctors Hosp. of Hyde Park, Inc. v. Desnick (In re Doctors Hosp. of Hyde Park, Inc.)*, 360 B.R. 787 (Bankr. N.D. Ill. 2007) (subsequent history omitted), it appears that the debtor had unreasonably small assets for the entire period encompassing the transfers at issue in that case, and the court found this sufficient to support relief under the Bankruptcy Code and state law. *Id.* at 870. But this Court notes that the analysis of unreasonably small assets is set out on a single page of the 94 page published decision, that the plaintiff in that case was successful on multiple theories of relief including other theories based in constructive fraud and so the unreasonably small capital analysis is not necessary to the judgment, and it appears that the issue of causation was not in any way raised before the court.

As the plaintiff argues, it appears that in *Geron v. Schulman (In re Manshul Constr. Corp.)*, 2000 WL 1228866 (S.D.N.Y. Aug. 30, 2000) the court did in fact find that the existence of unreasonably small capital before certain of the transfers sought to be avoided was sufficient to support avoidance of such transfers. The decision includes no analysis of the causation element this Court believes is required, nor does it appear that any party argued that prior existence of unreasonably small capital would negate the relief requested in that case. The *Manshul* decision can be cited by the plaintiff only for the proposition that the plaintiff's position follows from the outcome of the decision, but the opinion sheds no real light on the issue.

In *Gilbert v. Goble (In re N. Am. Clearing, Inc.)*, 2014 WL 4956848 (Bankr. M.D. Fla. Sept. 30, 2014), the court repeatedly references unreasonably small capital "at the time of the Transfers" even when the court is simply stating the legal theories available to the plaintiff in that case. *Id.* at *5. The

court in *North American Clearing* provides no rationale or citation for this proposition. More importantly, the quote included in the plaintiff's response is actually a quote from another decision, *EBC I, Inc. v. America Online, Inc. (In re EBC I, Inc.)*, 380 B.R. 348, 359 (Bankr. D. Del. 2008), which in turn cites the Third Circuit's decision in *Moody v. Security Pacific Business Credit, Inc.*, 971 F.2d 1056, 1073 (3d Cir. 1992). The Third Circuit in *Moody* was not analyzing the debtor's financial status "at the time of" the challenged transfers as suggested in *North American Clearing* and *EBC I*. The Third Circuit was looking at the debtor's financial status <u>after</u> the challenged transaction to determine whether the transaction <u>left</u> the debtor with an unreasonably small capital. *Moody*, 971 F.2d at 1073.

The plaintiff cites *Burtch v. Opus, LLC (In re Opus East, LLC)*, 528 B.R. 30 (Bankr. D. Del. 2015) for the proposition that the debtor's capitalization is to be determined as of the transfer date not as a result of the transfer. There is some language in that decision to support the plaintiff's position. But a closer review of the decision indicates that the court in *Opus East* blurred the lines among the insolvency, unreasonably small capital, and cash flow tests used in connection with constructive fraudulent transfer laws. For example, at one point in the decision the court states: "The Court concludes that, based on both the 'cash flow' and 'unreasonably small capital' test, the Debtor was not insolvent until February 1, 2009." *Id.* at 57. In the end, the court in *Opus East* denied recovery under any of these constructive fraud theories and so it is not clear whether causation, as discussed in this order, was at issue in any regard in *Opus East*.

The plaintiff also cites *Samson v. Western Capital Partners LLC (In re Blixseth)*, 514 B.R. 871 (D. Mont. 2014), *rev'd in part on other grounds*, 679 F. App'x 611 (9th Cir. 2017). In that case, the defendant had argued that there must be a "causal link" between the loan obligation sought to be avoided and the debtor's "ultimate financial ruin" and that the trial court was required to make a specific finding that the loan left the debtor with inadequate capital. *Id.* at 883. The defendant in that case cited *In re Pioneer Home Builders, Inc.*, 147 B.R. 889 (Bankr. W.D. Tex. 1992) for support. The *Blixseth* court

rejected any requirement of a causal link, ruling that the statute requires only a "showing that, at the time the transaction took place, [the debtor] had unreasonably small capital." *Id.* It should be pointed out that the argument made by the defendant in *Blixseth* incorporates two different kinds of causation, as outlined above in the Court's discussion of the ABI Article. The defendant argued first that the transfer must be the cause of the debtor's demise, an actual cause argument as discussed in the ABI Article, and then the defendant argued that there must be a link between the transfer and the debtor's financial distress, the view espoused in the ABI Article and by this Court. The Blixseth court rejected any causation requirement based apparently on the court's review of the *Pioneer Home Builders* decision. There is no detailed analysis of the issue in *Blixseth* and this Court gives the decision no weight.

It is true, as the plaintiff suggests, that the Third Circuit not long ago declined to specifically rule that its decision in *Moody* requires proof of a specific causal connection between the challenged transfer and the inadequacy of the debtor's capital position. *Whyte v. SemGroup Litig. Trust (In re SemCrude L.P.)*, 648 F. App'x 205, 212 n.6 (3d Cir. 2016). However, in that more recent unpublished decision, the Third Circuit encouragingly pointed out that '[t]here may be some force to this argument" and cited decisions in support of the proposition. *Id.* (citing *In re Terrific Seafoods, Inc.*, 197 B.R. at 736 and *In re Pioneer Home Builders, Inc.*, 147 B.R. at 894).

In the end, very few reported decisions explicitly state that, to prove a claim based in unreasonably small assets, there must be a "causal link" between the transfer sought to be avoided and the debtor's financial distress following the transfer. But it is apparent from a review of the case law that this is exactly what courts have been doing for more than two centuries. The ABI Article, discussed above, cites a number of these decisions. The few courts that have explicitly rejected the concept of a "causal link" fail to recognize the analyses undertaken by scores of courts in deciding fraudulent transfer cases, fail to understand the historical context and intent of this component of fraudulent transfer law and, in the end, ignore the language of the relevant statutes themselves.

In summary, to prevail under O.C.G.A. § 18-2-74, the plaintiff must show that a payment made by MGI to the defendant left MGI with unreasonably small assets. If MGI already had unreasonably small assets at the time of any challenged payment, then the payment did not leave MGI with unreasonably small assets. It is proper that a future creditor, such as the plaintiff in this case, should not have a claim in that instance as a transfer that has no potential causal connection to MGI's inability to pay the plaintiff's claim should not be actionable.

Based on the evidence before the Court on this motion for summary judgment, MGI had unreasonably small assets prior to any of the transfers at issue in count 1 of the complaint and so none of the transfers are actionable under O.C.G.A. § 18-2-74. At all relevant times, the sums owing to MGI as a result of MGI's investment activity were MGI's primary assets. It is undisputed that the lion's share of this asset category, more than 80%, was attributable to MGI's investments with Petters. As the Court explained in detail in its prior order on cross-motions for summary judgment, in light of Petters' Ponzi scheme and applicable law, MGI did not have an enforceable contract claim against Petters for MGI's expected "investment return." MGI had only a potential right to return of principal in the eventual liquidation of the Petters enterprise. The defendant did not offer any evidence contrary to that provided by the plaintiff on the issue of MGI's capital condition at the relevant times. Based on uncontroverted evidence now before the Court, prior to the first of the four payments at issue in count 1, and at all times thereafter, the total funds received by MGI from Petters exceeded the aggregate of every dollar MGI had ever invested with Petters. In other words, from before any payment by MGI to the defendant, MGI had no claim whatsoever against Petters. Indeed, because MGI had received more than return of its capital investment from Petters, MGI was subject to claims in the eventual liquidation of Petters. Yet MGI then had substantial bank debts, outstanding notes payable, and regular expenses. It is obvious that MGI did not have sufficient assets to remain in

business well prior to the transfers at issue here and so none of the transfers was the cause of MGI's financial distress.

For the foregoing reasons, summary judgment must be entered in favor of the defendant on count 1 of the complaint. Because the Court will have entered summary judgment in favor of the defendant on all counts of the complaint, the Court will enter judgment in favor of the defendant.

For the foregoing reasons, the Court hereby ORDERS and ADJUDGES as follows:

1.      The defendant's request for summary judgment on count 1 of the complaint [ECF No. 270] is GRANTED.

2.      The Court will enter a separate final judgment in favor of the defendant on all counts of the complaint.

###

*Copies to all parties of record.*